UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

       -against-

MARLEN RAPPA

14 Crim. 544

## SENTENCING MEMORANDUM
## ON BEHALF OF MARLEN RAPPA

Justine A. Harris
COLSON & HARRIS LLP
80 Broad Street, 19th Floor
New York, New York 10004
(212) 257-6455

*Attorney for Marlen Rappa*

Dated:   New York, New York
          March 6, 2015

# I.

## INTRODUCTION

Mr. Rappa pled guilty on October 31, 2014 to conspiracy to commit computer hacking, in violation of 18 U.S.C. § 1030(a)(2)(C). The Probation Department estimates an advisory Guidelines range of 6-12 months based on a total offense level of 10 and a criminal history category of I. Because the recommended guidelines range is in Zone B on the sentencing table, the minimum recommended sentence may be satisfied by a sentence of probation that includes intermittent confinement, community confinement or home detention. *See* U.S.S.G. § 5C1.1(c) and (e). We do not object to the guidelines calculation, but write to respectfully request that, consistent with the recommendation of the Probation Department, Your Honor impose a non-custodial sentence of probation.

The charges stem from Mr. Rappa's purchase and use of a malicious malware program, Blackshades. Mr. Rappa purchased the program online in February 2012. Over a two-year period, Mr. Rappa used Blackshades to infect over 90 computers, and retrieve photographs, music, and other material from those computers. He also used the program to turn on other people's webcams and take screen shots of what he saw. While he attempted to use the keylogger program, he could never get it to work. Mr. Rappa deeply regrets his conduct, which he understands is serious. He seeks neither to excuse nor minimize his crime.

Nevertheless, several factors warrant a sentence of probation. ████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

1

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

Second, unlike the vast majority of computer hacking defendants, Mr. Rappa never used the information he obtained to commit other crimes. He has no criminal history, and while his conduct in this case spanned a two-year period, that conduct stands in marked contrast to his prior unblemished record. (PSR ¶ 60).

Third, since his arrest, Mr. Rappa has taken substantial steps to turn his life around. ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████ Mr. Rappa is also working to build a healthier and more productive life in other respects. He took a course and obtained his commercial driver's license, and for several months was employed at a printing business. He has been compliant with the strict conditions of supervision and devotes his free time to his children and repairing his damaged relationship with his wife.

In support of our application, attached please find: a letter from Mr. Rappa (Exhibit A); a psychological evaluation of Mr. Rappa by Dr. Sasha Bardey (Exhibit B); a letter from Diane Harth, a licensed clinical social worker and Mr. Rappa's treating therapist (Exhibit C); letters of support from Mr. Rappa's mother and friends (Exhibit D); Mr. Rappa's certificate of completion of training for a CDL Class A license (Exhibit E); and photographs of Mr. Rappa's family and children (Exhibit F).

## II.

### MR. RAPPA'S PERSONAL HISTORY AND CHARACTERISTICS

Mr. Rappa, 42 years old, is a quiet, gentle and friendly man. Raised in New Jersey, his parents had a tumultuous relationship and divorced when he was 11. Mr. Rappa, an only child, took the divorce "very hard." (Ex. B at 3, PSR ¶ 66). After the separation, Mr. Rappa barely saw his father at all. (*Id.*). Mr. Rappa's mother, Margaret Alboher, was forced to return to work, and Mr. Rappa spent much of his adolescence alone, noting that he "'basically' raised himself." (Ex. B at 3*).* ████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Ms. Alboher confirms that during this time, Mr. Rappa was "very quiet and more withdrawn." (PSR ¶ 68).  When he stopped wanting to go to school, she placed him in counseling. Unfortunately, because his father refused to participate, the counseling did not last very long. (Ex. B at 3).

Mr. Rappa's teenage years remained troubled. He did poorly in school, skipping classes and receiving bad grades. (*Id.*). After being expelled from Westfield High School for absenteeism, he attended an alternative school for students with disabilities or other learning problems. He eventually dropped out in the 11th grade and took a year off before enrolling at a vocational school in Union County, where he studied graphic art and printing. (*Id*. at 4).

Printing became Mr. Rappa's vocation. From 1989 through 2008, he worked full-time at Prestige Graphics in Union, New Jersey. He worked in pre-press, making plates for the press and later using computers. Having the job and mastering printing skills gave Mr. Rappa enormous satisfaction and a sense of self-worth.

Mr. Rappa married Kelly DeSiena (now Kelly Rappa) in 2000. (PSR ¶ 71). Ms. Rappa is currently an assistant principal in a New Jersey public school. (*Id.* ¶ 72). The marriage had a strong foundation, and Mr. Rappa was happy. ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████    When the twins were born in 2007, Mr. Rappa and his wife decided he would work only three days a week to save on day care costs. In 2008, a new manager at Prestige Graphics told Mr. Rappa that he would have to work five days a week, or be laid off. Mr. Rappa and his wife decided that he would resign and be a stay-at-home dad. (Ex. A at 4).

Devoted to his children, Mr. Rappa did his best to care for the twins and manage the house. In his limited free time, Mr. Rappa worked to set up a home printing business (PSR ¶ 71.). However, the business did not take off and never returned a profit. (*Id.*). Ms. Rappa, who returned to work full-time shortly after having the children, also continued online courses to obtain her PhD. The courses cost substantial money, put a financial burden on the family, and consumed much of Ms. Rappa's non-work hours. (*Id.* ¶ 72).

The birth of the twins and the new home arrangement imposed enormous strain on the Rappas' marriage. The stresses of raising young children were compounded by the fact that when the twins were three years old, ████████████████████████████████████████. At some point, although Mr. Rappa felt he was doing his best with the toddler twins, Ms. Rappa unilaterally decided that Mr. Rappa could not handle the children and the household, and over time she increased the number of days they attended daycare. (*Id.* ¶ 71). By the time they were four, the twins were in daycare four days a week. Still, Mr. Rappa was a devoted father. As his friend David Reed writes, Mr. Rappa "maintained their home, cooked meals, took them to medical

appointments, taught them, played with them, and as they grew older, took them to many activities such as Karate, T-ball, baseball, Girl Scouts, and cheerleading." (Ex. C).

Indeed, for the past seven years, Mr. Rappa's children have been the center of his life. As his mother, Ms. Alboher, make clear in her letter, Mr. Rappa is a hands-on father. He is involved in every aspect of the twins' lives.  He cares for them when they are sick, supports and oversees their schoolwork, and spends all of his free time with them – taking them to cheerleading, karate and baseball.  As Ms. Alboher writes, but for the brief period when he was living with her, Mr. Rappa has seen his children almost every day since they were born." (Exh. D).

**III.**

**THE NATURE AND CIRCUMSTANCES OF THE OFFENSE**

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

It is during this time that Mr. Rappa first learned about Blackshades from a television program. Curious to see if this sort of malware could actually work, he purchased a copy online and began experimenting with it. The complaint sets out ways the program can be used to infect

other people's computers. However, rather than deploy these devices himself, Mr. Rappa paid

other individuals, who advertised in the hacker forum chat rooms, small fees to infect computers

on his behalf.

When Mr. Rappa gained access to another computer, he would typically look at music

and photos files and copy a few images. He found it hard to preview files while in another

computer, and so downloaded files sight unseen. If the initial files he viewed piqued his

curiosity, he might download the entire contents of selected folders on the target computer,

without knowing what exactly he was copying. He often opened up all the files with a single

keystroke. ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

In addition to accessing other people's files, Mr. Rappa tried to see if the keylogger

program could work. However, whenever he clicked on the "keylogger" tab, a blank window

appeared and he never successfully accessed any information typed in by the users of the target

computers. Mr. Rappa also manipulated the webcams on the target computers, taking screenshots

of what he saw. Although he often only saw an empty room, he sometimes viewed people in

more intimate settings or engaged in deeply private acts. ███████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████▌

While Mr. Rappa's intrusion into other people's private lives was serious, it is important

to emphasize that he never used the accessed material to commit other crimes. At no time did he

---

[1] During this same time period, Mr. Rappa experimented with other malware programs, but never used them
extensively, like he did with Blackshades.

contemplate accessing financial information to commit identity theft or some other form of fraud. Nor did he use the personal images he accessed to extort or threaten individuals. He also did not make contact with the target computers' users or try to scare them by remotely controlling their screen or mouse. As far as Mr. Rappa knew, his access was purely on the "back end," and even when he remotely accessed a webcam, the users had no way of knowing that he did so.

In short, while Mr. Rappa's unauthorized access of other people's computers is disturbing and admittedly criminal in its own right, his conduct was ultimately unsophisticated and personal. He did not use the information to hurt anyone, emotionally or financially, and, as far as we know, his victims remain unaware of his conduct.[2]

## IV.





## V.

## A SENTENCE OF PROBATION IS WARRANTED

Section 3553(a) of title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." 18 U.S.C. § 3553(a).  This obligation, known as the "parsimony clause," applies at every federal sentencing "except as otherwise specifically provided." 18 U.S.C. § 3551(a).

Indeed, the command of the parsimony clause defines the Court's "overarching duty." *Pepper v. United States*, 131 S. Ct. 1229, 1243 (2011).

Among the factors to be considered under § 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a).

As the Supreme Court reaffirmed in *Pepper*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper,* 131 S. Ct. at 1240 (quoting *Koon v. United* States, 518 U.S. 81, 113 (1996)). While the Guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States,* 552 U.S. 38, 49-50 (2007). Rather, the judge is directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Id*. at 50. The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008).

Finally, in determining the appropriate sentence, a court should also be mindful that no matter what the range recommended by the Commission, Congress, in enacting the Sentencing Reform Act of 1984, intended that "prison resources [would be], first and foremost, reserved for those violent and serious criminal offenders who pose the most serious threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well

9

as individual victims can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, §§ 217(a), 239, 98 Stat. 1987, 2039 (1984).  Congress thus instructed the Commission to ensure "that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious injury." 28 U.S.C. § 994(j). While the Commission has essentially ignored this "first offender" directive, classifying most offenses as "serious," Congress indicated its view of "serious" as "a crime of violence that results in serious bodily injury." 28 U.S.C. § 994(j).

Mr. Rappa's advisory range is within Zone B of the sentencing table. Accordingly, the guidelines permit the minimum term to be satisfied by a term of probation, combined with intermittent confinement, community confinement or home detention. *See* U.S.S.G. § 5C1.1(c). Here, consideration of the 3553(a) factors merit the full extent of the Court's leniency. As set out in full below, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ Moreover, Mr. Rappa has made enormous strides towards rehabilitation and incarcerating him would interrupt and derail his progress, as well as impose enormous hardship on his family.  Indeed, given his parenting responsibilities and that social isolation contributed to the commission of the offense, even home detention could be counter-productive. Because of the myriad mitigating factors, and that a sentence of incarceration is not necessary to achieve deterrence or promote respect for the law, a term of probation with conditions of supervision

would be sufficient, but not greater than necessary, to satisfy the goals of sentencing articulated in § 3553(a).

**A.** ██████████████████████████████████████████████
██████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████

██████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

███████████



███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

**B.**     **Mr. Rappa's Post-Offense Rehabilitation Provides Additional Grounds for a Sentence of Probation**

Prior to his arrest, Mr. Rappa's life was in shambles. ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

First, it is important to emphasize that Mr. Rappa acknowledges the seriousness of his conduct. He has been forthcoming and honest from the outset. When first approached by federal agents and questioned, Mr. Rappa made a full admission and cooperated fully. ████████████

███████████████████████████████████████████

███████████████████████████████████████████

Indeed, in his attached letter, Mr. Rappa takes full responsibility for his crime. He writes, "I am embarrassed, ashamed and feel terrible about [what I did]. I find it hard to put into words just how badly I feel.  Every day I regret my actions. Every day is a struggle for me to deal with the pain that I feel inside for the people whose privacy I invaded and for putting my wife, children

and family through all of this." (Exh. A).  He is resolved that he will never again commit a crime.

Second, Mr. Rappa has recognized that securing work outside his home is critical to his mental health and necessary to support his family. He abandoned the failing home printing business and in September 2014 secured a job in the sales department of a printing company. Although his hours were long, Mr. Rappa was thrilled to be working again. Unfortunately, after the company lost a large account, Mr. Rappa and several others were laid off last month. While he is once again looking for work, he is now better poised to find employment. His current resume lists recent work experience, and Mr. Rappa can count on a positive recommendation from his last manager.  In addition, recognizing that the printing industry has limited job opportunities, Mr. Rappa this past summer took a multi-week course to obtain his commercial drivers' license, which means he can now also apply for driving or trucking jobs.

Second, Mr. Rappa, who has struggled with a deep loneliness for many years, has searched out and found a new sense of community. While he and his wife had not attended church regularly since his children's baptism, within months of his arrest Mr. Rappa began attending Sunday services by himself at King of Kings Lutheran Church in Middletown, New Jersey. He is now joined at the services by his wife and children, who are enrolled in the Sunday school.  Attending the services and becoming part of the church community is a source of strength for Mr. Rappa and it has helped him cope with his deep shame and fear over his current legal predicament.

In short, ███████████████████ and by dint of hard work, Mr. Rappa is now equipped with the tools needed for a healthy and productive life. His rehabilitation "provides the most up-to date picture of [his] history and characteristics," *Pepper v. United States*, 131 S. Ct. 1229,

1242 (2011), and is good evidence that a jail sentence is not needed to deter him from

committing future crimes to protect the public. *See id.* ("rehabilitation may also critically inform

a sentencing judge's overarching duty under § 3553(a) to 'impose a sentence sufficient, but not

greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)).  *See*

*also United States v. Williams*, 65 F.3d 301, 305 (2d Cir. 1995) (approving extraordinary

rehabilitation as a permissible grounds for departure).

**C.     A Sentence of Incarceration is Not Necessary to Achieve General Deterrence Nor to Promote Respect for the Law**

Admittedly, this Court is required to also consider the need for the sentence imposed to

promote respect for the law and deter future criminal conduct. But in this case, incarceration is

not needed to achieve those sentencing goals.

With the appropriate conditions in place, probation constitutes sufficient punishment.

Custodial sentences are indisputably more severe than probationary terms. Nonetheless,

probationary sentences also include substantial restrictions on a defendant's freedom. As the

Supreme Court has recognized, "[p]robationers may not leave the judicial district, move, or

change jobs without notifying, and in some cases receiving permission from, their probation

officer or the court. They must report regularly to their probation officer, permit unannounced

visits to their homes, refrain from associating with any person convicted of a felony, and refrain

from excessive drinking. Most probationers are also subject to individual 'special conditions'

imposed by the court." *Gall*, 522 U.S. at 47-48.

Here, the Court could impose any number of special conditions to increase the severity of

Mr. Rappa's punishment, including limited computer access, a curfew, a period of home

confinement, continued mental health treatment, and/or community service. Mr. Rappa is the

first to admit that he committed a serious offense, and he concedes that some punishment is both

necessary and appropriate. He understands that the guidelines allow for incarceration, and he views probation as a privilege, not a right.

A sentence of incarceration is also not required to achieve general deterrence. The advisory nature of the guidelines and the discretion afforded federal sentencing judges changes the general deterrence analysis. This is because no individual defendant is guaranteed the same result as the one who came before. The Court's decision in *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008), is instructive. The defendant, Gus Gardellini, was convicted of filing a false income tax return. His advisory guidelines range was 10 to 16 months, but based on his extraordinary acceptance of responsibility and the low risk of recidivism, the court imposed a sentence of probation. On appeal, the government argued that the lenient nature of the sentence decreased the deterrent value of the criminal law. *See Gardellini*, 545 F.3d at 1095. The D.C. Circuit found the government's argument flawed because it elevated deterrence above the other sentencing factors. The Court also questioned the force of the argument even when "consider[d] in isolation." *Id.* The Court also explained: "Although Gardellini may have been treated leniently, the next similarly situated tax offender cannot expect the same treatment. Another defendant in this same situation might well receive an above-Guidelines sentence. In light of the discretion afforded to district courts by the Supreme Court's sentencing decisions, only a fool would think that he or she necessarily would receive the same sentence as Gardellini for a similar tax offense." *Id. See also United States v. Ovid*, 09 Cr. 216, 2010 WL 3940724, at *8 (E.D.N.Y. Oct. 1, 2010) ("There is nothing surprising or disturbing about the fact that once judgment is allowed to play a role in sentencing, it will be exercised differently by different people. It is the natural consequence of permitting judges to judge….").

Moreover, there was enormous deterrent value from the arrest alone. On May 19, 2014, over 90 users and creators of Blackshades were arrested, and there was widespread publicity about the case. The United States Attorney's Office and FBI issued a release and held a press conference, and media outlets around the country, including CNN, the Wall Street Journal, USA Today and the Los Angeles Times, have reported on the case. *See, e.g., International Blackshades Malware Takedown*, available at

http://www.fbi.gov/news/stories/2014/may/international-blackshades-malware-takedown/international-blackshades-malware-takedown; Alex Hern, *FBI arrests 100 hackers over Blackshades malware*, The Guardian, May 19, 2014.

Others charged for Blackshades will likely be punished more severely. One of the Blackshades users has already been sentenced. Kyle Fedorek, who had a criminal record and faced guidelines of 41 months, was sentenced by Judge Broderick to 24 months incarceration.[3] In addition to Mr. Fedorek, the government has obtained guilty pleas from the malware's creator, Alex Yucel (13 CR 834 [PKC]), coder, Michael Hogue (13 CR 12 [PKC]), and Brendan Johnston (4 CR 404 [JMF]), who was involved in sales and technical support.  Mr. Johnston is to be sentenced by Judge Furman in May.

Mr. Rappa, who had nothing to do with the creation or sale of the malware, is in an entirely different category from these individuals, and imposing a sentence of probation creates no "unwarranted sentence disparities" among defendants. 18 U.S.C. § 3553(a)(6). This is because sentencing "disparities based on legitimate individualized sentencing concerns" are perfectly appropriate. *Ovid*, 2010 WL 3940724, at *9. *See also United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) (a "reasonable explanation of the different sentences" is sufficient).

---

[3] It appears that Mr. Fedorek, unlike Mr. Rappa, stole private financial information but that PayPal could not verify whether he had been the one to compromise customer accounts.

Indeed, Mr. Rappa's case more closely resembles that of Juan Sanchez (14 CR 333), a Blackshades user who pled guilty to a misdemeanor and was sentenced by Magistrate Judge Francis to one year of probation. While Mr. Rappa's use of Blackshades may have been more extensive in duration and intensity, he, unlike Mr. Sanchez, will carry the lifelong stigma of a felony conviction and the negative consequences of the widespread publicity about his case.

General deterrence is certainly one of the principal objectives of our criminal justice system. Nonetheless, given the difficulty in a case like this of assessing the deterrent effect of conviction with incarceration over conviction alone, the goal of general deterrence should not outweigh the other § 3553(a) factors, namely Mr. Rappa's personal history and remorse, █ ███████████████, and his rehabilitation, all of which counsel in favor of a non-custodial sentence.

**D.      Mr. Rappa's Family Circumstances and Poor Physical Health Also Militate in Favor of a Probationary Sentence**

Two additional factors weigh in favor of probation. First, incarcerating Mr. Rappa would be a financial and emotional hardship on his family. As the attached letters confirm, he is a devoted and active father in his children's lives.  His wife works full-time and together, they share in the daily care and tasks required of modern parenting – taking the twins to and from school and myriad extracurricular activities, supporting them in their schoolwork, caring for them when they are sick, and engaging in family activities such as swimming, fishing, biking, playing board games and reading. (Exh. F). As Mr. Rappa's mother writes, "it would be traumatizing for the twins to not have their dad in their lives now. They need him. He needs them." (Exh. D)  Moreover, while Mr. Rappa is not working now, he hopes to find a job quickly and once again contribute to the family's income. As detailed in the pre-sentence report, Mr. Rappa and his wife are in financial straits, and he is worried that they are on the brink of losing

18

their house and/or filing for bankruptcy. (Exh. A). Incarceration would certainly make Mr.

Rappa's re-entry into the workforce that much more difficult and therefore his family's financial

ruin more likely.

Second, a sentence of incarceration would also risk jeopardizing Mr. Rappa's already

poor physical health. ████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ Those ailments would

be negatively impacted by sub-optimal prison sanitation and food, and a general lack of activity.

Beyond that, a number of Mr. Rappa's medications are not currently approved by the Bureau of

Prisons. (*See* The Federal Bureau of Prisons Health Services National Formulary, as found at

http://www.bop.gov/resources/pdfs/formulary.pdf). As it stands, Mr. Rappa's medical conditions

will be difficult and costly for the BOP to treat and bound to be exacerbated by a sentence of

incarceration.

## VI.

## CONCLUSION

███████████████████████████████████████████████, his post-offense rehabilitation, and that he did not use the information he accessed to hurt anyone, make money or commit other crimes, we respectfully submit that little public purpose would be served by incarcerating Mr. Rappa. At the time he committed the offense, ████████████████ ███████████████████████████████████████ in healthy and constructive ways. A sentence of probation would be more than sufficient to punish his conduct, while ensuring that Mr. Rappa continues rebuilding his life.

Dated:   New York, New York          Respectfully Submitted,
         March 5, 2015

                                     By:   /s/
                                           Justine A. Harris
                                           COLSON & HARRIS LLP
                                           80 Broad Street, 19th Floor
                                           New York, New York 10004
                                           (212) 257-6455

                                           *Attorney for Marlen Rappa*