# EXHIBIT A

# 1/4 MAG 1064

□ ORIGINAL

Approved: _____
James J. Pastore, Jr.
Assistant United States Attorney

Before: HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York



- - - - - - - - - - - - - - - x
                        :
UNITED STATES OF AMERICA     :    SEALED COMPLAINT **DOC # 1**
                        :
        - v. -           :    Violation of
                        :    18 U.S.C. §§ 1030, 1029
KYLE FEDOREK,              :    and 2
   a/k/a "kbello,"         :
                        :    COUNTY OF OFFENSE:
        Defendant.         :    New York
                        :
- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     NAVIN KALICHARAN, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

COUNT ONE
(Conspiracy to Commit Computer Hacking)

     1.    From at least in or about September 2012, up to and including in or about March 2014, in the Southern District of New York and elsewhere, KYLE FEDOREK, a/k/a "kbello," the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to engage in computer hacking, in violation of Title 18, United States Code, Section 1030(a)(5)(A).

     2.    It was a part and an object of the conspiracy that KYLE FEDOREK, a/k/a "kbello," the defendant, and others known and unknown, knowingly and willfully would and did cause the transmission of a program, information, code and command, and, as a result of such conduct, would and did intentionally cause damage without authorization, to a protected computer, and would and did cause damage affecting 10 and more protected computers during a one-year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A), 1030(c)(4)(B)(i) and (c)(4)(A)(i)(VI), to wit, FEDOREK purchased malicious software,

or "malware," from an entity known as Blackshades and, relying on servers maintained by that organization, used the malware to infect victims' computers and steal information, including financial account information.

## Overt Acts

3.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about September 12, 2012, KYLE FEDOREK, a/k/a "kbello," purchased a copy of malicious software known as "Blackshades" over the Internet.

b.    On or about June 30, 2010, a co-conspirator transmitted a copy of malicious software known as "Blackshades" to an FBI Special Agent located in New York, New York who was acting in an undercover capacity.

c.    In or about 2013, an FBI Special Agent located in New York, New York purchased a copy of malicious software from a website maintained by Blackshades.

(Title 18, United States Code, Section 1030(b).)

## COUNT TWO
### (Computer Hacking)

4.    From at least in or about September 2012, up to and including in or about March 2014, in the Southern District of New York and elsewhere, KYLE FEDOREK, a/k/a "kbello," the defendant, caused the transmission of a program, information, code and command, and, as a result of such conduct, intentionally caused damage without authorization, to a protected computer, and caused damage affecting 10 and more protected computers during a one-year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A), 1030(c)(4)(B)(i) and (c)(4)(A)(i)(VI), to wit, FEDOREK used malicious software, or "malware," including Blackshades malware, to infect victims' computers and steal information, including financial account information.

(Title 18, United States Code, Sections 1030(a)(5)(A), 1030(c)(4)(B)(i) and (c)(4)(A)(i)(VI), and 2.)

## COUNT THREE
(Access Device Fraud)

5.    From at least in or about September 2012, up to and including in or about March 2014, in the Southern District of New York and elsewhere, KYLE FEDOREK, a/k/a "kbello," the defendant, knowingly and with intent to defraud possessed fifteen and more access devices which were counterfeit and unauthorized access devices, to wit, FEDOREK possessed at least thousands of access devices, including credit card numbers and financial account numbers, which were obtained through computer hacking.

(Title 18, United States Code, Sections 1029(a)(3) and 2.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

6.    I have been personally involved in the investigation of this matter.  This affidavit is based upon my investigation, my conversations with other law enforcement agents, and my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

7.    I have been a Special Agent with the FBI since approximately February 2009.  Since approximately June 2013, I have been assigned to a computer intrusion squad in the FBI's New York Field Office.  I have received training regarding computer technology, computer fraud, and white collar crimes.  I have participated in the arrests of multiple individuals suspected of engaging in cybercrimes.

### Overview

8.    Since at least in or about 2010, an organization known as "Blackshades" has sold and distributed malicious software to thousands of cybercriminals throughout the world.  Blackshades' flagship product was the Blackshades Remote Access Tool, or R.A.T. (the "RAT"), a sophisticated piece of malware that enabled cybercriminals to remotely and surreptitiously gain control over a victim's computer.  After installing the RAT on a victim's computer, a user of the RAT had free rein to, among other things, access and view documents, photographs and other files on the victim's computer, record all of the keystrokes entered on the victim's keyboard, steal the passwords to the victim's online

3

accounts, and even activate the victim's web camera to spy on the victim -- all of which could be done without the victim's knowledge.

     9.    The FBI's investigation has shown that the RAT was purchased by at least several thousand users in more than 100 countries and used to infect more than half a million computers worldwide.  The FBI's investigation has included, among other things, the execution of physical search warrants and more than 100 e-mail search warrants, the seizure of more than 1,900 domain names used by purchasers of the RAT to control victims' computers, and the execution of a search warrant for a computer server controlled by Blackshades. Further, an undercover FBI agent in New York, New York obtained a copy of the RAT from one of the RAT's co-creators, who subsequently cooperated with the Government and provided extensive information about Blackshades ("CW-1").[1]  The FBI's investigation has revealed that the Blackshades RAT was, in fact, used by Blackshades customers to, among other things, activate web cameras, steal files and account information, and log keystrokes.

     10.    KYLE FEDOREK, a/k/a "kbello," the defendant, was a customer of Blackshades who purchased the RAT in or about September 2012. From in or about September 2012 through in or about March 2014, when the FBI executed a search warrant at FEDOREK's home and seized his computer, FEDOREK used the RAT to steal financial and other account information from more than 400 victims.  As detailed below, a search of FEDOREK's computer also revealed that FEDOREK was deploying a variety of other types of malicious software against his victims.

### Background on the Blackshades RAT

     11.    The Blackshades RAT was advertised and discussed, among other places, on online forums for computer hackers. Copies of the RAT were available for sale, typically for $40 each, on the Blackshades website, which was located at, among

---

[1]    CW-1 was arrested in June 2012 as part of a Government investigation known as "Operation Cardshop."  In January 2013, CW-1 pled guilty to two counts of violating Title 18, United States Code, Section 1030 (computer hacking) pursuant to a cooperation agreement with the Government, in the hopes of obtaining a reduced sentence.  CW-1 has proven to be reliable, and the information that CW-1 has provided has been corroborated by, among other things, emails and other information seized pursuant to search warrants, as well as logs of online chats seized from CW-1's computer.

other domains, www.blackshades.ru and www.bshades.eu (the "Blackshades Website"). The RAT was typically advertised as a product that conveniently combined the features of several different types of hacking tools. For instance, one online advertisement read:

> Deciding between a RAT, a host booter, or controlling a botnet has never been easier.[2] With Blackshades . . . you get the best of all three – all in one with an easy to use, nice looking interface.
>
> Even better, Blackshades . . . does a lot of work for you – it can automatically map your ports, seed your torrent for you, and spread through AIM, MSN, ICQ and USB devices.

12. Based on my review of the Blackshades software, as well as information provided by CW-1, I know that, after purchasing a copy of the RAT, in order to use it, a user had to install the RAT on a victim's computer – i.e., "infect" a victim's computer. The infection of a victim's computer could be accomplished in several ways, including:

a. by tricking victims into clicking on malicious links contained in emails sent to them;

b. by convincing victims to click on links for videos or to visit websites that caused the malware to be installed; or

c. by hiring others to install the RAT on victims' computers, which at times Blackshades itself offered to do on behalf of its customers for an additional fee.

13. The RAT also contained tools known as "spreaders" that helped users of the RAT infect victim computers. The spreader tools generally worked by using computers that had already been infected to help spread the RAT further to other computers. For instance, as depicted below, in order to lure people to click on malicious links that would install the RAT on their computers, the RAT allowed users to send those malicious links to others via

---

[2] A "host booter" is a tool that can be used to launch a denial of service (or "DoS") attack, typically in the context of online video games. It disconnects or "boots" a person from a "host" (e.g., an online video game platform) and is typically done to cheat at the video game. A "botnet" typically refers to a network of infected computers or "bots."

5

a victim's social media service, making it appear as if the message had come from the victim's compromised computer:



In this example, the user of the RAT has set the RAT to be spread through a malicious link that would be sent to others via the victim's instant messaging, or IM, services. In this case, the victim's social contacts would receive an IM message (purportedly from the victim), saying "Hello!" and inviting them to click on a link that appeared to lead to the YouTube website. In this way, the victim's friends might be fooled into clicking on the link purportedly sent by the victim, which would in fact install the RAT on that person's computer.

As can be seen above, the RAT's spreader feature also provided users an option to "Infect USB," which would infect any device plugged into a USB port on the victim's computer, such as a thumb drive. In this way, the malware could be spread between two computers through use of a thumb drive (e.g., a person's home and work computers).

14. The RAT also featured a graphical user interface, which allowed cybercriminals to easily view and navigate all of the victim computers that they had infected:



Among other things, the user interface[3] listed IP address information for each infected computer, the computer's name, the computer's operating system, the country in which the computer was located, and whether the computer had a web camera.

15. Once a computer was infected with the RAT, the user of the RAT could remotely activate the victim's web camera. By doing so, the RAT user could take photographs or obtain a live feed from the infected computer's web camera. In this way, the user could spy on anyone within view of the victim's webcam inside the victim's home or in any other private spaces where the victim's computer was used.

16. The RAT also contained a "keylogger" feature that allowed users to record each key that victims typed on their computer keyboards. To help users steal a victim's passwords and other log-in credentials, the RAT also had a "form grabber" feature. The "form grabber" automatically captured log-in information that victims entered into "forms" on their infected computers (e.g., log-in screens or order purchase screens for online accounts).

17. The RAT also provided its users with complete access to all of the files contained on a victim's computer. A RAT user could use such access to view or download photographs, documents, or other files on a victim's computer. Further, using a tool known as "file hijacker," the RAT enabled users to encrypt, or lock, a victim's files and demand a "ransom" to unlock them. This "ransomware" feature of the RAT included a pre-drafted ransom note that could be sent to victims:

---

[3] A copy of the interface is attached hereto as Exhibit A.



18.   The RAT also allowed users to exploit victims'
computers to launch other cyber attacks.  Infected computers –
which, as noted above, are sometimes referred to as "bots" –
could be gathered into a network known as a "botnet."  The botnet
could then be used to launch Distributed Denial of Service
("DDoS") attacks against particular websites by repeatedly
sending requests to the website in an effort to disable the
website and deny service to legitimate customers.  The RAT
included a special DDoS tool that simplified the process of
launching DDoS attacks using infected computers:



19. The RAT also included several features that were designed to harass or frighten victims. One feature, for example, allowed RAT users to "talk" to a victim through the victim's own infected computer by using the computer's "speech to text" feature. That is, a RAT user could type a message to the victim, and the victim's computer would read the message aloud. Another feature of the RAT caused an online chat window to appear on a victim's computer, through which the RAT user could type messages to the victim. The victim was unable to close, move, or otherwise remove the chat window.

### Other Blackshades Products and Services

20. Based on the FBI's review of the Blackshades Website, as well as information provided by CW-1, I know that, in addition to the RAT, Blackshades has also sold Blackshades Crypter, a program designed to make the RAT undetectable by anti-virus software; Blackshades Stealth, a version of the RAT coded in certain programming languages that allowed the RAT to be controlled by Macs in addition to PCs; and Blackshades Fusion, malicious software designed to steal passwords, launch DDoS attacks, and capture webcam feeds, among other things.

21. Based on the FBI's review of a server controlled by Blackshades (the "Blackshades Server"), a copy of which was obtained by the FBI pursuant to a search warrant, I know that the Blackshades Server stored usernames and passwords of victims that had been stolen using Blackshades products. A Blackshades

9

customer could access and download to his or her computer the stolen usernames and passwords by logging into his or her Blackshades account.

22. From speaking with CW-1 and from reviewing the Blackshades Website, the FBI has also learned that from time to time Blackshades has provided a service known as a "Virtual Private Network" or "VPN." Based on my training and experience, I know that VPNs can be used to obscure the true IP address of a computer. Accordingly, cybercriminals often use VPNs to make it more difficult for law enforcement to identify their true IP addresses and physical locations.

## The Blackshades Organization

23. Based on information provided by CW-1 and other witnesses, as well as records obtained pursuant to search warrants, I know that Blackshades operated as a business, which was owned and operated by Alex Yucel, a/k/a "marjinz." Among other things, Yucel hired and fired employees, paid employees' salaries, and updated the malicious software in response to customers' comments and requests. To facilitate the operations of the Blackshades organization, Yucel employed several paid administrators, including a director of marketing, website developer, customer service manager, and a team of customer service representatives. In addition to running the Blackshades organization, Yucel - along with CW-1 - created the RAT.

24. Based on the FBI's review of the Blackshades Website, information provided by CW-1, and records obtained pursuant to search warrants, I know that Blackshades maintained a customer support forum on its website and had a customer support email address. Customer complaints were opened as "trouble tickets," and would be answered by one of several paid customer service representatives. The Blackshades Server included employee reviews written by Yucel, as well as records reflecting payments made to employees.

25. Records obtained from various electronic payment processors show that Blackshades generated sales of more than $350,000 between September 2010 and April 2014.

## The FBI's Identification of Blackshades Users and Seizure of Domains Used to Control Victim Computers

26. According to information provided by CW-1, customers who wished to use the RAT were required to set up an account with Blackshades that included a username and password. In addition, to deploy the RAT, each Blackshades customer was required to

determine how his victims' computers would communicate with his computer. Typically, RAT users set up their accounts so that their victims' computers would communicate with a particular domain name, such as www.example.com. That domain name, in turn, was associated with the IP address of the RAT user's computer through the Domain Name System, or DNS.[4]

27. According to CW-1, when a Blackshades customer set up the RAT, the Blackshades Server logged the domain name to which that customer directed his victims' computers. This information was maintained in one or more database tables on the Blackshades Server. As indicated above, the Government seized a copy of the Blackshades Server pursuant to a search warrant. The copy of that server contained database tables that reflected the usernames and passwords associated with Blackshades accounts, as well as the domain names to which Blackshades users directed their victims' computers.

28. Records obtained from the Blackshades Server and other documents showed that there were more than 6,000 Blackshades customer accounts.[5] Based on information users provided to Blackshades, those users were located in more than 100 countries.

29. As part of the Government's investigation, the Government obtained a court order authorizing the seizure of more than 1,900 domain names used by certain Blackshades customers to control infected computers. By doing so, the FBI disabled communications between those infected computers and the RAT users that had infected them. The court order also authorized the FBI to obtain IP address information for computers trying to communicate with the seized domain names, to enable the FBI to identify and facilitate notification to victims regarding the infections.

### FEDOREK's Purchase and Use of the Blackshades RAT

30. In or about February 2013, the Government obtained a warrant to search the email account blackshadessupport@hotmail.com (the "Blackshades Email Account"),

---

[4]    Based on my training and experience, I know that DNS is the system through which an easily memorable domain name (e.g., www.doj.gov) is translated – or "resolved" – into an IP address (e.g., 149.101.1.3), thus allowing information to be transmitted between computers.

[5]    The number of customer accounts does not necessarily reflect the number of unique users, because a single user could have maintained multiple accounts.

which was used by Yucel to, among other things, communicate with Blackshades employees. The Government's search of the Blackshades Email Account also revealed communications with and/or concerning Blackshades customers, including: (1) email correspondence to and from customers seeking technical support for Blackshades products and services, and (2) electronic receipts reflecting purchases of Blackshades products and services by customers. Those electronic receipts sometimes contained contact information for the Blackshades customer, including email address information.

31. One of the emails I reviewed pursuant to the email search warrant described above was an email dated September 12, 2012, sent from an electronic payment processor (the "Payment Processor") to the Blackshades Email Account. That email shows, among other things, that:

      a. On or about September 12, 2012, "Kyle Fedorek" purchased "Blackshades Remote Controller (R.A.T)" for "40.00 USD."

      b. FEDOREK provided the Payment Processor an address of a residence in Stony Point, New York as his address (the "FEDOREK RESIDENCE").

32. Pursuant to the search of the Blackshades Server described above, the FBI recovered a database table reflecting the domain names used by Blackshades customers to control their victims' computers. That database table indicated that the user "KBello" had set up several copies of the RAT to communicate with various domain names, including kbella.zapto.org and kbello.zapto.org. Based on records obtained pursuant to subpoena, I have determined that the IP addresses to which those domain names resolved in April and May 2013 were subscribed to the FEDOREK RESIDENCE.

33. On or about March 6, 2014, the Government obtained a search warrant for the FEDOREK RESIDENCE. On or about March 7, 2014, other agents and I executed the warrant and seized a laptop computer from the bedroom of KYLE FEDOREK, the defendant. That laptop had the username "Kyle" and, according to a relative of FEDOREK, the laptop belonged to FEDOREK. A search of FEDOREK's laptop revealed the following:

      a. FEDOREK's laptop contained a copy of the Blackshades RAT. The RAT was configured and operating on FEDOREK's laptop. Among other things, the RAT's "form grabber" feature was configured to search for financial account

12

information. The files recovered from FEDOREK's laptop revealed that he had deployed the form grabber on at least 400 victims.

b.     FEDOREK's laptop contained various other forms of malicious software, including the code for viruses that target banking information (such as Carberp and Citadel); code for "phishing" websites – that is, websites designed to look like legitimate sites for financial entities such as banks and credit card companies but which in fact capture victims' personal identification information; electronic publications on how to hack computers; various tools that can be used to spread malware and to prevent its detection by anti-virus software; and BIN files – that is, files that can reveal what bank issued a particular credit card, thereby enabling its exploitation.

c.     FEDOREK's laptop contained at least 9,000 usernames and passwords for others' accounts, including login information for electronic payment processors, banks, email accounts, and social networking sites.

d.     FEDOREK's laptop contained a file labeled "CreditCardsHackedByNuclearGroup." The file contained what appear to me to be approximately 50,000 credit card numbers, expiration dates, and security codes known as credit card verification numbers, or "CCVs."

e.     FEDOREK's laptop contained files that appear to have been exfiltrated from victims' computers. Among other things, it appears that FEDOREK stole personal photographs that were stored on victims' computers. These photographs were contained in a main folder labeled "downloads," and each victim's photographs were contained in a separate subfolder listing the name of the victim's computer.

f.     FEDOREK's laptop contained a folder labeled "work." Within that folder were several subfolders whose labels and contents confirmed FEDOREK's involvement in computer hacking activities including, among others:

i.     A folder labeled "Bots + Keyloggers." Within that folder were several programs that operate as keyloggers as well as copies of malicious executable files.

ii.     A folder labeled "Andromeda v2.06." Based on my training and experience, I know that Andromeda is a program that can be used to spread malware.

13

iii.    A folder labeled "Citadel."  Based on my training and experience, I know that Citadel is a virus that is designed to steal victims' banking information.

iv.    A folder labeled "Dos + DDoSers" which contained a DDoS tool.

v.    A folder labeled "Havij."  Based on my training and experience, I know that Havij is a program that can be used to launch cyber attacks known as SQL injections.  The folder contained a copy of the program, among other things.

vi.    A folder labeled "PHISH SITES."  Based on my training and experience, I know that "phishing" refers to schemes in which users are tricked into clicking on a link and/or divulging their confidential personal information.  For instance, a phishing website could be created to look like the legitimate website of a bank.  Victims directed to the website are thus tricked into entering their username and password to log in to the site.  In truth and in fact, their username and password instead is captured by the operator of the phishing site for later exploitation.  The folder on FEDOREK's laptop contained files for phony websites for a bank, a credit card company, and an electronic payments processor.

WHEREFORE, I respectfully request that an arrest warrant be issued for KYLE FEDOREK, a/k/a "kbello," the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

*hw Kelil*

NAVIN KALICHARAN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
15th day of May 2014

*Debra Freeman*

HON. DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

14

# EXHIBIT B

F2JLFEDS                        Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4             v.                        14 CR 548 (VSB)

5    KYLE FEDOREK,

6                   Defendant.

7    ------------------------------x

8                                       New York, N.Y.
                                        February 19, 2015
9                                       10:10 a.m.

10
     Before:
11
                        HON. VERNON S. BRODERICK,
12
                                        District Judge
13

14                       APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     SARAH Y. LAI
17        Assistant United States Attorney

18   SERCARZ & RIOPELLE, LLP
          Attorneys for Defendant
19   BY:  MAURICE H. SERCARZ
          JULIANA GRAHAM
20
     ALSO PRESENT:  NAVIN KALICHARAN, F.B.I.
21

22

23

24

25

F2JLFEDS                          Sentence

1          (Case called)

2          THE COURT:  We're here this morning in the matter of

3     the sentencing of Kyle Fedorek.

4          Mr. Fedorek, if at any point in time you don't

5     understand something that I'm saying, please let me know or let

6     your attorney know.  We'll take a break and we'll try and

7     explain it to you, or, if you need a break, just let me know.

8          Okay?

9          THE DEFENDANT:  Okay.

10         THE COURT:  As an initial matter, I'd like to review

11    with the parties the materials I've received in connection with

12    today's sentencing.

13         So I've read and reviewed the presentence

14    investigation report, which was initially prepared November 12

15    of 2014 and revised January 6 of 2015, including the

16    recommendation and the addendum.

17         I've received the defendant's sentencing submission,

18    dated February 3, that has Exhibits A through V, which includes

19    letters from Mr. Fedorek's immediate family members, relatives,

20    and friends, as well as various letters from physicians and a

21    medical institution concerning Mr. Fedorek's physical and

22    mental health.

23         There's also a letter from Daytop Village accounting

24    with regard to testing that Mr. Fedorek underwent with regard

25    to drug counseling that he's receiving.  And the final exhibit

F2JLFEDS                          Sentence

1      is an affidavit from Joel Sickler, which is Exhibit V.

2                I'm also in receipt of the government's submission

3      dated February 17, 2015.

4                In addition, I made a request, and, Mr. Sercarz, you

5      should know in connection with the email I sent several days

6      ago, the government provided me with the FBI 302 relating to

7      statements made by Mr. Fedorek on March 7, 2014.  And there may

8      be some questions I have with regard to that later on in the

9      proceeding.

10               Just so the parties know, I requested and received a

11     copy of Mr. Fedorek's pretrial service report.  I did that in

12     part because I wanted to check -- and we'll talk about this

13     later on.  The plea agreement indicated criminal history

14     category I, but because of Mr. Fedorek's prior convictions,

15     he's actually in criminal history category II, which changes

16     the guideline range somewhat from what it was in the plea

17     agreement.

18               Let me just see if there's anything else.

19               Now, have the parties received all the submissions I

20     mentioned?  The government.

21               MS. LAI:  I have, your Honor.  Thank you.

22               MR. SERCARZ:  I have, your Honor.

23               THE COURT:  Okay, including the 302?

24               MR. SERCARZ:  Yes, your Honor.

25               THE COURT:  Are there any submissions or documents

F2JLFEDS                          Sentence

1   that I don't have, in other words, that the parties intend to

2   submit to me today?

3            MS. LAI:  I think it depends on what issues come up,

4   your Honor.  We do have some additional material.  But if I can

5   offer them at the correct time, if the issue comes up.

6            THE COURT:  Absolutely.  Obviously, there will be a

7   time period for both counsel to address me with regard to

8   sentencing, as well as the defendant.

9            Mr. Sercarz, have you read the presentence report and

10  discussed it with your client?

11           MR. SERCARZ:  I have, and I've discussed it with my

12  client, your Honor.

13           THE COURT:  Mr. Fedorek, have you read the presentence

14  report?

15           THE DEFENDANT:  Yes.

16           THE COURT:  Have you discussed it with your attorney?

17           THE DEFENDANT:  Yes.

18           THE COURT:  Have you had an opportunity to go over any

19  errors in the report with him or anything else that you feel

20  should be taken up with me with regard to the report?

21           MR. SERCARZ:  Yes.

22           THE COURT:  Okay.  Mr. Sercarz, do you have any

23  objections to the presentence report as it currently stands?

24           MR. SERCARZ:  None beyond those that are addressed in

25  the report in various footnotes, your Honor.

5

F2JLFEDS                          Sentence

1          THE COURT:  Okay.  I'll note that the report was

2     initially issued in November, Mr. Sercarz submitted certain

3     comments to the report, and that the report was modified to

4     take into account those comments.

5          Does the government have any objections to the report?

6          MS. LAI:  No, your Honor.

7          THE COURT:  Okay.  So I will adopt the factual

8     findings in the report.  The presentence report will be made

9     part of the record in this matter and placed under seal.  If an

10    appeal is taken, counsel on the appeal may have access to the

11    sealed report without further application to the Court.

12         Now, Mr. Fedorek, you may recall back when you pled

13    guilty in October that Judge Gorenstein mentioned a set of

14    rules known as the sentencing guidelines probably several times

15    to you during your guilty plea.

16         The sentencing guidelines are a set of rules that are

17    published for judges by the sentencing commission in order to

18    provide a guide to us.  They are not mandatory.  They used to

19    be mandatory, which means that courts were required to follow

20    them in almost every instance.  However, they're no longer

21    binding.  However, I am still required to consider the

22    applicable guidelines as one factor, among others, when

23    determining an appropriate sentence for you.  In a sense, the

24    guidelines have become starting point.  My first task is to

25    determine what the sentencing guideline range is that you face

F2JLFEDS                          Sentence

1     under the guidelines.

2              Now, as I mentioned, the plea agreement I know

3     provides for a sentencing range of 37 to 46 months.  Based upon

4     my review of the probation report and Mr. Fedorek's criminal

5     history category, which comes out as a II, I have the guideline

6     range as 41 to 51 months' imprisonment.

7              Do the parties agree that that is the sentencing

8     range, 41 to 51 months?  And, again, I understand that for

9     purposes of the plea agreement, both parties are bound by the

10    plea agreement.

11             Well, let me ask it this way.  Is there an objection

12    to the calculation of the criminal history category?

13             MR. SERCARZ:  None by the defense, your Honor.

14             MS. LAI:  Not by the government, your Honor.

15             THE COURT:  Thank you.  I apologize.  I probably

16    phrased that incorrectly because I know you are bound by the

17    plea agreement.

18             So based upon my understanding that defendant's

19    criminal history category is II, I find that the sentencing

20    guideline range is 41 to 51 months, and I accept the guideline

21    calculation in the presentence report.  I find that the

22    defendant's offense level is 21 and criminal history category

23    II and that the recommended sentencing guideline, as I

24    mentioned, is 41 to 51 months' imprisonment.  The range of

25    supervised release is one to three years, and the fine range is

F2JLFEDS                    Sentence

1    7,500 to $75,000.

2         As I mentioned, I note the plea agreement had criminal

3    history category I and resulted stipulated guideline range of

4    37 to 46 months' imprisonment.

5         Now, I reached the guideline level by starting at a

6    base level offense of six.  To that base offense level I

7    increased it by six because the loss amount was more than

8    $30,000 but less than $70,000, based upon the defendant's

9    possession of approximately 90 unauthorized access devices.

10   Because the offense involved more than 250 victims, the offense

11   level is again increased by six.  The offense level is then

12   increased by two because the offense involved the intent to

13   obtain personal information, including email messages.

14        The offense level is then increased by another four

15   levels because the defendant was convicted of offense under 18

16   U.S.C. 1030(a)(5)(A), making the defendant's adjusted offense

17   level 24.  The adjusted offense level is then decreased by a

18   total of three levels for Mr. Fedorek's acceptance of

19   responsibility.  The resulting offense level is 21.

20        Now, I understand there is a plea agreement in this

21   case that sets forth the government's position as of the date

22   of the letter with regard to its view of the application of the

23   guidelines due to Mr. Fedorek's conduct.  As Magistrate Judge

24   Gorenstein stated at the time of your guilty plea, Mr. Fedorek,

25   the government's letter is not binding on me.

F2JLFEDS                          Sentence

1            With regard to the applicability of any departures, I

2     note that the parties have agreed that neither party will seek

3     an upward or downward departure.  However, again, the plea

4     agreement is not binding on me.  Therefore, I've independently

5     considered whether there is any other appropriate basis for

6     departure from the advisory range within the guideline system.

7     And while I recognize I have the power and the authority to

8     depart, I do not find any grounds warranting a departure under

9     the guidelines.  Although I do not find grounds warranting a

10    departure, I note that I have the power to impose a

11    nonguideline sentence based upon what we call a variance.

12            Mr. Sercarz, in your letter you suggested that a

13    variance is appropriate in this case.  The government, on the

14    other hand, has indicated that it does not believe a variance

15    is appropriate in this case.

16            Now I'll hear from the parties concerning sentencing.

17            Does the government wish to be heard on sentencing?

18            MS. LAI:  Beyond -- well, yes.  I think the main issue

19    that troubled us was the health issue.  But in looking at the

20    letters more closely after submitting the response, it does

21    seem that the last time he actually received treatment for the

22    problem was almost ten years ago.  Since then there's been no

23    recurrence that I can see from the medical reports of this

24    issue.  And the adjectives used to describe what he had before

25    was mild and nothing life-threatening.  So I can't imagine

1   that -- that to me does not seem an adequate excuse for a

2   mitigating factor to depart from the stipulated guidelines

3   range.

4          There are some other issues, including whether he made

5   money from the offense, whether he intended to use the devices.

6   Frankly, in response to the Court's question, we do not have a

7   definitive answer as to whether or not those devices were

8   actually used.

9          We do have evidence in the form of a search -- and I'm

10  happy to offer up the photos to the Court -- evidence in his

11  bedroom that he had fairly expensive items, including a 50- to

12  55-inch flat screen TV, a saltwater fish tank that was the

13  length of his bed, not the width, the length, as well as at

14  least one stack of $100 bills.

15         Now, we cannot say that those properties were

16  purchased with the proceeds of the black shade scheme as

17  opposed to his marijuana dealing scheme.  So I offer that for

18  what it's worth.  But it does speak to the nature and

19  characteristics of this defendant and whether a guidelines

20  range is necessary to deter future criminal conduct.

21         We also raise the fact in the letter that cybercrime

22  is becoming a very serious problem and a lot of hackers start

23  at a very young age.  And I think a message needs to be sent in

24  the form of general deterrence that hacking carries serious

25  offenses and not just a slap on the wrist.

1          So those are some of the issues that I think are worth

2    considering.  And we have screen shots from the computer which

3    show the file structure, also, of the computer.  This is not

4    someone who for fun did it a few times.  You can see from the

5    file structure -- and, again, I can hand it up if the Court

6    wants to see it -- that everything is very well-organized in

7    his computer.  There is a file called Kyle.  There's a file

8    beneath that called work.  Beneath that is a list, different

9    folders for different types of malware, including the ones that

10   were mentioned in the government's letter, as well as in the

11   presentence report, the credit card information that was taken,

12   the password information that was taken -- it was all very

13   well-organized within the computer.  So it doesn't strike us as

14   indicators of someone who did it for fun and really was not

15   interested in the information that he was gathering.

16          So those are some of the issues we would raise, your

17   Honor.

18          THE COURT:  Okay.  Now, I heard what you said about

19   the money in his bedroom and the television and the fish tank.

20   I'm correct though that there was no proof or evidence provided

21   in discovery or that the government has that he utilized any of

22   the access devices.

23          MS. LAI:  That's correct.  I think part of the problem

24   is once -- so, for example, one of the victims, financial

25   victims, that is, was PayPal.  There were numerous PayPal user

F2JLFEDS                    Sentence

1    names and passwords.  They just cannot tell if there's a fraud

2    indicator on a particular account what caused it.  So if

3    someone obtains a user name and password, you can basically log

4    in and make purchases with PayPal and PayPal was unable to tell

5    us what caused the fraud, basically.  So we can't point to it

6    definitively.

7          THE COURT:  Well, definitively -- I'll ask some

8    additional questions a little bit later on.  Was there an

9    attempt to, in other words, there are 900 or so access devices

10   and what I'm trying to determine --

11         MS. LAI:  Ninety, your Honor.

12         THE COURT:  Ninety.  Sorry.  What I'm trying to

13   determine is if any of them, putting aside PayPal, was there

14   any evidence with regard to any of the other access devices

15   that the victims -- that they were used and that there was an

16   actual financial loss?

17         MS. LAI:  Not that we've been able to determine, your

18   Honor.

19         THE COURT:  And I guess the other question I have,

20   with regard to the restitution amount, which is $45,000, based

21   upon the application of $500 per access device, I haven't dealt

22   with this before.  Assuming I order restitution, what happens

23   with that money?

24         MS. LAI:  Well, I think we're seeking forfeiture in

25   this case, your Honor, and the forfeiture would be applied to

F2JLFEDS                         Sentence

1    restitution if any victim, if the financial institutions are

2    able to determine and provide us with information that suggests

3    that the loss occurred as a result of this crime.

4           THE COURT:   Okay.  Now, I have the 302 that you

5    provided.  And I think I mentioned that in the defense

6    submission, there were comments that Mr. Fedorek made some

7    substantive comments at the time of that call.  I guess my

8    question is was there a different call or is this the only call

9    that you're aware of?

10          MS. LAI:   That's the only call that we're aware of,

11   your Honor.  I think what happened was the defendant was not

12   home at the time of the search.  He I think approached home

13   while the search was going on.  When he saw law enforcement at

14   his home, he basically left, and then later on his mother

15   called the FBI.

16          THE COURT:   Okay.  Was there any evidence -- I know

17   that some users of this software utilize it to freeze or lock

18   victim's computers and then request money or something of value

19   in order for the computer to be released.  Is there any

20   evidence that that occurred in this case?

21          MS. LAI:   No, your Honor.

22          THE COURT:   Okay.  Now, with regard to other

23   individuals, I noted in the presentence report that there were

24   some other defendants that were actual either workers at black

25   shades or other participants in a larger sense, other

F2JLFEDS                        Sentence

1    coconspirators.  Do you have a sense what the status is of

2    their cases?  I take it they have not been sentenced yet.

3            MS. LAI:  No, none of them have been sentenced, your

4    Honor.

5            THE COURT:  Okay.  Thank you.

6            Mr. Sercarz, I'll hear from you on behalf of your

7    client.

8            MR. SERCARZ:  Thank you, your Honor.

9            Your Honor, what I propose to do is to attempt to

10   answer the questions that the Court sent us by email in

11   preparation for this appearance and then to speak to the

12   3553(a) factors, if the Court will allow me to proceed --

13           THE COURT:  Sure.

14           MR. SERCARZ:  -- in that sequence.  And I want to take

15   your questions out of order because I think it will be more

16   helpful to the Court, and I want to talk first about the status

17   of the defendant's New Jersey case.

18           I've been in touch with counsel in Bergen County, and

19   the story as of today is as follows.  A plea offer was made to

20   the defendants in the New Jersey case.  In fact, let me back

21   off and just give the Court some --

22           THE COURT:  Context.

23           MR. SERCARZ:  -- factual background.

24           The defendant and a group of other individuals were in

25   a car that was stopped shortly after it left an apartment in

F2JLFEDS                    Sentence

1    Edgewater, New Jersey, if I have that right.  A search ensued

2    and a quantity of marijuana of over 25 pounds was confiscated

3    as a result of the search.  Apparently, there was a

4    confidential informant among those that were in the apartment,

5    and agents of law enforcement were following the car as it left

6    the apartment.

7          A plea offer has been extended to a group of the

8    defendants.  The attorney understands it to be a global plea

9    offer, meaning that the offer has been extended to the

10   defendant on condition that everybody in the case accepts it.

11   It calls for a sentence that in the vernacular in New Jersey is

12   called five flat, which means in English that the defendant

13   would be eligible for release after two years if he accepted

14   the sentence.

15         To go on a little bit further, it is the defendant's

16   intent and desire to plead guilty in connection with his

17   participation in the events in New Jersey.  And it is my hope

18   that I can fashion a sentence for him that will allow him to do

19   all of his time in custody in a federal facility and never have

20   to endure either incarceration in a Bergen County facility or

21   transportation from a federal jail to Bergen County for the

22   purpose of a court appearance, then to waste away for a while

23   in Bergen County, and then to be transported back to a federal

24   facility with all of the attendant hardship.

25         What we are trying to accomplish with counsel in the

F2JLFEDS                          Sentence

1    state courts is the following.  The defendant will plead guilty

2    here.  I am going to ask for a surrender date which is

3    sufficiently far in the future for the Bergen County prosecutor

4    and the defense attorney in Bergen County to arrive at a

5    disposition and to take the plea.  It is my hope that the

6    defendant will have surrendered before the sentencing date in

7    New Jersey and that the judge in New Jersey will consent to a

8    sentence in absentia.  And I understand that that is not a

9    far-fetched plan and, indeed, that is what I hope is going to

10   take place.

11         That's my answer to the question about the Jersey

12   case.

13         THE COURT:  I just have a few follow-up questions on

14   that issue.  Do you have a sense of what the position is of the

15   prosecutor's office in that case as to whether or not the

16   sentence imposed in that case will be concurrent or

17   consecutive?

18         MR. SERCARZ:  Our sense is and our hope is that it's

19   going to be a concurrent sentence.

20         THE COURT:  And I'll tell you the reason, sort of my

21   motivation.  And, again, I haven't heard from all the parties.

22   But if there is a sentence of incarceration here, I believe,

23   and it's borne out in the presentence report, that Mr. Fedorek

24   would benefit from drug treatment.  The affidavit that was

25   submitted casts some doubt on whether or not that would be

F2JLFEDS                        Sentence

1    possible if there's a detainer lodged against Mr. Fedorek based

2    upon the New Jersey case.

3            And it sounds like you're taking the steps that you

4    need to take to try and ensure that to the extent he's

5    eligible, that he be able to go into a program if he is

6    incarcerated because, again, I think he would benefit from

7    that.  And so that's the principal reason why, because although

8    the affidavit identifies issues, that being one of them; the

9    other being the possibility or likelihood that Mr. Fedorek will

10   go, if he's sentenced to incarceration, to a minimum security

11   facility rather than a camp.

12           Do you have a sense, Mr. Sercarz, when the next court

13   date is for that case?

14           MR. SERCARZ:  There's a status conference scheduled in

15   Bergen County for all of the defendants on March 4.  The

16   defense counsel, who's been very helpful to me and has worked

17   closely with me, has been trying to reach the prosecutor by

18   phone for the past two weeks to find out whether or not Kyle

19   can plead on that date, whether he can plead regardless of what

20   the codefendants do.  And she -- her name is, for the record,

21   Lisa Leboeuf -- has been unsuccessful in reaching that

22   prosecutor.

23           So, again, the answer to the question, March 4 is the

24   date for the status conference.  Whether or not a plea is going

25   to be taken on that date we just don't know.

F2JLFEDS                      Sentence

1          THE COURT:  Okay.   Thank you.

2          MR. SERCARZ:   Your Honor, the answers to the other

3    questions that I'm in a position to answer, question No. 1, the

4    defendant's conversation with an FBI agent on the day his

5    family's home was searched, you now have an FBI 302

6    demonstrating that the defendant's mother, with the defendant

7    present, got on the phone and indicated a willingness to speak

8    to agents of law enforcement.

9          I can also tell the Court that within two weeks the

10   defendant was in the offices of the FBI accompanied by counsel,

11   made a full proffer on March 24 of 2014, which is summarized in

12   an FBI 302 report.   The government provided us with that report

13   in discovery.   I have it and it indicates exactly what the

14   defendant has been saying from the day that he got arrested:   I

15   hacked.   I am sorry for what I did.   I never took the sensitive

16   personal financial information of my victims and, to use the

17   Court's word, attempted to "monetize" the information for the

18   purpose of stealing money from my victims.

19         When the defendant pled guilty in this court, in his

20   plea allocution he said exactly the same thing.   The government

21   has been on notice of our position in this case from the very

22   beginning.   The defendant has been open, honest, and

23   comprehensive in the information that he has provided to the

24   government.   And, indeed, I don't think it's presumptuous to

25   say if there was a Fatico hearing on the issue of whether or

F2JLFEDS                         Sentence

1    not the defendant monetized the information, the Court would be

2    constrained to make a finding based on all the defendant's

3    statements and the lack of any evidence coming from the

4    government that it is a fact that the defendant did not

5    monetize the financial information that came from others.

6            THE COURT:  Mr. Sercarz, as I understand the

7    defendant's statements, although with regard to the access

8    devices there wasn't that effort, but my understanding was that

9    at least part of the intent was to get bitcoin.

10           MR. SERCARZ:  That's right.

11           THE COURT:  I understand it may not have been was --

12   it didn't reap the benefits that the defendant had thought it

13   would, but that that was one of the motivations.

14           MR. SERCARZ:  That's right.  It's not only that he was

15   unsuccessful.  It is not that he was unsuccessful in extracting

16   money from people's accounts.  And here we have a generational

17   problem because I am not as computer facile as Ms. Graham, the

18   agent, and others.  But my understanding is when you

19   quote/unquote mine for bitcoin, you're not taking credit card

20   information, bank account information, and converting that into

21   money and putting it into your pocket, that you mine bitcoin by

22   using the power in other people's computers to go through a

23   series of hoops which somehow, if you navigate them

24   successfully, will give you credit in an online exchange that

25   allows you to convert this credit into bitcoin or, indeed, into

F2JLFEDS                        Sentence

1    dollars.

2           The defendant was fascinated with the process.   He

3    harbored the desire to day trade using this bitcoin or to

4    invest in an online casino in which bitcoin would be used as

5    the currency at the casino.

6           I'm not suggesting that the defendant was entirely

7    without a financial motive.   I guess in some ways I'm splitting

8    hairs here, but I am suggesting that he never intended to take

9    the financial information that he obtained from victims and to

10   use it so that the victims would be placed in an out-of-pocket

11   situation and he would reap the benefits of their credit card,

12   bank account, and the like, which is a distinction of some

13   importance when the Court considers harm to victims and the

14   like.   And the defendant has been up-front about this from the

15   day of his arrest.

16          Juliana, if you were closer to me, would you be

17   kicking me under the table?   Did I get this more or less right?

18   So that's the answer to that question.

19          You asked, your Honor, about the status of genetic

20   family testing.   You've heard about the problem that the

21   defendant experienced when he was 16 years old, the fact that

22   his brother, who is present in court, has been diagnosed with

23   the same problem, and you've asked whether there's been any

24   follow-up.   When the defendant's blood was taken, he was told

25   that no result would be available for at least six months and

F2JLFEDS                          Sentence

1    perhaps as long as two years.  Whether there is going to be any

2    follow-up, whether there's going to be any need to extract

3    further blood, saliva, or skin from the defendant, I'd be

4    speculating --

5               THE COURT:  Okay.

6               MR. SERCARZ:  -- as to that.  I would note, among

7    other things, if we knew that it was needed, I would be here

8    arguing that that's an extraordinary family circumstance and

9    that his presence in order to provide those materials was

10   necessary to the welfare of his brother, who's suffering from a

11   very serious illness.  I leave that for the Court, but I am not

12   going to exaggerate.  It would be speculative to assume that

13   the defendant is going to be called upon to provide any further

14   material for that study.

15              I'm ready to talk about 3553(a) if the Court is ready

16   to hear me.

17              THE COURT:  Let me just see if I have any additional

18   questions before you move to that.

19              I noted that the last indication from Daytop Village

20   was January 19, 2015.  Has Mr. Fedorek had any testing since

21   that time?

22              THE DEFENDANT:  Yeah.

23              THE COURT:  Let me ask, I assume since I haven't been

24   notified that he tested positive and that there's a violation.

25   Is the government aware whether or not there have been any

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2JLFEDS                    Sentence

1   positive tests in connection with Daytop Village?

2           MS. LAI:  We've received no indication of such from

3   pretrial services, your Honor.

4           THE COURT:  All right.  And I take it, Mr. Sercarz,

5   you haven't either.

6           MR. SERCARZ:  That's correct, your Honor.

7           THE COURT:  Okay.

8           MR. SERCARZ:  Thank you, your Honor.

9           Your Honor, the Court should know at the outset that

10  present in the court are the defendant's mother, Bonnie

11  Fedorek, his father.  His brother is seated all the way on the

12  right.  And the defendant's aunt, Mr. Fedorek's sister, are all

13  present in court to lend their support on his behalf.  This is

14  a family that has been unified by the events that's taken place

15  and are all lock solid in their support for Kyle.

16          The statute requires that the sentence imposed be, and

17  I quote, sufficient but not greater than necessary to meet the

18  goals of sentencing set forth in 18 U.S. Code Section 3553(a),

19  which calls for the Court to consider in this context the

20  nature and circumstances of the offense.  Among them I would

21  urge the Court to consider that at the time the defendant

22  engaged in the offense, he was suffering from a major

23  depressive disorder and this is documented.

24          And right there I would note parenthetically, the

25  government has focused on the illness and the absence of a

1   recurrence, but the government has overlooked the psychological

2   impact of what happened to my client at the age of 16, his near

3   brushes with death, and the documented impact that that caused

4   on him, the major depressive disorder that resulted from these

5   horrible episodes that befell him.

6           And I went through it in the submission.  So many

7   times Bonnie Fedorek attempted to rein Kyle in only to be

8   confronted with the response, what's the difference, I'm going

9   to die young anyway.  He made some horrible self-destructive

10  choices, but there was a reason why and, as I'm going to

11  discuss, he's taken steps to address these choices.

12          At the time he committed this offense and the offense

13  in New Jersey, he was suffering from substance abuse,

14  polysubstance abuse -- the abuse of marijuana, the abuse of

15  alcohol, and his use of other drugs.  He had an unhealthy

16  fascination with the internet, with malware, with bitcoin, with

17  internet casinos, that led him to engage in this behavior.  We

18  submit, and there's no proof to the contrary, that there was no

19  effort to monetize sensitive victim financial information.

20          Now, with regard to this notion of multiple

21  overlapping enhancements -- and I have urged the Court to

22  address this by looking carefully at the other 3553(a)

23  factors -- the government in its submission suggests that there

24  are no multiple overlapping enhancements, and I respectfully

25  beg to differ, your Honor.  If you hacked into someone's

F2JLFEDS                    Sentence

1   computer, you are not in control of the information that's

2   provided to you in response.  There are enhancements for both

3   the loss and the number of victims.  When the defendant

4   obtained access device material from more than 90 victims,

5   almost by definition you're going to apply a $500 minimum loss

6   to each one as a presumption.  The loss amount is also going to

7   climb.

8           This was a computer-related crime, and if you use the

9   computer to hack into the computers of others, you are almost

10  as an inevitable result going to obtain personal information;

11  and yet enhancements are given both for personal information

12  and for computer-related crime.  And if you hacked, it is

13  almost an inevitable result that you're going to receive all

14  four enhancements.

15          I'm constrained by the plea agreement to acknowledge

16  that all of these enhancements apply.  But when I said in my

17  sentencing submission that what happens in a case like Kyle's

18  is that the guidelines become a very poor gauge -- my words --

19  for evaluating his conduct, I meant it and I stand by it.

20          The other 3553(a) factors indicate that there is a

21  need for the sentence imposed to reflect the seriousness of the

22  offense and to provide just punishment, and here we have

23  Exhibit V to my submission, the affidavit of Joel Sickler.  It

24  is our best understanding that as a result of this detainer,

25  the defendant will not be eligible for the residential drug and

F2JLFEDS                    Sentence

1    alcohol program, which is the best method and, indeed, to my

2    knowledge, the only method by which the defendant's substance

3    abuse problems would be addressed while he is in a federal

4    jail.  That's No. 1.

5             Now, No. 2, this is a 27-year-old man who has never

6    had the experience of having to spend any time in jail.  He is

7    now going to be locked up not in a camp but behind the walls,

8    not with other camp-eligible incarcerated defendants, but with

9    people from a greater spectrum of the criminal justice system.

10   He's going to be there not only with no opportunity for

11   meaningful treatment, but the very treatment that has proven

12   successful thus far is going to be taken away from him.  He's

13   going to be in there cold turkey, on his own.  This is going to

14   be hard time for this defendant.  And anybody in the general

15   public who understood what it is that Kyle is going to have to

16   endure for the next two years or more wouldn't describe this as

17   a slap on the wrist.  This is going to be hard punishment for a

18   serious crime, your Honor.

19            The Court must consider whether or not the sentence

20   imposed will provide adequate deterrence for the defendant's

21   conduct, and Bonnie Fedorek put it much more eloquently than I

22   could when she said that the arrest in Bergen County and the

23   arrest here in the Southern District of New York stopped the

24   runaway train that was her son's life.  Indeed, his remorse

25   before he came to court to be sentenced is the best guarantee

1    that we can give this Court that whatever term of incarceration

2    he receives is going to provide adequate deterrence and that

3    this Court need not be concerned that the defendant is going to

4    go back out on the street when he's released and commit crimes

5    other than this.

6          And if some kind of more objective evidence was

7    required, then I commend to the Court the report from Daytop

8    indicating his successful completion of the program and all of

9    those pretrial services reports that demonstrate time after

10   time after time negative urine samples.

11         Your Honor, all of these factors weigh in favor, I

12   respectfully submit, of a shorter term of incarceration, the

13   difficult term of incarceration that lies in store for Kyle,

14   and then a maximum term of supervised release with requirements

15   for drug treatment.  I would urge the Court that if we have a

16   genuine interest in making sure that the defendant is drug

17   free, that he receives the education that he needs and the

18   support that he needs to maintain a sober life and a productive

19   life, the best way to do it is to get him out as soon as

20   possible and to get him back into drug treatment.  And it's for

21   that reason that I recommended to the Court with the Jersey

22   sentence in mind a period of incarceration of 24 months.

23         In conclusion, your Honor, notwithstanding that Kyle

24   is 27 years old, I note that he was still living at home at the

25   time of the offense and he's in many ways a very young man and

F2JLFEDS                          Sentence

1  a very unformed young man.  I truly believe his family is here

2  to tell you that he has reached a turning point in his life.

3  He is young enough to change.  He has the desire to change.  He

4  is capable of changing.

5          And I urge the Court to impose a sentence with the

6  minimum amount of jail time the Court can see fit to impose,

7  bearing in mind the requirement that it be sufficient but not

8  greater than necessary and supervised release that will give

9  Kyle the drug treatment and treatment for his depression that

10  he needs.  Thank you.

11          THE COURT:  Sure.  Mr. Sercarz, let me ask just this

12  question with regard to the affidavit submitted from

13  Mr. Sickler and I just want to make sure I'm reading this

14  correctly that if you're successful and Mr. Fedorek's New

15  Jersey attorney are successful in -- and, again, assuming that

16  there's a period of incarceration -- successful in getting him

17  pled and sentenced to concurrent time and that time is not in

18  excess of the time that I sentence him to, is it your

19  understanding that a detainer will be placed?

20          MR. SERCARZ:  A detainer is going to be placed from

21  the time that there is a judgment in Bergen County, which will

22  be present when the defendant goes in, and it will be lifted

23  shortly after the defendant fulfills his sentence, assuming

24  that it's a sentence to concurrent time, and assuming for the

25  moment that it's the kind of two-year sentence that's

F2JLFEDS                    Sentence

1    anticipated by counsel in New Jersey.

2         THE COURT:  Okay.  I don't know whether there's a

3    possibility of transferring jurisdiction from New Jersey to the

4    federal system for purposes of eliminating the detainer

5    possibility because I do think, as I mentioned, that the

6    defendant would benefit from a drug treatment program which, as

7    I understand it from Mr. Sickler's affidavit, he wouldn't be

8    eligible for as long as there's a detainer outstanding.

9    Regardless of where he may be housed, he wouldn't be eligible.

10   And I have no idea whether New Jersey, what that means or what

11   would have to occur.

12        MR. SERCARZ:  That's right.  You know, in considering

13   the difference between the guidelines, your Honor, and the

14   sentence that I'm proposing, this may help the Court.  If the

15   defendant received a sentence of 44 or 45 months' imprisonment

16   and were eligible for the residential drug and alcohol program,

17   he could complete the portion of the program that an inmate

18   completes while incarcerated and be eligible for the first

19   stages of release after two years, and that's customarily the

20   way it works.

21        THE COURT:  Because of the reduction, that happens

22   when you participate and are successful.

23        MR. SERCARZ:  Yes.  And the remainder of the sentence

24   would be served under progressively less restrictive conditions

25   of confinement, halfway house, and then ultimately supervised

F2JLFEDS                    Sentence

1    release.  If he were eligible for that program, I could be in

2    here saying, your Honor, give him a guideline sentence and I'd

3    have some comfort he would be out after two years.  But

4    Mr. Sickler found out that the designation people in Texas --

5    and this is right in his affidavit -- they will not allow a

6    defendant who has a detainer from another jurisdiction to

7    participate in that program.

8              THE COURT:  Okay.  All right.  Thank you.

9              Mr. Fedorek, would you like to be heard on your own

10   behalf?

11             THE DEFENDANT:  Yes.  First I would like to apologize

12   to the Court and the agents who worked on my case.  I would

13   also like to apologize to all the victims, those who realized

14   that their computers were compromised and those who did not.  I

15   am fully aware now the damage that my computer hacking has

16   caused to the victims.  This whole situation has been a real

17   eye opener and a life-altering event for me.  I look back and I

18   am upset with myself for using my knowledge and computer

19   expertise to do harm instead of using it for a good and lawful

20   purpose.

21             I cannot change what has been done, and I can only say

22   that I am learning from my mistakes.  I look forward to

23   continuing my education by pursuing my master's degree and

24   having a productive career once I get past this hard point in

25   my life.  The most important reform that I have made is that I

F2JLFEDS                          Sentence

1   started down the road of living a sober life.  I have struggled

2   with drug and alcohol dependency for more than ten years.

3           Since my arrest, I have learned to exercise caution

4   and to think more carefully about all of my actions and the

5   repercussions of my actions.  I've also learned to avoid going

6   out as much as I used to and putting myself into other

7   dangerous situations and more aware of who I'm hanging out

8   with.  I look forward to living a sober life and having a

9   brighter future.

10          Finally, I'd like to thank my parents, my brother, my

11  family, and my friends for the love and the support that they

12  have given me throughout this difficult time.  I only hope to

13  be able to repay the trust and confidence that they have shown

14  in me.

15          THE COURT:  Okay.  Thank you.

16          Does either counsel know of any reason why sentence

17  should not be imposed at this time?

18          MS. LAI:  No, your Honor.

19          MR. SERCARZ:  No, your Honor.

20          THE COURT:  Okay.  As I have stated and as the parties

21  acknowledge, in light of the criminal history category, the

22  defendant's sentencing range is 41 to 51 months.

23          Now, before I get started, I would like to comment on

24  one thing, Mr. Sercarz.  You mentioned that the family was

25  brought closer together in part because of what has happened to

F2JLFEDS                       Sentence

1   Mr. Fedorek.  But I would say that based upon what I've read

2   that they were close before that and hopefully will remain so

3   because I think he's going to need their support.

4          Okay.  So under the Supreme Court's decision in Booker

5   and its progeny, the guideline range is only one factor that I

6   must consider in deciding an appropriate sentence.  I'm also

7   required to consider other factors set forth in 18 U.S.C.

8   3553(a) and I have done so.  Those factors include, but are not

9   limited to, the nature and circumstances of the offense and the

10  personal history and characteristics of the defendant, as each

11  defendant must be considered individually as a person.  Judges

12  are required to consider the need for the sentence imposed, to

13  reflect the seriousness of the offense, promote respect for the

14  law, provide just punishment for the offense, afford adequate

15  deterrence to criminal conduct, and to avoid unwarranted

16  sentencing disparities, among other things.

17         First I'm going to address Mr. Fedorek's history and

18  characteristics.  I note that it is clear from the letters

19  submitted by Mr. Fedorek's immediate family, other relatives,

20  and friends that he has people who believe he is a caring and

21  loving person and that they support and love him despite his

22  battle with alcohol abuse and possible other addictions, his

23  guilty plea in this case, his other criminal convictions, and

24  his pending criminal case in New Jersey.  Therefore, I credit

25  the descriptions in their letters of their perceptions of him

F2JLFEDS                      Sentence

1    as indicative of his character and I will give these

2    considerations under 3553(a).

3            However, I note the defense submission and many of the

4    letters submitted on Mr. Fedorek's behalf reference, and I

5    quote, that family has always been of the utmost importance to

6    him.  While I have no reason to doubt the statements made in

7    the letters and that as a general proposition that that is

8    correct, I do believe that the fact Mr. Fedorek committed the

9    underlying offense in his family's home, that resulted in the

10   family's home being searched, an event that had to have been

11   traumatic, I imagine, for the family members who were present

12   at that time, demonstrated a lack of at a minimum maturity and

13   astounding bad judgment.  That I also must consider.

14           I guess what I'm saying is, in other words, if family

15   was at the forefront of his mind, I would expect at a minimum

16   him to avoid criminal conduct or I should say to avoid criminal

17   conduct and at a minimum to not do it in his family's home,

18   putting them in harm's way.

19           I also indicated that I don't believe that a downward

20   departure is warranted in this case.  Having said that, I do

21   believe that Mr. Fedorek's health issues that began when he was

22   age 16, combined with the apparent impact those issues had on

23   him, warrant consideration as part of his sentence.  And by

24   that I mean independently, under the sentencing guidelines, I

25   don't believe that his health would warrant necessarily a

F2JLFEDS                          Sentence

1    departure.  But when considered in combination with the impact,

2    as Mr. Sercarz pointed out, that it had on him -- and I don't

3    know what the future holds with regard to his health.  But it

4    did appear from the letters that were submitted that it did

5    have a psychological impact on him, whether that was real --

6    and by real I mean whether his feeling that he wasn't going to

7    live was real or not, it was real to him.  Therefore, I credit

8    the observations of his immediate family who commented how the

9    defendant appeared to change after his hospitalization.

10              And I would note that although there hasn't been a

11   recurrence in the recent past, that the initial onset resulted

12   in Mr. Fedorek collapsing, resulted in Mr. Fedorek being

13   hospitalized I think for multiple weeks, resulted in both of

14   his lungs collapsing over the course of that treatment, and so

15   it was a serious onset.  What the future holds, I don't know

16   and I can't predict.

17              Now, I believe that his fatalistic attitude, increase

18   in drinking, experimenting with drugs, and his unwillingness to

19   listen to adults, including his parents, were at least in part

20   tied to his illness and the uncertainty that he perceived he

21   was living under.  Although this reaction could have been the

22   product of his age, 16 at the time that he became ill, and a

23   consequent lack of maturity, the defendant didn't grow out of

24   this phase in his life and, in many ways, was unable to move

25   forward with his life to become an adult, not only with regard

F2JLFEDS                          Sentence

1   to age but in his deeds.  In fact, the defendant's conduct

2   seemed to get worse until it progressed into criminal acts.

3          I would note that with regard to the defendant's prior

4   two convictions that he's incredibly fortunate that someone

5   wasn't injured when he was drinking or under the influence

6   because we wouldn't even be here today.  He would be in a much

7   worse position.

8          Now, next I'll turn to the nature and circumstances of

9   the offense.  There is no question that Mr. Fedorek pled guilty

10  to a serious offense.  He purchased and used the black shade

11  software to infect hundreds of computers belonging to hundreds

12  of victims and stole, among other things, user names and

13  passwords, financial information, as well as personal items

14  such as photographs.  The FBI also gathered evidence that the

15  defendant purchased and/or downloaded other malware on his

16  computer, although I recognize there's no evidence that he

17  utilized that software.

18         In the defense submission it's pointed out that it was

19  never Mr. Fedorek's intention to hurt anyone.  Well, it's a

20  very difficult position to be in.  I can't look into his heart

21  to determine what his actual intent was.  I can only look at

22  what the evidence is that's been presented to me.  And I note

23  that with regard to whether or not actual losses were found,

24  with the exception of bitcoin, there is no evidence that there

25  was actual losses.

F2JLFEDS                    Sentence

1      But I would say this with regard to the intention,

2   that he didn't have an intention to hurt anybody.  And this,

3   again, may just be a product of immaturity or not a complete

4   understanding of exactly what this crime entailed.  There's

5   still no escaping that the defendant stole and invaded the

6   privacy of his victims.  In many ways, computers have replaced

7   photo albums, phone directories, and diaries; and we use them

8   on a daily basis to store critical financial information.  So,

9   in many ways, it was as if the defendant literally entered the

10  homes of these victims and stole their valuables.  There's,

11  again, and Mr. Fedorek acknowledged this in his comments, for

12  the victims who are aware that their privacy was invaded, it

13  will take a long time for them to recover from that because,

14  again, it's as if someone was rummaging through their home.

15      Therefore, in order to demonstrate the seriousness of

16  the offense, promote respect for the laws related to computer

17  hacking, provide just punishment for the offense, afford

18  adequate specific and general deterrence to criminal conduct,

19  such as been committed here by the defendant, I do believe that

20  Mr. Fedorek's conduct does warrant a period of meaningful

21  incarceration even when tempered against his history and

22  characteristics.

23      However, I believe that certain aspects of the

24  guideline calculation overstates the seriousness of the offense

25  in light of the defendant's conduct and in light of his

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2JLFEDS                          Sentence

1    history.

2         I recognize and I have accepted the guideline

3    calculation of loss in the PSR applying $500 per device, the

4    rule contained in application note (3)(f)(i).  This multiplier

5    is used whether or not a device was used and/or whether or not

6    it resulted in a loss.  This is consistent with the Second

7    Circuit's holding in *United States v. Dodson*, as well as the

8    holding in other circuits, specifically the Sixth Circuit in

9    *United States v. Gilmore* and in *United States v. Lyles*.

10        Here, as I understand it, there is no evidence that

11   Mr. Fedorek used any device and there's no evidence that there

12   was an actual financial loss by any of the victims attributable

13   to his conduct.  Under the facts of this case, I believe that

14   the six-level loss enhancement would be an overstatement or

15   overly harsh and, therefore, it warrants consideration under

16   3553(a).

17        I also note that unlike the defendant in *Dodson* who

18   knowingly possessed a list of stolen credit cards and actually

19   sold some of those credit card numbers to a cooperating witness

20   with the knowledge that those were going to be used without

21   authorization, I also note that unlike the defendant in *Dodson*,

22   Mr. Fedorek does not have a long history of committing identity

23   fraud.

24        Now, to be clear, I'm not saying that the application

25   of application note (3)(f)(i) would warrant a variance in every

F2JLFEDS                       Sentence

1    case.  Rather, given Mr. Fedorek's history and characteristics

2    and the facts and circumstances of his conduct in this case, I

3    believe that a variance is warranted with regard to this

4    particular guideline application.  As the Sixth Circuit noted

5    in *Lyles*, "The harshness of the 500 per case device rule will

6    certainly justify a downward variance in the eyes of some

7    judges, but that is an individualized determination to be made

8    by the sentencing court."

9         I note that the defendant has the support of his

10   family and friends and, as I've indicated, I believe that they

11   will continue to support him.  I hope that this will help

12   Mr. Fedorek comply with the law in the future.  Therefore, with

13   regard to specific deterrence, it's less of a factor for me in

14   this case because of that fact.

15        Now I'm ready to impose sentence.  Mr. Fedorek, please

16   rise for the imposition of sentence.

17        It is the judgment of this Court that you be committed

18   to the custody of the Bureau of Prisons for the period of 24

19   months.

20        That period of incarceration will be followed by three

21   years of supervised release.

22        There is also -- and, again, I'm not sure exactly how

23   this will work -- but there's also the issue of restitution in

24   the amount of $45,000 and I will order that restitution.

25        In addition, the defendant must pay a $100 special

1     assessment, which is due immediately.

2            Now, I'm not going to impose a fine because at this

3     stage I know the defendant is unable to pay a fine and I think

4     it's more important, again, to the extent that restitution be

5     made.

6            I believe that the sentence is sufficient but not

7     greater than necessary to comply with the purposes of

8     sentencing set forth in 18 U.S.C. 3553(a)(2).

9            Now, with regard to supervised release, the defendant

10    will be subject to the mandatory conditions set forth on

11    page 26 of the presentence report, the standard conditions one

12    through 13, and the special conditions described in the

13    presentence report on pages 27 through 28.

14           Now, does any counsel know of any legal reason why

15    this sentence should not be imposed as stated?

16           MR. SERCARZ:  No, your Honor.  I have an application

17    with regard to the sentence once it is imposed.

18           THE COURT:  Okay.  Does the government have any legal

19    reason why the sentence should not be imposed?

20           MS. LAI:  No, your Honor.

21           THE COURT:  Okay.  The sentence as stated is imposed.

22           Mr. Sercarz, you have an application.

23           MR. SERCARZ:  Yes, your Honor.  I'm going to request

24    that the Court give the defendant a date for voluntary

25    surrender which is sufficiently far out for us to try and

F2JLFEDS                      Sentence

1    accomplish in the County of Bergen the events that we

2    described.  I would ask the Court for a surrender date two

3    months out.  And we would also request that the Court recommend

4    that the defendant be housed in the Federal Correctional

5    Institution in Danbury, Connecticut, which is the nearest low

6    security facility, and would therefore permit maximum

7    visitation by members of the defendant's family.

8              THE COURT:  Okay.  Does the government want to be

9    heard on either of those applications, that was the 60-day

10   surrender period and the recommendation for Danbury,

11   Connecticut?

12             MS. LAI:  We have no objection to the surrender

13   period.  We take no position on where he should be

14   incarcerated.

15             THE COURT:  All right.  So I will set -- and I'll

16   provide you with a specific date in a moment -- surrender date

17   of 60 days.  And I will recommend to the Bureau of Prisons,

18   again, it is a recommendation, that Mr. Fedorek serve his

19   sentence in Danbury, Connecticut, in that facility.

20             Ms. Williams, if we could have a date 60 days out.

21             THE DEPUTY CLERK:  April 20.

22             THE COURT:  So April 20 will be the surrender date.

23             Now, let me say this with regard to that.

24   Mr. Sercarz, I expect that you and the New Jersey counsel will

25   do your utmost to make sure it happens in the next 60 days.  If

F2JLFEDS                    Sentence

1   for some reason it doesn't, I'd like to hear from you to make a

2   determination about whether or not I believe there's good cause

3   to extend the time period to allow that to happen, in other

4   words, but I expect you to take care of that as best you can.

5            MR. SERCARZ:  You got my word, your Honor.

6            THE COURT:  Okay.  Now let me just say this.  That's

7   my sentence, Mr. Fedorek, and you may be seated.  You have a

8   right to appeal your conviction and sentence.  The notice of

9   appeal must be filed within 14 days of the judgment of

10  conviction.  If you're not able to pay the cost of an actual

11  appeal, you may apply for leave to appeal in forma pauperis.

12  If you request, the clerk of the court will prepare and file an

13  appeal on your behalf.

14           Now, Mr. Fedorek, I expect that when you are in prison

15  that you're going to meet other inmates who are not nearly as

16  fortunate as you are.  There are going to be young men who

17  don't have families who are supporting them.  I hope that you

18  view this as an opportunity to see if you can help others,

19  obviously, and make the best time you can in jail, whether or

20  not you're able to participate in a drug treatment program.

21           Now, I hope that when you're released from custody,

22  you'll be a law-abiding citizen, and I guess what I mean by

23  that, I sentenced you to three years' supervised release for a

24  reason.  I will be, not directly, but the probation department

25  will be watching you, and I don't want to see you again.  And

F2JLFEDS                      Sentence

1    you don't want to see me again because I will tell you I've

2    given you a break today.  And but for the advocacy of your

3    attorney, you'd be spending more time in jail, and the support

4    of your family in the letters and things that they submitted,

5    you know, you would be spending more time in jail.

6            So what I'm saying to you, if you do come back before

7    me, I'll just say this, you don't want to come back before me

8    because I'm not going to give you another break.

9            Now, with regard to the forfeiture, I understand, I

10   don't have a forfeiture order, but I understand that

11   Mr. Fedorek agreed to forfeit the computers that were utilized

12   in connection with the offense.  And I'm not sure what other

13   materials there were.  I'm just looking at the plea agreement

14   now.

15           MS. LAI:  Your Honor, the government will submit a

16   forfeiture order within 24 hours.

17           THE COURT:  Fantastic.  Are there any other

18   applications?

19           MR. SERCARZ:  One, your Honor.  The Court is aware

20   that we have provided a version of our presentence submission

21   with certain proposed redactions relating to sensitive personal

22   information, addresses of those who wrote letters, information

23   regarding the defendant's medical conditions.  We have spoken

24   to the government and understand that the government has no

25   objection to our proposed redactions, and I would ask the Court

F2JLFEDS                        Sentence

1    to order that we have permission to redact the submission as

2    indicated.

3          THE COURT:  I have reviewed both the redacted and,

4    obviously, the unredacted version.  I think it's appropriate.

5    You can submit the redacted version for filing on ECF and an

6    unredacted version for filing under seal.

7          MR. SERCARZ:  Yes, your Honor.

8          THE COURT:  As I understand it, the defendant pled

9    guilty to an information and that there are no outstanding

10   counts.

11         MS. LAI:  That's correct, your Honor.

12         THE COURT:  Okay.  Is there anything further from the

13   government?

14         MS. LAI:  No not from the government, your Honor.

15         THE COURT:  From the defense?

16         MR. SERCARZ:  No.  Thank you, your Honor.

17         THE COURT:  We'll stand adjourned.  Thank you.

18                             o0o

19

20

21

22

23

24

25

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                             :

UNITED STATES OF AMERICA

                                             :

        - v. -                            14 Cr. 548 (VSB)

                                             :

KYLE FEDOREK,
   a/k/a "kbello,"                       :
   a/k/a "kbella,"

                                               :

                          Defendant.

                                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


## **GOVERNMENT'S SENTENCING MEMORANDUM**


 

 

 

                                            PREET BHARARA
                                            United States Attorney for the
                                            Southern District of New York,
                                            Attorney for the United States of America.


SARAH Y. LAI / DANIEL S. NOBLE
Assistant United States Attorneys
   – *Of Counsel* –



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 17, 2015

BY ECF AND EMAIL

Hon. Vernon S. Broderick
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

      Re:    *United States v. Kyle Fedorek*
           **14 Cr. 548 (VSB)**

Dear Judge Broderick,

      Sentencing in the above-referenced matter is scheduled for February 19, 2015, at 10:00 a.m. The Government respectfully submits this letter in advance of sentencing for the Court's consideration.

      The United States Probation Office has calculated a United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 41 to 51 months' imprisonment, as set forth in their Presentence Investigation Report ("PSR"). The Government respectfully submits that a sentence within that Guidelines range is sufficient, but not more than necessary, to provide just punishment, promote respect for the law, and provide deterrence for a serious offense that involved infecting over 400 victims' computers with malicious software, or malware, known as the Blackshades Remote Access Tool ("RAT"). Defendant Kyle Fedorek ("Fedorek" or the "defendant") used the RAT primarily to steal victims' usernames and passwords for various financial, email and social networking accounts.

      As discussed in the PSR, Fedorek was a customer of the Blackshades organization. He purchased the Blackshades RAT in or about September 12, 2012. (PSR ¶ 34(a)). Based on an analysis of Fedorek's laptop computer, which was seized pursuant to a search warrant at the time of his arrest, the last time that he downloaded stolen data from any victim's computer was in November 2013. The feature of the RAT that Fedorek used the most was a feature known as "form grabber." This feature was configured to search for financial account information, deployed on over 400 victim computers (PSR ¶ 36(a)), and used successfully to steal financial account log-in credentials from approximately 90 of those computers. In addition, Fedorek used the RAT to steal usernames and passwords for victims' email and social media accounts. The Government has not been able to determine from the analysis of the laptop whether Fedorek used the stolen log-in credentials. While some of the accounts associated with the stolen usernames

and passwords had experienced fraud, the financial institutions where the accounts were held were unable definitively to attribute the fraud to any particular malware.

The analysis of Fedorek's laptop showed that in addition to data stolen using the Blackshades RAT, he also possessed data stolen through other means and other types of malware. Although not part of the charged offense, Fedorek's possession of other malware is relevant to the nature and characteristics of the defendant. For example, Fedorek's laptop stored a database of 50,000 credit card numbers with corresponding expiration dates and security codes. (PSR ¶ 36(d)). The file name of this database suggested that the credit card information was stolen by a hacking group.

In addition, Fedorek's laptop also contained other malware, including, among others:

- at least two other types of keyloggers, besides the Blackshades keylogger;

- executable files for at least two known banking Trojans, *i.e.*, malware designed to steal bank account log-in credentials;

- a program which sends spam to instant messaging services such as ICQ and AOL Instant Messenger;

- an executable file for malware used to launch Distributed Denial of Service ("DDoS") attacks;

- two cryptors, *i.e.,* malware which is used to obfuscate viruses to prevent their elimination by antivirus software;

- four penetration testing tools which are designed to find and exploit security vulnerabilities on webpages, a common method of compromising websites;

- files for creating counterfeit websites for American Express, Bank of America and PayPal; such fake websites are often used by cyber criminals to deceive victims into divulging their account access and personal identification information; and

- proxy programs, which are software programs that obfuscates the user's true Internet Protocol address, and hence, physical location.

(PSR ¶ 36).

The information stored in Fedorek's laptop was extensive and carefully organized. The level of organization, together with the variety of malware stored on Fedorek's computer, suggests that he was a resourceful and determined hacker. While the Government is sympathetic to Fedorek's medical condition, it cannot excuse his criminal conduct.

The defendant contends that a sentence within the Stipulated Guidelines Range of 41 to 51 months would overstate the seriousness of the offense because the Guidelines for computer

hacking "are a poor gauge for evaluating behavior such as that exhibited by Mr. Fedorek in this case." (Def. Ltr at 11). The Government disagrees. The enhancement based on the loss amount – calculated by multiplying the number of stolen access devices (here, usernames and corresponding passwords are counted as one device) by $500 per access device, *see* U.S.S.G. § 2B1.1 comment n. 3(F)(i) (loss "shall be not less than $500 per access device") – is actually a *conservative* estimate. As discussed above, the defendant possessed some fifty *thousand* credit card numbers together with their expiration dates and security codes. However, because it is unclear how and when Fedorek obtained that database, we did not include that database as relevant conduct to which the $500 per access device formula would otherwise apply.

The other enhancements in the Guidelines calculation do not substantially overlap with each other or with the enhancement based on the loss amount. Each enhancement focuses on an aspect of the defendant's conduct that is not necessarily present in every computer hacking scheme. Thus, it is because Fedorek used the Blackshades RAT to steal usernames and passwords for both email accounts as well as financial accounts that he received the additional enhancement for stealing personal information under U.S.S.G. § 2B1.1(b)(17). Similarly, it is because he indiscriminately infected the computers of over 400 victims that he received the enhancement under U.S.S.G. § 2B1.1(b)(2)(C). And because Fedorek intended to, and did, undermine the integrity of his victims' computers, the four-level enhancement under U.S.S.G. § 2B1.1(b)(18)(A)(ii) must be applied. Each of these enhancements reflects specific harm caused by the defendant's offense conduct.

In addition to the seriousness of the offense and the nature and characteristics of the defendant, the need for general deterrence requires a Guidelines sentence. Computer hacking is becoming an ever increasing threat. Given the anonymity of the Internet and the proliferation of tools available to cyber criminals to evade law enforcement (*e.g.,* tools like the cryptors and proxy programs which Fedorek possessed), a sentence within the Stipulated Guidelines Range of 41 to 51 months is necessary to deter others from engaging in cybercrime.

CONCLUSION

For the reasons discussed above, the Government respectfully submits that a sentence within the Stipulated Guidelines Range of 41 to 51 months should be imposed.

Respectfully yours,

PREET BHARARA
United States Attorney

By: ___/Sarah Y. Lai/_____
    Sarah Y. Lai / Daniel S. Noble
    Assistant United States Attorneys
    (212) 637-1944 / 2239

cc: Maurice Sercarz, Esq. (by ECF)

# EXHIBIT E

ecngsans

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA

4            v.                        14 Cr. 333 (JCF)

5  JUAN SANCHEZ,

6                 Defendant.

7  ------------------------------x

8                                     New York, N.Y.
                                      December 23, 2014
9                                     10:20 a.m.

10
   Before:
11
                   HON. JAMES C. FRANCIS,
12
                                      Magistrate Judge
13
14                      APPEARANCES

15
   PREET BHARARA
16      United States Attorney for the
        Southern District of New York
17 SARAH LAI
   DANIEL NOBLE
18      Assistant United States Attorneys

19 PETER KATZ
        Attorney for Defendant
20

21

22

23

24

25

ecngsans

1          (Case called)

2          MS. LAI:  Sarah Lai and AUSA Daniel Noble for the

3     government.

4          MR. KATZ:  Peter Katz for Juan Sanchez.

5          THE COURT:  Good morning.

6          Mr. Katz, is your client prepared to be sentenced at

7     this time?

8          MR. KATZ:  He is.

9          THE COURT:  Mr. Sanchez, are you ready for sentencing?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Mr. Katz, I know you have reviewed the

12     presentence report and that you have certain objections.  Do

13     you want to voice those now?

14          MR. KATZ:  Certainly.  Thank you.  As you mentioned, I

15     put them in writing.  I'm not going to belabor the record now.

16     I'll just make a general comment that I understand why they're

17     in there, at least from probation's perspective, but I think

18     it's highly unusual and it doesn't occur in any other type of

19     case.  I'm not quite sure really what relevance it has, the

20     sections that I referenced.  Paragraphs 6 and 7, 9 and 12

21     through 29 all refer to things that have nothing to do with

22     Mr. Sanchez whatsoever.

23          They are background about an organization he's not a

24     part of, he never knew, has not dealt with, doesn't know any of

25     the codefendants, the cases are not related in any legal way,

ecngsans

1   and I don't think they belong in the presentence report.

2          In some way, I can't unring the bell.  You already

3   read it and you know about it, and there's nothing wrong with

4   that, but I don't think it belongs in the document, so that's

5   why I voiced the objections that I did.

6          THE COURT:  Ms. Lai, do you wish to be heard?

7          MS. LAI:  The background is that Mr. Sanchez is a

8   customer of this organization.  The government made a decision

9   to separate him out and not make a reference to that particular

10  organization because of a very unique, compelling family and

11  mental health background that he has, plus the fact that he

12  recognized his problems and sought professional help before the

13  government knocked on his door, so we made a conscious decision

14  to keep that aspect of the case out of the information.  That

15  said, factually, he is not a member of the organization per se;

16  however, he is a customer.  Other customers in this case have

17  been charged as customers of the organization.  His case is

18  unique because of the reasons that I mentioned.  I think it

19  should stay in the sentence report because factually it's

20  correct, but if there's any special notation that can be made

21  that says he was a customer and not a working member of the

22  organization, that's fine, but I don't think the PSR is

23  inaccurate.

24          THE COURT:  I will strike paragraphs 6 and 7 because I

25  agree that those refer to related cases which I think are not,

ecngsans

1    in fact, related because it involves other customers with whom

2    Mr. Sanchez had no contact.

3          I won't strike paragraphs 9 and 12 through 29 because

4    I think those are specifically background and that's frankly

5    useful background to me because it allows me to understand what

6    the charged crime is.  But I agree with Mr. Katz that they are

7    not significant to sentencing in the sense that Mr. Sanchez was

8    not involved except as a customer.

9          Mr. Katz, is there anything you'd like to say on

10   behalf of your client?

11         MR. KATZ:  Thank you, your Honor.  Very briefly, as I

12   referenced before, you have my submission of December 10 and I

13   rely on that.  I'll just say, as AUSA Lai mentioned,

14   Mr. Sanchez is certainly unique in this case and unique in my

15   experience in computer hacking cases.  He has a documented

16   mental health issue which we reference and is quite documented

17   over his entire life.

18         He sought help before the government came knocking on

19   his door as AUSA Lai mentioned.  He's tried to fix the things

20   that have been wrong in his life, many of which are not of his

21   own doing.  His family situation, his economic situation, the

22   things that he's had to endure as a child and growing up all

23   led him to today, but I don't think that it in any way defines

24   who he is.

25         To know Mr. Sanchez is to know what he's done since he

ecngsans

1    engaged in this conduct, which is to try to get help himself,
2    to be cooperative with law enforcement, to be compliant while
3    on pretrial release and do everything that the Court has asked
4    of him and everything that the U.S. Attorney's Office has asked
5    of him.   And I think that's why we're here in this Court with a
6    misdemeanor as opposed to a felony as I think many of the other
7    defendants who are otherwise similarly situated are.
8         I think a sentence of probation is appropriate.   He
9    needs continued supervision.   No doubt Mr. Sanchez is not out
10   of the woods from his personal situation.   I think probation
11   can be very helpful in that regard in continued mental health
12   treatment, which just in the nine months I have known
13   Mr. Sanchez, I can see a marked difference in his mental state.
14   It's definitely helping and I think it needs to continue under
15   the auspices of probation.   I think it would be beneficial to
16   him.
17        So that's what I ask your Honor to do, is to sentence
18   Mr. Sanchez to probation with the continued mental health
19   treatment that he has already been seeking.
20        THE COURT:   Thank you.
21        Mr. Sanchez, is there anything you'd like to add to
22   what your attorney has said?
23        THE DEFENDANT:   The only statement I suppose I wish to
24   give is that I wish to express apologies for those affected,
25   any and all family and friends included.

ecngsans

1        THE COURT:   Thank you.

2        Ms. Lai, is there anything the government would like

3    to add with respect to sentencing?

4        MS. LAI:  Nothing further, your Honor.

5        THE COURT:   Thank you.  Well, I think I agree

6    generally that this case is a unique one.  This crime appears

7    to have been a consequence of computer addiction, if you will,

8    which was itself symptomatic of the defendant's other mental

9    and emotional issues, and certainly, it does not appear that

10   the hacking involved here was malicious.

11       I will therefore sentence Mr. Sanchez in accordance

12   with probation's recommendation and I will sentence him to a

13   term of probation of one year on the following conditions:

14   That he shall not commit another crime; that he shall not

15   possess a controlled substance; he shall not possess a firearm

16   or destructive device; he shall refrain from any use of

17   controlled substances; he shall submit to a drug test within 15

18   days of today and two unscheduled drug tests thereafter as

19   directed by probation; he shall cooperate with the collection

20   of DNA as directed by the probation officer.

21       Furthermore, he shall submit to any reasonable search

22   of himself or his premises, including search of his computer,

23   which may involve the installation of a monitoring program to

24   observe his use of the computer.  He shall participate in

25   mental health counseling as directed by probation.  He shall

ecngsans

1  abide by the directives of immigration officers.  He shall

2  report to the probation office within 72 hours.  And he shall

3  pay a special assessment of $25 due immediately.  Because of

4  Mr. Sanchez's financial circumstances, I find that it is not

5  appropriate to impose a fine.

6           Mr. Sanchez, you have the right to appeal the sentence

7  that I have imposed.

8           Is there anything further?

9           MR. KATZ:  No, your Honor.

10          MS. LAI:  Not from the government.

11          THE COURT:  Thank you, all.

12          MR. KATZ:  Thank you, your Honor.  Happy holidays.

13          THE COURT:  Thanks.  Same to you.

14          (Adjourned)

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT F







# EXHIBIT G

FILED

2013 JAN 25 PM 12:26

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2012 Grand Jury

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR **CR 13 00056** |
| Plaintiff, | ) | I N D I C T M E N T |
| v. | ) | [18 U.S.C. §§ 1030(a)(2)(C), (c)(2)(B)(ii): Unauthorized Access of Protected Computers; 18 U.S.C. § 1028A(a)(1): Aggravated Identity Theft] |
| KAREN KAZARYAN, aka "Gary Kazaryan," | ) | |
| Defendant. | ) | |

The Grand Jury charges:

COUNTS ONE THROUGH FIFTEEN

[18 U.S.C. §§ 1030(a)(2)(C), (c)(2)(B)(ii)]

A.   INTRODUCTORY ALLEGATIONS

1.   At all times relevant to this Indictment:

a.   Defendant KAREN KAZARYAN, also known as Gary Kazaryan ("defendant KAZARYAN"), resided in Glendale, California, and was employed in Burbank, California.

b.   Yahoo! Inc. ("Yahoo!") provided electronic mail ("e-mail") services to users all over the world.

c.   Google, Inc. ("Google") provided e-mail services to users all over the world.

          d.   Facebook, Inc. ("Facebook") provided social
networking services to users all over the world.

          e.   Microsoft, Inc. provided Skype Voice-Over-Internet
Protocol services ("Skype") to users all over the world.

          f.   Between 2009 and 2011, defendant KAZARYAN gained
unauthorized access to the e-mail accounts, Facebook accounts,
and Skype accounts of more than 100 victims residing in
California.

          g.   After defendant KAZARYAN gained unauthorized
access to these accounts, he would change the passwords to the
accounts, sometimes multiple times so that he had sole access to
the accounts for periods of time.

          h.   After defendant KAZARYAN gained unauthorized
access into these accounts, he would also obtain information
belonging to the victims from the accounts, including pictures,
communications, and information about other accounts.

          i.   Using the accounts to which he had obtained
unauthorized access, defendant KAZARYAN would then, in the guise
of the victims' online identities, contact friends or associates
of the victims in order to fraudulently persuade, or extort,
those individuals into removing their clothing so that defendant
KAZARYAN could view, and take pictures of, their naked or semi-
naked bodies via their webcams.  Defendant KAZARYAN would also
use naked or semi-naked images of victims to further extort those
and other victims to remove their clothing so that defendant
KAZARYAN could view, and take pictures of, their naked or semi-
naked bodies.

## II.  UNAUTHORIZED ACCESS

2.  On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant KAZARYAN knowingly and intentionally accessed without authorization and in excess of authorization, and thereby obtained information, from a protected computer, as that term is defined in Title 18, United States Code, Section 1030(e)(2)(B), namely, a server of the service provider described below, in furtherance of criminal and tortious acts, to wit, Extortion, Threatening Letters, False Personation, Identity Theft, and Contact by Electronic Communication with Intent to Annoy, in violation of California Penal Code Sections 518, 520, 523, 530, 530.5, and 653m, respectively, and the California State Torts of Intentional Infliction of Emotional Distress and Invasion of Privacy, as set forth below:

| COUNT | DATE | ACCOUNT HOLDER VICTIM | SERVICE PROVIDER |
|-------|------|------------------------|------------------|
| ONE | 01-28-2010 | M.O. | Yahoo! |
| TWO | 02-18-2010 | S.D. | Yahoo! |
| THREE | 05-15-2010 | H.K. | Yahoo! |
| FOUR | 08-15-2010 | C.P. | Facebook |
| FIVE | 09-25-2010 | A.P. | Skype |
| SIX | 10-15-2010 | T.M. | Skype |
| SEVEN | 10-16-2010 | T.M. | Skype |
| EIGHT | 11-20-2010 | A.M. | Facebook |
| NINE | 11-20-2010 | L.A. | Facebook |
| TEN | 11-20-2010 | L.A. | Skype |
| ELEVEN | 11-21-2010 | C.P. | Facebook |
| TWELVE | 11-27-2010 | A.P. | Skype |

| COUNT | DATE | ACCOUNT HOLDER VICTIM | SERVICE PROVIDER |
|---|---|---|---|
| THIRTEEN | 12-12-2010 | E.A. | Yahoo! |
| FOURTEEN | 12-18-2010 | E.A. | Facebook |
| FIFTEEN | 12-18-2010 | H.K. | Facebook |

COUNTS SIXTEEN THROUGH THIRTY

[18 U.S.C. § 1028A(a)(1)]

3. The Grand Jury re-alleges paragraphs one and two of this Indictment, including all subparagraphs, as if fully set forth herein.

4. On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant KAREN KAZARYAN, also known as Gary Kazaryan, knowingly and without lawful authority possessed and used means of identification of other persons, that is, the usernames of the below-described individuals, during and in relation to the acts of unauthorized access to a protected computer, as charged above in Counts One through Fifteen, and in violation of Title 18, United States Code, Sections 1030(a)(2)(C), (c)(2)(B)(ii):

| COUNT | DATE | VICTIM | RELATED COUNT |
|-------|------|--------|---------------|
| SIXTEEN | 01-28-2010 | M.O. | ONE |
| SEVENTEEN | 02-18-2010 | S.D. | TWO |
| EIGHTEEN | 05-15-2010 | H.K. | THREE |
| NINETEEN | 08-15-2010 | C.P. | FOUR |
| TWENTY | 09-25-2010 | A.P. | FIVE |
| TWENTY-ONE | 10-15-2010 | T.M. | SIX |
| TWENTY-TWO | 10-16-2010 | T.M. | SEVEN |
| TWENTY-THREE | 11-20-2010 | A.M. | EIGHT |
| TWENTY-FOUR | 11-20-2010 | L.A. | NINE |
| TWENTY-FIVE | 11-20-2010 | L.A. | TEN |
| TWENTY-SIX | 11-21-2010 | C.P. | ELEVEN |
| TWENTY-SEVEN | 11-27-2010 | A.P. | TWELVE |

| COUNT | DATE | VICTIM | RELATED COUNT |
|-------|------|--------|---------------|
| TWENTY-EIGHT | 12-12-2010 | E.A. | THIRTEEN |
| TWENTY-NINE | 12-18-2010 | E.A. | FOURTEEN |
| THIRTY | 12-18-2010 | H.K. | FIFTEEN |

A TRUE BILL

/s/

_____
Foreperson

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

WESLEY L. HSU
Assistant United States Attorney
Chief, Cyber & Intellectual Property Crimes Section

ERIC D. VANDEVELDE
Assistant United States Attorney
Deputy Chief, Cyber & Intellectual Property Crimes Section

TRACY L. WILKISON
Assistant United States Attorney
Cyber & Intellectual Property Crimes Section

6

# EXHIBIT H

ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
TRACY L. WILKISON (Cal. Bar No. 184948)
Assistant United States Attorney
Cyber and Intellectual Property Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-0622
    Facsimile:  (213) 894-0141
    E-mail:    tracy.wilkison@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 13-56-GHK |
|---|---|
|        Plaintiff, | GOVERNMENT'S SENTENCING POSITION AND OPPOSITION TO DEFENDANT'S SENTENCING POSITION; EXHIBITS FILED CONCURRENTLY UNDER SEAL |
|          v. | |
| KAREN KAZARYAN, aka "Gary Kazaryan," | |
|        Defendant. | |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Tracy L. Wilkison, hereby files its sentencing position and opposition to defendant Karen Kazaryan's sentencing position.

This Opposition is based upon the attached memorandum of points and authorities, the exhibits filed concurrently under seal, the Presentence Investigation Report and recommendation letter, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 22, 2013     Respectfully submitted,

                                  ANDRÉ BIROTTE JR.
                                  United States Attorney

                                  ROBERT E. DUGDALE
                                  Assistant United States Attorney
                                  Chief, Criminal Division

                                       /s/
                                  _____
                                  TRACY L. WILKISON
                                  Assistant United States Attorney

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                                                    **PAGE**

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION...................................................1

II.   DEFENDANT'S OBJECTIONS SHOULD BE OVERRULED.....................3

      A.    Defendant's Victims Number More Than 250................3

      B.    Defendant's Offense Involved Sophisticated Means........7

III.  DEFENDANT DESERVES AN UPWARD DEPARTURE........................9

IV.   BASED ON THE § 3553 FACTORS, A SENTENCE OF 72 MONTHS IS
      APPROPRIATE..................................................15

      A.    18 U.S.C. § 3553(a)(1)................................15

      B.    18 U.S.C. § 3553(a)(2)................................21

      C.    18 U.S.C. § 3553(a)(6)................................22

V.    CONCLUSION...................................................25

# TABLE OF AUTHORITIES

**DESCRIPTION**                                                          **PAGE**

**Cases**

Nichols v. United States,
  511 U.S. 738 (1994)......................................................19

United States v. Barrington,
  648 F.3d 1178 (11th Cir. 2011)...........................................5

United States v. Blixt,
  548 F.3d 882 (9th Cir. 2008)............................................4

United States v. Feigin,
  2010 WL 376278(11th Cir. 2010) .........................................24

United States v. Gonzalez,
  541 F.3d 1250 (11th Cir. 2008)..........................................15

United States v. Ledgard,
  2012 WL 3996855 (C.D.Ca. September 12, 2012)....................5

United States v. Moon,
  513 F.3d 527 (6th Cir. 2008)............................................15

United States v. Popa,
  361 Fed.Appx. 854 (9th Cir. 2010)........................................4

United States v. Watts,
  519 U.S. 148 (1997)......................................................19

**Statutes**

18 U.S.C. § 1028(d)(7).....................................................3

18 U.S.C. § 1028A(a)(1).................................................2, 4

18 U.S.C. § 1030(3)(2)....................................................10

18 U.S.C. § 2252A.........................................................11

18 U.S.C. § 3553(a)...............................................15, 21, 22

18 U.S.C. §§ 1030(a)(2)(C)................................................1

**Rules**

U.S.S.G. § 2B1.1.....................................................passim

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant Karen Kazaryan, aka Gary Kazaryan, is a sexual cyber terrorist.  He hacked into hundreds of victims' email, Facebook, and Skype accounts using their usernames and passwords or password reset questions.  He then methodically searched their accounts for naked pictures, passwords, and the contact information of their friends. He had two goals every time that he accessed these accounts: get more naked pictures in any way he could, and get more victims.  Once he had access to an account, he would take over the account and pretend to be that person to her friends.  He would persuade the friends to show him their breasts or provide naked pictures.  He also persuaded them to provide their usernames and passwords so that he could obtain access to their accounts too.  Once he had stolen the naked pictures from these women, he went further, returning to them in the guise of another victim account, and demanding that they provide him with more sexually explicit videos.  He "sextorted" their compliance, forcing them to strip for the camera while he took yet more pictures.  He was indifferent to their pain, to their pleas to stop, and to their requests for privacy.  If they hesitated at all, he posted previously obtained pictures publicly, causing the horrified victims to receive calls from other friends about how their entire friend network could now see them naked.  His victims were devastated and felt like they had been raped.  They continue to be thoroughly traumatized by his criminal conduct.

For his crimes, defendant was charged with fifteen counts of unauthorized access of protected computers, in violation of 18 U.S.C. §§ 1030(a)(2)(C), (c)(2)(B)(ii), and fifteen counts of

aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).
He pleaded guilty on July 15, 2013, to one count each of
unauthorized access and aggravated identity theft, pursuant to a
written plea agreement.

On September 3, 2013, the United States Probation Office issued
its Presentence Investigation Report ("PSR") in this matter.  The
PSR calculated a total offense level for the unauthorized access
count as 13, and found defendant to be in Criminal History Category
I, and found the advisory guideline range, with the mandatory
consecutive sentence of two years imprisonment, to be 36 to 42
months.  Recognizing that the Sentencing Guidelines do not
adequately address defendant's crimes, the Probation Office
recommended a sentence of 48 months' imprisonment.

The government has no objections to the Guideline calculations.
On November 20, 2013, defendant filed his sentencing position.  In
it, he first makes two objections to the PSR: (1) to the six level
increase for number of victims in paragraphs 73-78; and (2) to the
two level increase for sophisticated means in paragraphs 79-82.  He
then argues for a sentence of 30 months' imprisonment based on the
Section 3553(a) factors.

Because defendant's objections lack merit, they should be
overruled.  Moreover, for the reasons set forth below, including the
fact that the sentencing guidelines do not adequately capture
defendant's sextortionate conduct, the government recommends a
sentence of imprisonment of 72 months, or six years.

## II. DEFENDANT'S OBJECTIONS SHOULD BE OVERRULED

### A. Defendant's Victims Number More Than 250

Defendant first objects to the increase of six levels for more than 250 victims on the basis that victims who had their usernames used without authorization are not properly counted as victims, and that the number of victims includes only those named in the Indictment. Defendant's objections lack merit and should be overruled.

The PSR correctly states that Application Note 4(E)(ii) to U.S.S.G. § 2B1.1 affirms that for purposes of calculating the number of victims, in a case involving means of identification, "victim" means any individual whose means of identification was used unlawfully or without authority. "'Means of identification' has the meaning given that term in 18 U.S.C. § 1028(d)(7)." U.S.S.G. § 2B1.1 cmt. n.1. Under § 1028(d)(7), "means of identification" includes "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any . . . name . . . or electronic identification number [or] address." There is no requirement, as defendant suggests, that the means of identification be used in furtherance of a criminal or tortious act for the individual to qualify as a victim; only that the means of identification be "used unlawfully or without authority."[1]

In this case, defendant used the unique usernames – which are both names and electronic addresses under the plain language of

---

[1] That said, as discussed below, the victims' means of identification in this case were in fact used in furtherance of criminal and tortious acts.

Section 1028(d)(7) – of more than 370 victims.  These usernames identify persons very specifically to the provider; no two people can have the same username at the same provider.  For example, there may be many John Smiths, but there is only one JSmith365@gmail.com. Indeed, in pleading guilty to count 27, which charges a violation of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1), defendant agreed that these usernames were means of identification, that he used them knowing that they belonged to real victims and that he had no lawful authority to use them.  In the factual basis, he agreed: "In addition, during and in relation to this unauthorized access to a computer in furtherance of a state crime or tort, defendant intentionally obtained, possessed and used without legal authority a means of identification of another person, specifically the user id for the computer accounts that he accessed.  Defendant knew that these user ids belonged to a real person, and he acted without their permission and without lawful authority."  CR 42.

Defendant used these usernames to assume the victims' online identities, connect with their friends and family, search for images, search for new victims, fraudulently persuade victims to pose naked on Skype, and extort other victims to pose naked as well. He cannot now object to the inclusion of these victims in calculating the Sentencing Guidelines.  See United States v. Popa, 361 Fed.Appx. 854, 856 (9th Cir. 2010) (unpublished) (holding that a defendant had committed aggravated identity theft in making drivers' licenses that included the real names of other people, but fake information, or Popa's information, for the remainder of the licenses, because the names uniquely identified the victims of the identity theft crimes);  United States v. Blixt, 548 F.3d 882, 887–

88 (9th Cir. 2008) (holding that a forged signature constitutes a means of identification, because it is a name in a different form, and because it, taken in conjunction with other information as a whole, will identify a specific individual. "[Section 1028] includes the use of a name, alone or in conjunction with any other information, as constituting the use of a means of identification so long as the information taken as a whole identifies a specific individual. There is nothing in the language of the statute that suggests the use of another's name in the form of a signature is somehow excluded from the definition of 'means of identification.'"); United States v. Barrington, 648 F.3d 1178, 1193 (11th Cir. 2011) ("[c]learly, the usernames and passwords, considered together, constituted a 'means of identification' for those specific individuals and [the defendant] knew that."); United States v. Ledgard, 2012 WL 3996855, *14 (C.D.Ca. September 12, 2012)(defendant found guilty of Section 1028A by Judge Pregerson based on his use of victim's username to access account); United States v. Mijangos, 10-743-GHK (C.D.Ca. September 1, 2011)(Court imposed enhancement based on number of victims whose usernames were used, finding that the screen names are a means of identification).

Defendant's objection as to the number of victims also fails. Every time defendant accessed an email, Facebook, or Skype account, he necessarily had to use the username and either the password or the password reset questions. He could not have gained the access to the accounts without using the means of identification. The usernames that defendant used to access accounts are separately filed under seal in Exhibit A. Exhibit A contains lists of accessed accounts obtained in one of two ways: (1) based on the evidence on

5

defendant's computer, found during the search in this case, which showed him accessing other people's accounts; (2) based on records maintained by Facebook, Yahoo, and Google, which showed defendant's IP address accessing other people's accounts.  The lists have been cross-referenced, and duplicates or persons with multiple accounts have been deleted.  What remains is 372 individual victims identified as having their accounts actually accessed through defendant's use of their username, not simply the nine victims named in the indictment.  The six-level increase for more than 250 victims is entirely appropriate.

Defendant objects that if the victims did not know that their accounts were hacked, then they cannot be counted as victims, and further asserts that there is no evidence that the usernames were used in furtherance of a criminal or tortious act.  These objections lack merit.  First, nothing in the Sentencing Guidelines supports defendant's suggested amendment to the definition of "victim."  Second, the entire point, the raison d'etre, of defendant's unauthorized use of his hundreds of victims' means of identification was to gain access to their accounts so that he could (1) search for naked pictures to steal; (2) pose as the victim to allow him to victimize others; and (3) gain the usernames and passwords of other victims, all in violation of Extortion, Threatening Letters, False Personation, Identity Theft, and Contact by Electronic Communication with Intent to Annoy, in violation of California Penal Code Sections 518, 520, 523, 530, 530.5, and 653m, respectively, and the California State Torts of Intentional Infliction of Emotional Distress and Invasion of Privacy.  The evidence on defendant's computer confirms that defendant methodically worked to expand his

victim network and to terrorize yet more people. Defendant's assertion that the majority of the victims in this case suffered "neither actual nor emotional loss, nor were inconvenienced," flies in the face of reality.

Defendant's objection should be overruled and the six-level enhancement applied.

**B.  Defendant's Offense Involved Sophisticated Means**

Defendant next objects to the two level increase for sophisticated means.  U.S.S.G. § 2B1.1(b)(9)(C) states: "if . . . the offense otherwise involved sophisticated means, increase by 2 levels."  The commentary explains that "sophisticated means" include:

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1(b)(9)(C), cmt. n.8(B).

As the PSR points out, defendant's activities in this case involved hiding transactions through the use of fictitious entities or names.  PSR, ¶ 82.  His computer showed evidence of programs designed to hide his IP addresses so that he could further conceal his crimes from law enforcement.  PSR, ¶¶ 81, 82.

Indeed, defendant's crimes were "especially complex" and especially intricate," both in the execution and concealment of the offense.  Defendant took elaborate steps to take over as

7

many victim accounts as possible, so that he could use his victims as a shield in order to gain the trust of other victims. He would pose as one victim, and ask others for their passwords or password reset information. For example, the Skype chat filed under seal as Exhibit B shows defendant as one victim, first asking the second victim to "flash" him, and then, pretending that he can solve a computer problem, asks for her username and password (at line 609-14). The second victim, thinking that she is speaking with the first victim, supplies it. Defendant would then access her accounts and network out from there to find other victims. This happened numerous times with many different victims.

Defendant also used his ability to access victim accounts to obtain naked pictures, pretending to be one victim to gain the confidence of another so that she would show her naked breasts to him. Once he had that, he would extort more sexual activity from the second victim. For example, in the Skype chat filed under seal as Exhibit C, defendant on one day pretended to be the first victim and fraudulently persuaded the second victim to show her breasts. When she did, he took a picture of her and saved it on his computer. He then came back a second day, and was able to extort her into revealing her breasts again and again took pictures. Defendant did this frequently and with many of his victims. As detailed above, he ultimately was able to access and take over well over 350 online identities, and he had over 1,100 naked or semi-naked pictures of women on his computer.

Defendant contends that because the government was able to successfully investigate defendant's crimes, they were not sophisticated.  However, the fact that ultimately, the government was able to track down defendant's IP addresses to his home and work, and discover evidence of his crimes on his computer, does not make defendant's crimes unsophisticated.  If prosecution equalled unsophisticated, the enhancement would never be applied.  Similarly, defendant's argument that the sophisticated means enhancement is duplicative of USSG § 2B1.1(b)(16)(a) (applying a two-level increase for a § 1030 offense where there was intent to obtain personal information) fails; not all unauthorized computer access cases are necessarily exceptionally sophisticated.  Here, the enhancement is appropriate because defendant designed special precautions in setting up his crimes specifically in order to avoid detection and to continue extorting his victims.  Defendant's crimes were more complex than the average case under this Guideline.  Given both the intricacy and the level of concealment of defendant's crimes, he qualifies for the sophisticated means enhancement, and defendant's objection should be overruled.

**III. DEFENDANT DESERVES AN UPWARD DEPARTURE**

The Probation Office recommends a sentence of 48 months' imprisonment, which includes a six-month upward departure from the Sentencing Guidelines.  The government agrees that an upward departure is warranted, but recommends a 30-month upward departure, for an ultimate sentence of 72 months.  In the alternative, the government recommends a variance under Section 3553(a), as discussed

1  below, to the same sentence, based on defendants conduct, history,

2  and circumstances.

3      U.S.S.G. § 2B1.1 is the Guidelines section used for section

4  1030

5  offenses like that to which defendant has pleaded guilty.  This is

6  the same section used for offenses involving, among other things,

7  theft, stolen property, property damage or destruction, fraud,

8  forgery, and counterfeiting.  Accordingly, the section generally

9  gauges the seriousness of the offense by the amount of monetary

10  loss.  The commentary recognizes, however, that an upward departure

11  is warranted where the nature of the crime is non-monetary.  See

12  U.S.S.G. § 2B1.1 cmt. n.19.  Among the non-exhaustive list of

13  factors warranting an upward departure are the following:

> (i) A primary objective of the offense was an aggravating,
> non-monetary objective. For example, a primary objective
> was to inflict emotional harm.

> (ii) The offense caused or risked substantial non-monetary
> harm. For example, the offense cause physical harm,
> psychological harm, or severe emotional trauma, or
> resulted in substantial invasion of a privacy interest
> (through, for example, the theft of personal information
> such as medical, educational, or financial records). . . .

> (v)  in a case involving stolen information from a
> protected computer," as defined in 18 U.S.C. § 1030(3)(2),
> the defendant sought the stolen information to further a
> broader criminal purpose.

22  The PSR recommends an upward departure on this basis, but the

23  government respectfully submits that the departure does not go far

24  enough.  In this case, a substantial, 30 month, upward departure is

25  warranted for this defendant because the monetary adjustments in

26  § 2B1.1 do not properly capture the seriousness of defendant's

27  conduct, nor the true loss to the victims.

28

Here, defendant was not motivated at all by monetary gain. There is no increase for loss in this case. Rather, defendant's currency was naked pictures of women, and, using that measure, there was substantial loss to the victims. Defendant intentionally hacked into his victims accounts, made contact with his victims, and played psychological games with them intending to inflict emotional harm. The nonchalant manner in which he terrorized these women for his own pleasure, and the scale on which he did it, are disturbing. In one chat, defendant called it his "hobby." Exhibit D, line 589. Some of the images were of minor girls, and thus child pornography or child erotica, which is itself a very serious crime. See 18 U.S.C. § 2252A; USSG § 2G2.2. On defendant's computer, agents discovered more than 8,000 instant message chats where defendant was attempting to obtain email accounts and account passwords and pictures of naked or semi-naked women and sexually explicit conduct. PSR, ¶ 62. There were more than 1,100 saved photos of naked or semi-naked women. Id. There is nothing in the Sentencing Guidelines calculation that accounts for that loss. Indeed, if each naked picture were afforded the same loss calculation as an unused credit card, a conservative loss estimate would be $550,000, or an increase of 14 levels (gained at any loss beyond $400,000). The resulting Guideline would be 70-87 months, plus two years consecutive for the Section 1028A conviction, for a total Guideline sentence of 94-111 months.

Moreover, as the PSR points out, the account holder victims reported that defendant changed their passwords multiple times, locking them out of their accounts. They were forced to cancel accounts, start new ones, and re-establish contact with friends.

11

The guidelines do not account for the fact that the victims spent many hours attempting to undo the damage that defendant caused to their accounts and the severe invasion of their privacy.

An upward departure is also appropriate because Section 2B1.1 does not adequately address the intentional infliction of emotional distress that defendant visited upon his victims. The PSR well discusses a small sampling of the emotional trauma and psychological harm that the victims suffered at defendant's hands. PSR, ¶¶ 35-60. The government also attaches as Exhibits B-E some of the instant message chats (4 out of 8,000) found on his computer. Each time defendant gained access to an account, he would plunder it searching for pictures he could steal and use to extort further pictures, passwords he could steal and use to get into other accounts, and contacts that he could victimize next. With total disregard for his victims, defendant would take pictures of those who trusted he was who he said he was, and use them to further extort the victims. As the Probation Office notes in the recommendation letter, "not only was this conduct egregious, defendant's callousness and complete disregard for the demand victim is evident in that he would 'allow' the demand victim to cover her face when he took the naked or semi-naked body pictures of the demand victim."

Defendant's assaults took a tremendous toll on his victims. They lost their privacy. They felt raped. And for many of them, realizing that defendant was someone they knew was further victimization. As the PSR states, many of defendant's victims were people that he knew or went to school with. PSR, ¶ 29. He used his knowledge of these people to gain access to their accounts, and then spread out to other victims. For this reason, many victims have

reported to the government an extreme reluctance to appear in court to see their former friend or acquaintance, and all have requested that their names not be used in any letters to the court.  For example, filed under seal as Exhibit F is a letter from one victim who is too scared to be named.  This victim is one who was sextorted by defendant into providing naked pictures.  She writes that the fear caused by defendant has still not left her mind.  She states that defendant was a family friend, and because of his abuse of her, she says, "I am convinced that he will be a threat to both my community and me.  He certainly made threatening comments prior to his arrest and I fear the effects of such an individual being released into our community, should he not face the appropriate consequences for his crime."  She no longer feels safe on the Internet based on his manipulation of her.

Other victims reported the effects of defendant's crimes when they spoke with law enforcement.  These reports are filed under seal as Exhibit G.  For example, victim S.A. (referenced at PSR, ¶¶ 57-60) stated that she feels "threatened and terrorized" by defendant. She closed down her accounts and created new ones.  She was very scared that her photos would get out and damage her reputation. This fear about photos becoming public and damaging their reputation is one repeated in the Skype chats, for example at Exhibit D, line 593, and is the main means by which defendant was able to coerce his victims:  by threatening to publicly post the pictures he already had.

As another example, victim S.D. (PSR, ¶¶ 55, 56) reported that she "was very scared, could not sleep and felt traumatized.  She is still very paranoid about using computers and instant messaging with

13

friends." Victim D.M. (PSR, ¶¶ 47-51) stated that she "is
emotional[ly] distraught and cried profusely for the rest of the
evening [following the extorted provision of naked pictures]." She
stated that she "felt like she was raped, and was scared to log into
her email account." Victim H.K. (PSR, ¶¶ 57-60) stated that she
feels "threatened and terrorized" by defendant. She had closed down
her Facebook account, changed her email accounts, and was fearful of
using the Internet and computer. At a later interview, she stated
that she felt threatened, scared, and attacked. Victim M.M. (PSR,
¶¶ 43-46) stated that she was upset, and fearful, and had to close
down all of her email and social media sites. She stated that she
experienced depression, and continues to be upset about it. Victim
A.A. (PSR, ¶¶ 37-42) said that she felt "extremely violated" and was
fearful of what defendant would do with the photographs he obtained.
Victim H.A., whose naked picture was posted on victim C.P.'s
Facebook page by defendant as an incentive to get victim H.A. to
show him her breasts (PSR, ¶ 36), felt scared and unsafe. She
reported calling victim C.P. during the attack, crying, and asking
her to take down the picture and delete all of her friends.
Ultimately, Victim H.A. deactivated her Facebook account and still
feels scared.

Given the extreme emotional violence that defendant visited
upon these women, and given the persistent and pervasive efforts by
defendant to victimize as many people as possible, the six-month
upward departure recommended by the Probation Office is insufficient
to fully capture his conduct. The government recommends a sentence
of 72 months, or a 30 month upward departure, because nothing less
can account for the true loss defendant caused. Indeed, as noted,

the recommendation is less than what would result from an approximate monetization of defendant's currency of choice: naked pictures of women, obtained without their consent and against their will.

**IV.  BASED ON THE § 3553 FACTORS, A SENTENCE OF 72 MONTHS IS APPROPRIATE**

Taking the advisory Guidelines into consideration, including the upward departure, the government believes that a sentence including 72 months' imprisonment is sufficient but not greater than necessary to comply with the enumerated purposes of sentencing and the factors set forth in 18 U.S.C. § 3553(a).

**A.  18 U.S.C. § 3553(a)(1)**

1.  <u>Nature and Circumstances of the Offense</u>

18 U.S.C. § 3553(a)(1) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of defendant.  As discussed above, defendant's crimes and the impact on his victims were truly terrible.  The emotional distress caused to the victims is a necessary part of the evaluation of the nature and circumstances of defendant's offense. <u>See</u>, <u>e.g.</u>, <u>United States v. Moon</u>, 513 F.3d 527, 534 (6th Cir. 2008) (affirming sentence where district court permitted testimony of relatives of deceased patients as relevant to nature and circumstances of the fraud offense).  Some courts have considered harm to the victim under Section 3553(a)(2) as well.  <u>See</u>, <u>e.g.</u>, <u>United States v. Gonzalez</u>, 541 F.3d 1250, 1254 (11th Cir. 2008) (noting district court's consideration of "desperation of the victims" when considering the nature and circumstances of offense and harm to victims when considering the need to reflect the

seriousness of the offense, to promote respect for the law, and to
provide just punishment).

In this case, defendant attacked his victims on an almost daily
basis.  For example, Exhibit H is a chart compiled with Facebook
records of accounts accessed from defendant's home IP address and
shows that defendant, just between November 1, 2010 and February 23,
2011, accessed his victims' accounts almost daily.  Notably, the
chart does not include the times he accessed the accounts from his
work IP address, nor does it include the entire year of 2010 that he
was accessing victim accounts, nor does it include any access beyond
Facebook.  It nonetheless speaks powerfully about defendant's
dedication to his crime.

In addition, the captured instant messages themselves
demonstrate defendant's callousness, his abuse of power, and his
complete disrespect for women.  For example, in Exhibit D, defendant
posed as victim T.M., and had a Skype conversation with victim M.M.
In his Skype conversations with victims, defendant was able to
persuade his victims that his video camera was malfunctioning, and
he could type his part of the conversation while watching the victim
on her camera.  After he persuaded M.M. to show him her breasts, he
later spoke with her and demanded that she "flash me regularly."  He
was completely dismissive of her statements that she could report
him and threatened to post the picture of her flashing him on all of
her friends' accounts.  He said "at this point I have power," and
ignored her pleas to stop.  When she expressed concern that he was
going to ruin her good reputation, he was unmoved and continued to
demand the naked pictures.

In Exhibit C, defendant posed as victim A.P. and victimized victim A.A.  Again, after gaining a picture of her flashing by fraud, he returned to demand more.  He trivialized her attempts to fight back, and flippantly said that he had "incentives" to cause A.A. to "flash[] me for about a minute and play with her boobs… I don't care if her face is in it."  He said if she did, "I wont facebook the picture of her flashing :)"  He was indifferent to her cries for mercy and demanded that she appear on screen "no face 2 min topless and just rub your boobs."  He pretended not to be "some Armenian person that we know," as she was concerned about that, and further demanded her compliance.

These chats comport with the reports by other victims of the horrific nature of defendant's conduct.  The conduct was also repeated and long-lasting for well over a year, and involving hundreds and hundreds of victims.  The sheer volume of defendant's hacks and victims sets him apart.  It can be no understatement to say that the nature and circumstances of the offense call for a very significant sentence.

Defendant contends that a lower sentence is appropriate in this case because "there were [no] attempts to circulate any comprising [sic] pictures into the general public domain."  This is absolutely not true.  Defendant repeatedly posted naked pictures of his victims onto their, or their friends', Facebook pages in order to force them to show him their breasts.  He showed no remorse about doing so, and about threatening to do so, in his communications with the victims; rather, he seemed quite smug about his power.  Moreover, defendant's argument that he should be given a lower sentence because he has "spared the victims the stress, anxiety and obvious personal and

17

emotional apprehension that comes from having to testify in open court about the events in question" is offensive given the stress, anxiety, and obvious personal and emotional apprehension he has already given them.

### 2. Defendant's History and Circumstances

Defendant is a 27-year-old man who has been a daily marijuana user with a spotty employment record. He received an associate's degree, and "is skilled in marketing and the creation of website concepts." PSR, ¶ 148. However, he chose to use those skills to break the law and victimize others. Defendant argues that he was young at the time of the offense, and so now he "obviously has the intellect to control any further inappropriate, impulsive actions"; however, there is no evidence that this is true. Defendant was 24 and 25 at the time of the offense. This is well after when most people graduate college and many have been working for years. There is nothing to substantiate defendant's assertion that he lacked that intellect two years ago but suddenly has it now.[2]

Defendant's prior arrest for rape of an unconscious person, oral copulation of an unconscious person, sexual penetration by a foreign object, rape by use of drugs, and oral copulation by anesthesia or controlled substance must be considered. While it did not result in conviction, it cannot be ignored as evidence of defendant's character and regard for others. Defendant was

---

[2] Defendant also claims that he has strong family and community support. However, he had this support before and it did not affect his choices. Moreover, the quality of this support is dubious: as was learned during the detention hearings in this case, his parents are both convicted felons for welfare fraud, and his brother also has a lengthy felony criminal record. Notably, only one family member chose to write a letter in support.

identified by a victim of rape as the perpetrator.  She stated that defendant offered her a drink at a bar, and that after that she could not remember exactly what happened.  She reported that she next remembered defendant raping her in the back seat of a car.  Her friends reported that she was near unconscious in the car when they discovered her.  Defendant acknowledged in a recorded inmate call that he had sexual contact with the victim, but alleged it was consensual.  PSR, ¶¶ 104-114.

Defendant submits that the case was not dismissed for failure to bring the case to court in time, as the PSR states, but says that that the case was instead dismissed because the prosecution had insufficient evidence to proceed to trial.  This is false.[3]  The undersigned has spoken with the Deputy District Attorney assigned to the case, and she stated that the case had been set for trial following a preliminary hearing.  Unfortunately, the investigating officer had failed to stay in touch with a key witness, S.V., who had graduated from college and moved to parts unknown.  The Deputy District Attorney stated that she dismissed only because this witness could not be located.  She did not base the dismissal on any alleged evidence regarding the victim, as defendant asserts, especially given that the victim was unconscious during the attack.  Rather, she stated that that the victim wanted to proceed, and there

---

[3] Even if it were true, the inability to prove the rape beyond a reasonable doubt would not preclude its consideration at sentencing. Nichols v. United States, 511 U.S. 738, 747 (1994) (sentencing court may consider conduct that did not result in conviction without violating Due Process); see also United States v. Watts, 519 U.S. 148, 157 (1997) ("a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.").

1  was also substantial DNA evidence tying defendants to the crime, so

2  that if S.V. ever can be located, and it is within the statute of

3  limitations, she intends to re-file the case.[4]

4       Defendant's prior rape charge, as well as defendant's other

5  pending drug charges as discussed at paragraphs 115-123 of the PSR,

6  are very telling.  The crimes for which defendant stands convicted

7  ultimately have a lot of similarity to the prior allegations.  Both

8  represent an abuse of power, a lack of respect for women and their

9  personal space, and an extreme absence of judgement.  It also makes

10  clear that defendant's criminal history calculation, showing zero

11  points, does not adequately convey defendant's contact with, and

12  disregard for, law enforcement.  Defendant's conduct in this case

13  occurred while the rape case was pending, and the drug charges began

14  after the search warrant in this case was executed.  In truth,

15  defendant has no regard for law enforcement, or other people,

16  specifically women.

17       Defendant also claims that he was "more of a voyeur rather than

18  a sexual predator wanting physical contact with the victims," and

19  that there is no danger of further inappropriate conduct.  He points

20  to the report of Dr. Ronald Markman in support.  As a starting

21  point, Dr. Markman's report is useless, and should be wholly

22  rejected.  As background to prepare himself for this case, Dr.

23  Markman read only the indictment.  Defendant's Exhibit A, page 1.

24  He did not read any of the discovery, or the PSR, or any other

25  materials.  He did not read the exhibits attached to this position

26

27       [4] In defendant's report, attached as Exhibit A, Dr. Markman
   repeats the defendant's statement that the case has been dismissed
28  with prejudice.  This is also false.

20

and produced in discovery. He did not read the reports of
interviews with the victims. He did not read any of the reports
from defendant's prior rape offense. Then, Dr. Markman met with
defendant <u>once</u>, in his office, for what one can imagine was at most
a couple of hours. Defendant's Exhibit A, page 1. No tests were
performed. And, in fact, no critical thinking was engaged, as Dr.
Markman's report simply recites what defendant reported to him
during their chat. Based on that, Dr. Markham concludes both that
"there is no history of ongoing aggressive sexual misconduct" and
"the risk of future aggressive sexual behavior is low." These
conclusions are as baseless as the evidence upon which he grounds
them.

In truth, defendant is far more than "a voyeur" who is not
sexually aggressive. A voyeur, by definition, only watches from
afar; he does not act and does not interact. Defendant is the exact
opposite. He is a sexual cyber-terrorist, who reached out through
his computer to compel women to strip for him. The women complied,
even though he was not physically present in the room, because to
them it was precisely the same. They felt raped. He thrived on his
power over the victims, and taunted them with it. Defendant cannot
now pretend that because he hid behind a computer username that he
was not behaving aggressively. Calling it simple "immature bad
judgment" drastically understates both the experience of the victims
and defendant's methodical, long-lasting, and horrific crimes.

**B.    18 U.S.C. § 3553(a)(2)**

18 U.S.C. § 3553(a)(2) requires the Court to consider the need
for the sentence to reflect the seriousness of the offense, to
promote respect for the law, to provide just punishment for the

offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of defendant, and to provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. This factor also supports the government's recommended sentence of 72 months.

A significant period of incarceration is necessary given the serious nature of defendant's offense, including the number of victims and the depth of harm he inflicted on them. Many of the victims have reported significant fear of defendant based on his crimes. A lengthy sentence is also necessary to promote respect for the law and for specific deterrence. Defendant has had repeated contact with law enforcement and demonstrates little regard for others, especially women. In addition, defendant's punishment should be severe enough not only to serve as a deterrent for him, but also to other hackers who contemplate such activities.

**C.   18 U.S.C. § 3553(a)(6)**

18 U.S.C. § 3553(a)(6) requires the Court to minimize sentencing disparity among similarly situated defendants. While normally a Guidelines sentence helps to prevent sentencing disparities, here it would create one. As explained above, the applicable Guidelines simply do not capture the seriousness and depth of defendant's conduct, and the Guidelines themselves template this exact scenario and recommend an upward departure. This is further evidenced by the above-Guidelines sentences that have been repeatedly given to similarly-situated defendants.

In United States v. Mijangos, 10-743-GHK, defendant was a 32 year-old paraplegic who infected the computers of victims by sending

messages embedded with malicious software that gave him control over victims' computers.  He used that access to steal financial information, to obtain access into their accounts and to turn on their webcams.  He also used images of his victims to sextort them into providing more images.  Mijangos was sentenced by this Court to 72 months' imprisonment, which was an above-Guideline sentence. Mijangos had many similarities to defendant in terms of accessing accounts, and extorting victims.  While he used more technical means to access the accounts (malware instead of social engineering), and broadened his attack to include financial information, he also had significant medical issues, did not have the same large number of victims that defendant did, nor did he post the pictures publicly with anywhere near the same frequency that defendant did.

In <u>United States v. Chaney</u>, 11-958-SJO, Chaney was sentenced to 120 months' imprisonment after being convicted of unauthorized access and wiretapping.  Chaney accessed the accounts of numerous celebrities using similar methods to defendant: knowing or guessing the usernames, and then knowing or guessing the password reset answers.  After Chaney accessed the accounts, he searched for and obtained pictures of the celebrities.  He made no threats to his victims.  Chaney distributed a small amount of the pictures, but never posted them to the Internet himself.

In <u>United States v. Finkbiner</u>, 12-21-WTL (S.D. Ind.), a district court case in Indiana, the defendant was recently sentenced to 40 years in prison after tricking teens into providing sexual images and then extorting more from them.  Finkbiner, who had no criminal history, had approximately 153 victims, and had captured more than 11,000 video files with sexual conduct.

In <u>United States v. Feigin</u>, 2010 WL 376278, at **1 (11th Cir. 2010) (per curiam) (unpublished), Feigin was convicted for installing malware on the computer of a single adult female victim, which allowed him to capture nude images of the victim through her webcam. There was no further extortion. The victim reported a lasting impact from the crime, including insomnia, paranoia, anxiety, and issues with trust and insecurity. <u>Id.</u> The district court imposed a sentence nearly two times greater than the high end of the advisory Guidelines range. <u>Id.</u> at **6. This 30 month sentence was upheld by the Eleventh Circuit in an unpublished opinion which recognized that the financial focus of U.S.S.G. § 2B1.1 failed to capture the deliberate invasion of privacy and lasting the harm to the victim. <u>Id.</u> at **7-8. Notably, defendant's conduct in this case is significantly worse, as it involved hundreds of victims, some images of juveniles, and sextortion and threats to the victims.

<u>United States v. Barrett</u>, CR 09-115-R, cited by defendant, does not support a lower sentence. In that case, the defendant was convicted of stalking one victim (who was famous) and using a camera to videotape her through hotel peep holes. Barrett then uploaded the images of that victim onto the Internet and tried to sell them to a news organization. Law enforcement later discovered that Barrett had also uploaded approximately 15 or 16 more videos of unknown women on to the Internet. Barrett never contacted his victims directly, nor interacted with them, nor forced them to do anything. He was sentenced to 30 (not 27) months' imprisonment. In contrast, defendant has over 370 known victims, and he committed his

24

crime by contacting them directly, and terrorizing them. Over 1,100 naked or semi-naked pictures were found on his computer. Defendant's case is significantly worse in terms of both quantity and quality, and deserves a much greater sentence.

In sum, courts have repeatedly recognized that the type of crime for which defendant has been convicted warrants a greater sentence than that called for by the Guidelines. In order to minimize sentencing disparity among similarly situated defendants, an above-guideline sentence is appropriate in this case as well. Given defendant's extensive victimization, repeated extortion and threats, and other aspects of his offense, a 72 month sentence is appropriate and not greater than necessary.

**V. CONCLUSION**

For the foregoing reasons, the government requests that the Court impose a sentence of 72 months' imprisonment, followed by a three year period of supervised release.

# EXHIBIT I

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               WESTERN DIVISION

4     THE HONORABLE GEORGE H. KING, CHIEF U.S. DISTRICT JUDGE

5

6  UNITED STATES OF AMERICA,       )
                                    )
7               PLAINTIFF,          )
                                    )
8          VS.                      )      CR 13-0056-GHK
                                    )
9  KAREN KAZARYAN, ALSO KNOWN       )
   AS GARY KAZARYAN,                )
10                                  )
                DEFENDANT.          )
11 _____ )

12

13

14      REPORTER'S TRANSCRIPT OF SENTENCING PROCEEDINGS

15             LOS ANGELES, CALIFORNIA

16        MONDAY, DECEMBER 9, 2013; A.M. SESSION

17          PAGES 1 THROUGH 73, INCLUSIVE

18

19

20

21

22

23

24                    MARY R. RICKEY, CSR, RPR
                      CERTIFIED SHORTHAND REPORTER
25                    WWW.COURTREPORTERUSA.COM

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF:

 3        UNITED STATES DEPARTMENT OF JUSTICE
          UNITED STATES ATTORNEY'S OFFICE
 4        ANDRÉ BIROTTE, JR.
          BY:  TRACY WILKINSON
 5             ASSISTANT UNITED STATES ATTORNEY
          312 NORTH SPRING STREET
 6        LOS ANGELES, CALIFORNIA  90012

 7
     FOR DEFENDANT:
 8        LAW OFFICES OF ALEX KESSEL
          BY:  ALEX KESSEL, ATTORNEY AT LAW
 9        16542 VENTURA BOULEVARD, SUITE 305
          ENCINO, CALIFORNIA  91436
10

11   ALSO PRESENT:

12        JEFFREY KIRKPATRICK, F.B.I. SPECIAL AGENT

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

**I N D E X**

2

3
| **PROCEEDINGS** | **PAGE** |
|---|---|

4    CASE IS CALLED                                              4

5    COURT'S COLLOQUY WITH PARTIES AND DEFENDANT                 5

6    DEFENSE ARGUMENT                                           10

7    GOVERNMENT'S ARGUMENT                                      25

8    DEFENSE OBJECTION TO PUBLISHING VICTIM STATEMENTS          36

9    OBJECTION OVERRULED                                        36

10   VICTIM STATEMENT PUBLISHED                                 37

11   DEFENSE FURTHER ARGUMENT                                   39

12   GOVERNMENT'S FURTHER ARGUMENT                              48

13   COURT BEGINS TO PRONOUNCE SENTENCE                         49

14       RULINGS AS TO OBJECTIONS                               50

15       CUSTODY, SUPERVISED RELEASE TERMS                      59

16   GOVERNMENT MOTION TO DISMISS REMAINING COUNTS GRANTED      66

17   COURT ADVISES DEFENDANT OF RIGHT TO APPEAL                 66

18   DEFENSE REQUESTS AND RECOMMENDATIONS                       67

19   GOVERNMENT'S MOTION FOR REMAND                             68

20   ARGUMENT                                                   68

21   COURT ORDERS REMAND, DENYING SELF-SURRENDER REQUEST        72

22

23

24

25

DECEMBER 9, 2013  /  USA v KAZARYAN

```
 1            LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 9, 2013

 2                            9:40 A.M.

 3                            --oOo--

 4            THE CLERK:  PLEASE REMAIN SEATED AND COME TO

 5     ORDER.  THIS UNITED STATES DISTRICT COURT IS IN SESSION.

 6     THE HONORABLE GEORGE H. KING, CHIEF DISTRICT JUDGE,

 7     PRESIDING.

 8            CALLING ITEM NUMBER ONE ON THE COURT'S CALENDAR,

 9     CRIMINAL 13-56, UNITED STATES OF AMERICA VERSUS KAREN

10     KAZARYAN, ALSO KNOWN AS GARY KAZARYAN.

11            COUNSEL, WOULD YOU PLEASE STATE YOUR APPEARANCES

12     FOR THE RECORD.

13            MS. WILKINSON:  GOOD MORNING, YOUR HONOR.

14     TRACY WILKINSON ON BEHALF OF THE UNITED STATES.  WITH ME

15     AT COUNSEL TABLE IS F.B.I. SPECIAL AGENT

16     JEFFREY KIRKPATRICK.

17            THE COURT:  YES, GOOD MORNING.

18            MR. KESSEL:  YOUR HONOR, GOOD MORNING.  ATTORNEY

19     ALEX KESSEL.  I'M WITH MY CLIENT, WHO IS PRESENTLY AT THE

20     COUNSEL TABLE, YOUR HONOR.

21            THE COURT:  ALL RIGHT.  WHY DON'T YOU AND YOUR

22     CLIENT APPROACH THE LECTERN FOR SENTENCING.

23            THIS MATTER'S ON THE COURT'S CALENDAR FOR

24     CONSIDERATION OF THE PRESENTENCE REPORT AND FOR IMPOSITION

25     OF SENTENCE.
```

```
 1              ANY LEGAL CAUSE WHY SENTENCE SHOULD NOT NOW BE

 2   PRONOUNCED, MR. KESSEL?

 3              MR. KESSEL:  NO, YOUR HONOR.

 4              THE COURT:  IS KAREN KAZARYAN YOUR TRUE NAME?

 5              THE DEFENDANT:  YES, YOUR HONOR.

 6              THE COURT:  MR. KAZARYAN, HAVE YOU HAD AN

 7   OPPORTUNITY TO REVIEW THE PRESENTENCE REPORT AND

 8   RECOMMENDATIONS MADE BY THE PROBATION OFFICER AS WELL AS

 9   THE POSITION PAPERS OF THE PARTIES RE SENTENCING?

10              THE DEFENDANT:  I HAVE, YOUR HONOR.

11              THE COURT:  AND HAVE YOU HAD AN OPPORTUNITY TO

12   REVIEW ALL OF THOSE MATTERS WITH YOUR LAWYER?

13              THE DEFENDANT:  YES, YOUR HONOR.

14              THE COURT:  AND ARE YOU READY TO PROCEED WITH

15   SENTENCING AT THIS TIME?

16              THE DEFENDANT:  I AM, YOUR HONOR.

17              THE COURT:  MR. KESSEL, I ASSUME, OF COURSE, YOU

18   HAVE REVIEWED ALL OF THE SENTENCING PAPERS WHETHER FILED

19   BY THE PROBATION OFFICER OR THE PARTIES?

20              MR. KESSEL:  YES, I HAVE, ON NUMEROUS OCCASIONS,

21   YOUR HONOR.

22              THE COURT:  AND HAVE YOU HAD AN ADEQUATE

23   OPPORTUNITY TO REVIEW ALL OF THEM WITH YOUR CLIENT?

24              MR. KESSEL:  I HAVE, YOUR HONOR.

25              THE COURT:  AND TO THE EXTENT THAT HE MAY HAVE
```

```
 1   HAD ANY ADDITIONS, MODIFICATIONS, OR OBJECTIONS, YOU WOULD

 2   HAVE REFLECTED THOSE IN YOUR OWN VARIOUS POSITION PAPERS?

 3              MR. KESSEL:  YES, YOUR HONOR.

 4              AND MAY I JUST NOTE FOR THE RECORD, I'M ASSUMING

 5   THAT THE COURT HAS -- I HAD AN INITIAL SENTENCING

 6   MEMORANDUM THAT WAS SUBMITTED TO THE COURT.  I THEREAFTER

 7   SUBMITTED WHAT I DEEMED ENTITLED "REPLY TO THE

 8   GOVERNMENT'S OPPOSITION," AND THEN MY MOST RECENT

 9   SUBMISSION, YOUR HONOR, WAS A SUPPLEMENTAL REPLY.

10              THE COURT:  I HAVE ALL THREE.

11              MR. KESSEL:  THANK YOU.

12              THE COURT:  AND I HAVE CONSIDERED ALL THREE.

13              DO YOU HAVE ANY OBJECTION TO THE PROBATION

14   OFFICER'S SUGGESTION OF A THREE-YEAR TERM OF SUPERVISED

15   RELEASE?

16              MR. KESSEL:  AS TO THAT, NO, YOUR HONOR.

17              THE COURT:  DO YOU HAVE ANY OBJECTION TO THE

18   PROBATION OFFICER'S VARIOUS SUGGESTED TERMS OF

19   SUPERVISION?  AND THERE ARE, I BELIEVE, 17 OF THEM.

20              MR. KESSEL:  NO, YOUR HONOR.

21              THE COURT:  I HAVE FULLY CONSIDERED YOUR

22   POSITION.

23              LET ME JUST SUMMARIZE FOR YOU, AND THEN I'LL

24   GIVE YOU AN OPPORTUNITY TO GO AHEAD AND BE HEARD ON BEHALF

25   OF YOUR CLIENT, AND OF COURSE, I'LL GIVE YOUR CLIENT AN
```

```
 1   OPPORTUNITY TO BE HEARD AS WELL.

 2          FIRST, YOU HAVE CERTAIN OBJECTIONS TO THE

 3   PRESENTENCE REPORT.  YOU OBJECT TO THE SIX-LEVEL INCREASE

 4   UNDER THE GUIDELINE CALCULATION FOR MORE THAN 250 VICTIMS.

 5   YOU OBJECT TO THE TWO-LEVEL INCREASE FOR SOPHISTICATED

 6   MEANS.

 7          YOU AGREE THAT THE CRIMINAL HISTORY CATEGORY

 8   SHOULD BE 1, BUT YOU ALSO ARGUE THAT AT PARAGRAPH 104 --

 9   WHICH REFERS TO THE PRIOR ARREST BUT NO CONVICTION IN THAT

10   CASE -- YOUR VIEW IS THAT IT WAS NOT DISMISSED DUE TO

11   FAILURE OF THE D.A. TO BRING THE CASE TO TRIAL IN A TIMELY

12   MANNER, BUT THAT THERE WAS SOMETHING HAVING TO DO WITH THE

13   CREDIBILITY OF THE VICTIM, AT LEAST SO YOU SAY.

14          YOU ALSO HAVE VARIOUS ARGUMENTS UNDER 3553(A),

15   INCLUDING EARLY ACCEPTANCE OF RESPONSIBILITY, NO EGREGIOUS

16   PHOTOS, NO GENERAL PUBLIC DISSEMINATION, NO CHILDREN

17   INVOLVED.

18          THIS WAS, ACCORDING TO YOU, AT MOST AN ILLEGAL

19   ACCESS THAT DID NOT INVOLVE ACTUAL PHYSICAL CONTACT WITH

20   ANOTHER PERSON, THAT YOUR CLIENT WAS AT A YOUNG AGE, THAT

21   HE'S MORE OF A VOYEUR THAN A PREDATOR, THAT THE

22   PSYCHOLOGICAL REPORT CONFIRMED NO SEXUAL DYSFUNCTION

23   PROBLEMS LEADING TO DANGERS OF FURTHER MISCONDUCT.

24          HE DOES HAVE EDUCATION.  HE HAS SKILLS FOR A

25   CAREER.  HE HAD PRIOR EMPLOYMENT AND HAS SUPPORTIVE
```

```
1    FAMILY.  HE HAS COMPLIED WITH THE TERMS OF PRETRIAL

2    SUPERVISION AS WELL AS HOME DETENTION.  HE HAS ALSO

3    COMMUNITY SUPPORT.

4         HE HAS SUFFERED PUBLIC HUMILIATION THROUGH THE

5    NEWS COVERAGE, AND YOU COMPARE HIM WITH THE CASE OF

6    UNITED STATES VERSUS BARRETT, WHERE YOU ASSERT THAT THERE

7    WAS ONLY A 27-MONTH SENTENCE IN THAT CASE.

8         YOUR VIEW, ULTIMATELY, IS THAT IT SHOULD BE A

9    TOTAL SENTENCE OF 30 MONTHS -- 6 MONTHS ON COUNT 12 AND

10   THE REQUIRED 24 MONTHS MANDATORY MINIMUM CONSECUTIVE

11   SENTENCE ON COUNT 27.

12        DOES THAT ADEQUATELY SUMMARIZE YOUR INITIAL

13   PAPERS?

14             MR. KESSEL:  YES, IT DOES, YOUR HONOR.

15             THE COURT:  YOU ALSO HAVE FILED A REPLY, AS YOU

16   SAY, AND A SUPPLEMENTAL REPLY.

17        IN YOUR REPLY, YOU ARGUE THAT THE GOVERNMENT'S

18   EFFECTIVE UPWARD REQUEST OF 30 MONTHS IS UNWARRANTED, THAT

19   ANY AGGRAVATING CIRCUMSTANCES HAVE ALREADY BEEN

20   SUFFICIENTLY ACCOUNTED FOR IN THE GUIDELINES.

21        THE LEVEL OF PSYCHOLOGICAL INJURY IN THIS CASE,

22   IN YOUR VIEW, IS INSUFFICIENT TO WARRANT AN UPWARD

23   DEPARTURE UNDER THE PROVISIONS OF THE GUIDELINES; THAT THE

24   GOVERNMENT'S REFERENCE TO THIS AS "RAPE" OR "SEXTORTION"

25   IS HYPERBOLE BECAUSE, IN YOUR VIEW, NEITHER OF THOSE
```

```
 1   DEFINITIONS HAVE BEEN MET.

 2           YOU CRITICIZE THE GOVERNMENT FOR ATTEMPTING TO

 3   MINIMIZE THE DEFENDANT'S BACKGROUND AND CHARACTER, AND

 4   THAT YOU SUPPORT DR. MARKMAN'S POSITION.

 5           DOES THAT ADEQUATELY SUMMARIZE YOUR INITIAL

 6   REPLY?

 7           MR. KESSEL:  IT DOES, YOUR HONOR.  THANK YOU.

 8           THE COURT:  AND FINALLY, IN YOUR SUPPLEMENTAL

 9   REPLY, YOU ARGUE THAT UPWARD DEPARTURES ARE RARE EVENTS IN

10   FEDERAL SENTENCING, AND YOU ALSO MADE VARIOUS DISTINCTIONS

11   BETWEEN THIS CASE AND THE CASE OF UNITED STATES VERSUS

12   MIJANGOS, WHICH THIS COURT HAS ALSO HANDLED, AND SENTENCED

13   THE DEFENDANT THERE TO 72 MONTHS IN CUSTODY.

14           YOU ARGUE THAT THE GOVERNMENT'S EXHIBITS THAT

15   THEY HAVE ATTACHED DO NOT WARRANT UPWARD DEPARTURE FROM

16   THE GUIDELINES OR VARIANCE FROM THE GUIDELINES, AND YOU

17   SUBMITTED DR. MARKMAN'S RESUMÉ TO SUPPORT THE BONA FIDES

18   OF HIS QUALIFICATIONS.

19           DOES THAT ADEQUATELY SUMMARIZE YOUR SUPPLEMENTAL

20   REPLY, MR. KESSEL?

21           MR. KESSEL:  YES, IT DOES, YOUR HONOR.  THANK

22   YOU.

23           THE COURT:  ALL RIGHT.  MR. KESSEL, YOU MAY BE

24   HEARD ON BEHALF OF YOUR CLIENT, THEN, AT THIS TIME.

25           MR. KESSEL:  YOUR HONOR, THANK YOU.
```

**DEFENSE ARGUMENT**

AND I'M NOT GOING TO -- AS YOUR HONOR JUST
SUMMARIZED THIS, BUT I TOOK A LOT OF TIME AND EFFORT TO
TRY TO ARTICULATE IN MY WRITTEN SUBMISSIONS, YOUR HONOR,
OUR POSITION.

AND I PREFACE MY REMARKS NOW JUST TO AMPLIFY ON
SOME OF THOSE SUBMISSIONS, YOUR HONOR, THAT MY CLIENT HAS
TAKEN RESPONSIBILITY FOR HIS CONDUCT, WHICH NO DOUBT
INVOLVED SOME DEGREE -- AND, AGAIN, A DEGREE OF INVASION
OF PRIVACY, AND HE'S ACCEPTED THAT EARLY ON, YOUR HONOR.

I CAN TELL YOU THERE WAS NEVER EVEN A THOUGHT IN
MY CLIENT'S MIND, AFTER REVIEWING EVERYTHING AND SEEING
THE GOVERNMENT'S CASE, THAT HE WANTED TO GO TO TRIAL.

AND I MENTION THAT ONLY BECAUSE ONE OF THE
OTHER, I BELIEVE, MITIGATING CIRCUMSTANCES THAT WE'RE
ASKING YOUR HONOR TO CONSIDER IS IF THESE WOMEN -- AND I
WILL GET TO THAT -- HAVE SUFFERED SOME DEGREE, SOME
DEGREE -- I ARGUE IT DIDN'T AMOUNT TO THE DEGREE OF
PSYCHOLOGICAL DYSFUNCTION THAT'S SOMEWHAT ARTICULATED IN
THE GUIDELINES THAT HAS TO DO WITH SOME LONG-TERM
PSYCHOLOGICAL EFFECT, WHICH THE GOVERNMENT HASN'T
PRESENTED ANY EVIDENCE, THE ONE IMPACT LETTER.

BUT I HAVEN'T SEEN ANY MEDICAL OR PSYCHOLOGICAL
REPORTS THAT SUPPORT THAT ANY OF THESE AND I SAY "YOUNG
WOMEN" -- ALTHOUGH I'M NOT COUCHING THAT IN TERMS OF CHILD

```
 1    PORNOGRAPHY.  I'M TALKING ABOUT YOUNG ADULT WOMEN,

 2    YOUR HONOR -- I DON'T BELIEVE HAVE THE DEGREE OF

 3    PSYCHOLOGICAL DAMAGE THAT WARRANTS AN UPWARD DEPARTURE.

 4            I DID REFERENCE, AND YOUR HONOR PROBABLY KNOWS

 5    MORE SO THAN I, ABOUT THE TIMES IN WHICH UPWARD DEPARTURES

 6    ARE GRANTED.  AND IN MY MIND, IN MY 27 YEARS OF PRACTICE,

 7    THEY ARE A RARITY, I SHOULD SAY.  WHEN THE GUIDELINES,

 8    WHICH HAS A RANGE ITSELF, A LOW TO A HIGH END, TAKES INTO

 9    CONSIDERATION MANY, MANY FACTORS THAT THE COURT CAN

10    SENTENCE WITHIN THE GUIDELINES, TO GO 30 MONTHS ABOVE, AS

11    I INDICATED IN MY MOVING PAPERS, YOUR HONOR, I DON'T

12    BELIEVE IS WARRANTED IN THIS CASE.

13            THE OTHER THING I WANT TO MENTION, YOUR HONOR,

14    IS THE GOVERNMENT -- AND YOU USED THE WORD "HYPERBOLE,"

15    AND I'M NEVER, EVER MINIMIZING THE CONDUCT HERE.  BUT I AM

16    BELIEVING THE GOVERNMENT HAS OVERSTATED THE HARM, IF YOU

17    WILL, IN THIS CASE.  AND THEY USE CERTAIN WORDS, YOUR

18    HONOR, THAT THEY ATTRIBUTE --

19            AND I JUST WANT TO REEMPHASIZE THIS, YOUR HONOR,

20    REITERATE TO THE COURT.  I DON'T KNOW ABOUT TAKING

21    OFFENSE, BUT I DON'T THINK MY CLIENT'S CONDUCT, YOUR

22    HONOR, CAN BE EVEN CLOSE TO ATTRIBUTING IT TO THE CRIME OF

23    RAPE AS I KNOW RAPE, PHYSICALLY ASSAULTING A WOMAN FOR A

24    SEXUAL ACT WITH VIOLENCE AGAINST HER PERSON, YOUR HONOR.

25            SO I DON'T EVEN THINK IT COMES CLOSE TO THAT,
```

```
1    AND THE GOVERNMENT HAS OFTEN USED IN SOME OF THESE CASES,

2    INCLUDING MY CLIENT'S CASE, THAT TYPE OF CONDUCT TO DEFINE

3    OR SUPPORT, IF YOU WILL, THEIR ARGUMENT FOR A STRICT

4    SENTENCE.

5            THE OTHER THING, YOUR HONOR -- WE REFERENCED

6    THIS DURING THE COLLOQUY WE HAD WITH THE COURT DURING THE

7    CHANGE-OF-PLEA PROCEEDINGS.  THEY ALSO USE THE WORD

8    "EXTORTION" OR "SEXTORTION" OR EXTORTION IN THE SENSE

9    OF -- I DON'T KNOW IF YOUR HONOR KNOWS -- IN THE

10   UNITED STATES CRIMINAL CODE, THERE IS A DEFINITION OF

11   EXTORTION, AND IT'S UNDER 18 U.S.C., 3553(C)(2).  IT HAS A

12   NUMBER OF SUBSTANTIVE CRIMES, AND IT LISTS AT LEAST THE

13   COMMON DEFINITION OF EXTORTION, WHICH YOUR HONOR KNOWS

14   WAS -- AND I JUST WANT TO ITERATE IT AS IT'S NOTED.  IT'S

15   A VERY SHORT DEFINITION.  IT'S (AS READ:)

16           "EXTRACTION OF ANYTHING OF VALUE FROM ANOTHER

17        PERSON BY THREATENING OR PLACING THAT PERSON IN

18        THREAT OF BODILY HARM, FEAR, OF INJURY."

19               (END QUOTED MATERIAL.)

20        THE COURT:  AND I CAN TELL YOU UNQUESTIONABLY

21   WITHOUT ANY HESITATION THAT THE CONDUCT HERE, ALBEIT

22   INVASIVE, YOUR HONOR, IN NO WAY COMPORTS WITH IN MY

23   ASSESSMENT, YOUR HONOR, THE EXTORTION AS WE KNOW IT IN

24   DEFINITION OR PRACTICALLY, YOUR HONOR.

25           AND I WOULD ASK YOUR HONOR -- BECAUSE, AGAIN,
```

```
 1   THE GOVERNMENT USES THAT TERM, TO SOMEHOW -- AND I THINK

 2   IT HAS A DEFINITIVE LEGAL MEANING THAT IMPORTS IN THAT

 3   MEANING SOME DEGREE OF PHYSICAL THREAT OF VIOLENCE OR

 4   INJURY AGAINST A PERSON, AND THAT'S WHY IT'S EGREGIOUS

 5   CONDUCT, AND THAT'S WHY IT'S TREATED DIFFERENTLY.

 6          THAT'S NOT WHAT HAPPENED HERE.  EVEN IN THE

 7   HUNDREDS OR THOUSANDS OF MESSAGES HERE, THERE WAS NEVER AN

 8   ATTEMPT BY THE CLIENT TO RENDER ANYBODY IN FEAR THAT THEY

 9   WOULD SUFFER VIOLENCE OR GREAT BODILY INJURY.

10          THAT DOVETAILS INTO WHAT HAPPENED HERE.  THE

11   GOVERNMENT, IN ITS SUBMISSION, YOUR HONOR, SUBMITTED I

12   ASSUME THEIR MOST TELLING -- IF I CAN USE THAT WORD --

13   EVIDENCE OF COMPUTER MESSAGES THAT WERE SENT EITHER BY MY

14   CLIENT ACTING AS ANOTHER PERSON OR, AS YOU CAN SEE, YOUR

15   HONOR, MANY OF THESE YOUNG WOMEN LEARNED THAT MY CLIENT

16   WAS NOT THEIR RELATIVE OR THEIR FRIEND.

17          AND THE ONE THING I WANT TO ITERATE TO THE

18   COURT, AND IT'S PERVASIVE IN THE GOVERNMENT'S

19   SUBMISSIONS -- EXHIBITS C, D, AND E, MORE SPECIFICALLY OF

20   THEIR OPPOSITION -- IS THAT -- AND AGAIN, I'M PREFACING

21   THAT MY CLIENT SHOULDN'T HAVE BEEN CONTACTING, YOUR HONOR;

22   MY CLIENT SHOULDN'T HAVE BEEN OPERATING IN THE MEANS AND

23   MANNER IN WHICH HE DID.  NO QUESTION ABOUT THAT, AND I

24   NEVER WANT MY ARGUMENTS TO UNDERMINE AT ALL HIS

25   RESPONSIBILITY.
```

```
 1              I'M JUST TRYING TO SHOW, YOUR HONOR -- BECAUSE A

 2    LOT OF THE GOVERNMENT'S SUPPORT FOR THE 30-MONTH DEPARTURE

 3    IS BASED ON THE OUTRAGEOUS CONDUCT.  WHAT I SAW IN THESE

 4    EXHIBITS, MOST OF MY CLIENT'S CONDUCT, YOUR HONOR -- AND

 5    THAT HAD TO DO WITH OUR ARGUMENT THAT THERE WASN'T 250

 6    VICTIMS.  I DON'T KNOW HOW THE COURT IS GOING TO LOOK AT

 7    THAT.

 8              THERE IS A FINE LINE.  IF YOU LOG IN ON

 9    SOMEBODY'S COMPUTER NETWORK AND YOU USE THEIR PASSWORD, I

10    GUESS THE COURT COULD FIND -- AND EVEN THOUGH YOU DON'T

11    CONTACT THEM AND YOU DON'T USE IT IN A MANNER THAT THE

12    CRIME WAS DONE HERE, WHERE YOU ARE CONTACTING PEOPLE AND

13    HAVING SOME DIALOGUE WITH THEM, BUT IT IS SIMPLY A LOG-IN,

14    WHICH 90 PERCENT OF THE CONTACTS WERE THAT TYPE.

15              THERE IS A REFERENCE ABOUT A PERSON'S MEANS OF

16    IDENTITY, WHICH CLEARLY I WOULD SUBMIT COULD BE A COMPUTER

17    NAME OR LOG-IN NUMBER, IF YOU WILL.  THEN IF HE USED IT IN

18    THAT SENSE, I WOULD SUBMIT IT.

19              BUT I'M JUST TRYING TO SHOW YOUR HONOR THAT

20    UNLIKE THE GUY WHO TAKES A CREDIT CARD AND USES THOSE

21    NUMBERS IN A TRANSACTION, YOUR HONOR -- THAT HAPPENED LESS

22    THAN FIVE TIMES IN THIS CASE, YOUR HONOR -- AND THAT'S WHY

23    I HAD ARGUED, YOUR HONOR, WHETHER OR NOT THERE WAS A

24    SIX-LEVEL ADDITION, WHICH IS SUBSTANTIAL, FOR THE NUMBER

25    OF VICTIMS.
```

```
1          THE OTHER THING THAT I ARGUED, YOUR HONOR, WAS
2    THAT THE GOVERNMENT IS SAYING THIS CASE DEMANDS MORE TIME
3    BECAUSE THE GUIDELINES, IN THE WISDOM OF THE GUIDELINES,
4    DOESN'T CAPTURE -- THAT'S THE TERM I USE -- THE CONDUCT
5    HERE.  AND I SAY TO THAT -- I DON'T AGREE WITH THAT; I
6    HOPE YOUR HONOR DOESN'T AGREE TO IT.
7          AND I WANT TO POINT TWO THINGS IN THAT
8    DIRECTION.  FIRST AND FOREMOST, YOUR HONOR, BESIDE
9    PLEADING TO THE COMPUTER ACCESS TO GAIN PERSONAL
10   INFORMATION, WHICH IS THE 1030 CHARGE, MY CLIENT ALSO
11   PLEAD TO A 1028A.
12         NOW, THAT, I THINK, ALSO CAPTURES -- THAT'S A
13   MANDATORY MINIMUM OF TWO YEARS.  THAT, IN A NUTSHELL,
14   DOVETAILS WITH THE SUBSTANTIVE CRIME, AND I'VE ALWAYS
15   TRIED TO DISCERN WHAT CONGRESS'S INTENT WAS.  BESIDES
16   PUNISHING YOU FOR THE SUBSTANTIVE CRIME, WE HAVE THIS
17   CRIME CALLED AGGRAVATED IDENTITY, AND I SEE WHY.  IT'S ONE
18   THING TO PILFER A MEANS OF IDENTITY.  THAT'S A CRIME IN
19   AND OF ITSELF.  BUT THEN, IF YOU USE IT IN CONJUNCTION
20   WITH ONE OF THE CRIMES ARTICULATED -- A BANK FRAUD, A
21   COMPUTER FRAUD -- THEY WANT PUNISHMENT, AND I AGREE WITH
22   THAT.
23         THAT'S WHAT HAPPENED HERE.  HE NOT ONLY FOUND
24   AND ACCESSED COMPUTER INFORMATION -- AND I'M USING A
25   SHORTHAND VERSION FOR EMAILS, WHAT-HAVE-YOU -- HE NOT ONLY
```

```
 1   PILFERED THAT.  AND I'M USING THAT WORD "PILFER" IN THE

 2   SENSE OF ILLEGALLY OBTAINING IT -- BUT HE USED IT.  AND I

 3   SAY HE USED IT ON THE FEW OCCASIONS THAT THERE WAS THIS

 4   DIALOGUE BETWEEN HIM AND THESE VICTIMS, YOUR HONOR.

 5          SO WHEN THE GOVERNMENT TRIES TO HAVE YOU LOOK AT

 6   THE LOSS AND THE MONETARY LOSS TABLE TO TRY TO ANALOGIZE,

 7   I DON'T THINK THAT'S FAIR BECAUSE I BELIEVE THAT THE

 8   CONDUCT HAS BEEN CAPTURED RIGHTFULLY BY VIRTUE OF THE 1030

 9   PLEA, BY VIRTUE OF MY CLIENT'S ADMISSION AND PLEA TO ONE

10   COUNT OF AGGRAVATED IDENTITY THEFT.

11          THE OTHER THING THAT I WANT, YOUR HONOR, TO

12   INDICATE -- CONGRESS HAS CONTEMPLATED IN THE ADJUSTMENTS

13   FOR THIS KIND OF CRIME A SPECIFIC ADJUSTMENT.  I WOULD

14   ALERT YOUR HONOR, SOMETHING THAT MY CLIENT AGREED TO IN

15   THE PLEA AGREEMENT AND I THINK IS APPLICABLE HERE,

16   2B1. -(B)16(A).

17          THAT'S SPECIFICALLY, IF YOU LOOK AT THAT, THAT

18   SAYS IN A 1030 CASE WHERE A DEFENDANT HAS INVADED, HACKED,

19   IF YOU WILL, INTO A PERSONAL COMPUTER OF ANOTHER AND ALSO

20   HAS USED THE INFORMATION.

21          AND 2B1. -(B)16(A) ALSO HAS AS AN ALTERNATIVE IF

22   THAT COMPUTER INFORMATION, WHATEVER'S BEEN GAINED FROM

23   THAT PILFERING, YOUR HONOR, HAS RESULTED IN SOME TYPE OF

24   DISSEMINATION, THAT'S ALL UNDER THAT ADJUSTMENT, YOUR

25   HONOR.
```

```
 1        AND THAT'S EXACTLY WHEN THE GOVERNMENT IS

 2   IMPLORING YOUR HONOR TO GO ABOVE AND BEYOND THE

 3   GUIDELINES.

 4        THEY ASK YOU TO LOOK AT THE FACT THAT EVEN IF IT

 5   WAS DONE IN THE VICTIM'S OWN COMPUTER NETWORK VERSUS OVER

 6   THE INTERNET -- AND I'LL GET TO THAT IN A MINUTE WHEN I

 7   TALK ABOUT THAT ONE CASE THAT YOU SENTENCED SOMEBODY FOR

 8   SIMILAR CONDUCT.  MY CLIENT NEVER PUBLICLY DISSEMINATED

 9   ANY OF THIS INFORMATION, YOUR HONOR, AND THAT'S CRITICAL.

10        SO I TRULY BELIEVE, YOUR HONOR, THAT THE

11   GUIDELINES AND THE MEASURE OF THE CONDUCT UNDER THE

12   GUIDELINES IN THIS CASE, WITH THE CAVEAT ALSO THAT MY

13   CLIENT ALSO PLED GUILTY TO THE 1028, YOUR HONOR, IS MORE

14   THAN SUFFICIENT TO CAPTURE THE CONDUCT INVOLVED IN THIS

15   CASE AND THAT A DEPARTURE VIA THE MECHANISM OF SOME

16   TORTURING OF THE MONETARY LOSS TABLE TO TRY TO GET YOUR

17   HONOR TO SEE THAT IT'S SOMEHOW AKIN TO THAT, WITH ALL DUE

18   RESPECT, I DON'T BELIEVE IS LEGALLY CORRECT, NOR IS IT

19   PRACTICAL IN THE SENTENCING ASPECT OF THIS CASE,

20   YOUR HONOR.

21        WITH RESPECT TO DISPARITY, YOUR HONOR, I TRIED

22   TO FIND A CASE.  IT'S ONE THING JUST TO PICK OUT ANY CASE.

23   AND THE ONE THING THAT -- I USED THE BARRETT CASE BECAUSE

24   THE GOVERNMENT, KINDLY, WHEN I MET WITH THEM, THEY GAVE ME

25   A NUMBER OF THESE CASES, AND I SAY "THESE CASES" THAT HAVE
```

```
 1   THIS TYPICAL TYPE OF HACKING WHERE THERE'S BEEN CONTACT

 2   WITH A COMPUTER USER AND THERE'S BEEN SOME SEXUAL

 3   OVERTONES, MESSAGES, IF YOU WILL.

 4           SO I TRIED TO GET THE UNIVERSE OF THOSE TYPE OF

 5   CASES FOR YOUR HONOR TO LOOK AT.  THE ONE I FOUND -- I

 6   DON'T WANT TO SAY SIMILAR, BUT THE SAME TYPE OF CONDUCT

 7   WAS THE CASE THAT YOUR HONOR SENTENCED, MIJANGOS -- AND I

 8   MAY BE MISPRONOUNCING IT -- BUT YOUR HONOR WAS THE

 9   SENTENCING JUDGE.

10           AND I HOPE, YOUR HONOR, THAT IN MY MOST RECENT

11   SUBMISSION I WENT THROUGH WHAT I BELIEVE APPROPRIATELY MAY

12   HAVE JUSTIFIED A 72-MONTH SENTENCE, AND I SAY THAT BECAUSE

13   THAT'S WHAT THE GOVERNMENT IS ASKING FOR IN THIS CASE.

14           OUR PLEA AGREEMENT, YOUR HONOR, HAD A MAXIMUM

15   LIMIT THAT THE GOVERNMENT COULD ASK FOR, WHICH WAS

16   72 MONTHS, AND THEY ARE ASKING FOR THAT.  I DON'T THINK

17   THEY ARE VIOLATING THE PLEA AGREEMENT.  I'M JUST SIMPLY

18   INDICATING TO YOU THAT I DON'T BELIEVE THEIR REQUEST FOR

19   THE MAXIMUM UNDER THE PLEA AGREEMENT IS WARRANTED.

20           AND I TRIED TO BRING UP THE CASE YOUR HONOR

21   USED.  IF YOU MAY REMEMBER OR NOT REMEMBER, JUST A COUPLE

22   THINGS, BECAUSE DISPARITIES OF SENTENCES ARE A 3553

23   FACTOR.

24           I KNOW IT'S IMPORTANT YOUR HONOR TRY TO BE AS

25   FAIR AS POSSIBLE TO SIMILARLY SITUATED PEOPLE, AND I
```

```
 1   WANTED YOU TO KNOW THAT I DON'T THINK MIJANGOS, EVEN

 2   THOUGH IT WAS THE SAME CONDUCT, A COUPLE OF THINGS

 3   DIFFERED.

 4          ONE, OVER HUNDREDS OF VICTIMS THAT WERE ACTUALLY

 5   CONNECTED WITH AND COMMUNICATED WITH, YOUR HONOR.

 6   WIRETAPPING, HE PLEAD TO.  BECAUSE WHAT HE DID IS HE PUT

 7   ON THIS MAL-WARE, WHICH IS A SHORTHAND TERM FOR A NUMBER

 8   OF COMPUTER VIRUSES THAT ALLOW THE INFECTOR, IF YOU WILL,

 9   TO MONITOR A PERSON'S COMPUTER, TO DISENGAGE THE ABILITY

10   TO CHANGE AN ACCOUNT OR ALLOW SOMEBODY, IF THEY FEEL THEY

11   HAVE BEEN INVADED, TO CHANGE AN EMAIL ACCOUNT.  THAT'S THE

12   TYPE OF INFECTIOUS DEVICES THAT ARE OUT THERE.  THAT'S

13   WHAT MIJANGOS PUT ON AT THE TIME, YOUR HONOR, HIS VICTIMS.

14          NOTHING WAS DONE HERE IN THAT REGARD.  THERE WAS

15   NEVER AN ATTEMPT BY MY CLIENT TO DISRUPT THE COMPUTER OF

16   THE VICTIM TO THE POINT WHERE HE WOULD INFECT THE

17   COMPUTER, ALLOWING HIM TO TOTALLY CONTROL ITS FUNCTIONS.

18          THE OTHER THING IN THAT CASE, YOUR HONOR, THERE

19   WAS CHILD PORNOGRAPHY ON THAT MAN'S COMPUTER, CLEAR CHILD

20   PORNOGRAPHY.

21          THE OTHER THING THAT I THOUGHT WAS INDICATIVE OF

22   AN AGGRAVATING CIRCUMSTANCE IS THE DEFENDANT IN THAT CASE

23   NOT ONLY STOLE INFORMATION, PICTURES, COMMUNICATED,

24   THREATENED TO SEND IT TO THE VICTIM'S FAMILY, COWORKERS

25   AND DID ON OCCASION SEND IT TO ONE OF THE VICTIM'S
```

```
 1   COWORKERS.  NONE OF THAT HAPPENED HERE.

 2              AND MORE IMPORTANTLY, THE DEFENDANT IN THAT

 3   CASE, YOUR HONOR, USED ALSO FINANCIAL INFORMATION THAT WAS

 4   GLEANED FROM HIS COMPUTER HACKING AND DID FRAUDULENT

 5   FINANCIAL TRANSACTIONS USING THE VICTIM'S CREDIT

 6   INFORMATION, SOCIAL SECURITY AND BANKING INFORMATION, TO

 7   DO VARIOUS FRAUDULENT BANKING AND FINANCIAL TRANSACTIONS,

 8   YOUR HONOR.  NONE OF THAT EVER, EVER OCCURRED IN THIS

 9   CASE.

10              SO I'M TRYING TO GIVE THE COURT AT LEAST AN IDEA

11   WHY THE GOVERNMENT'S SUBMISSIONS AND THE HYPERBOLE, IF I

12   CAN USE THAT -- AND I THINK YOUR HONOR WAS DEFINING WHAT I

13   WAS TRYING TO GET ACROSS TO THE COURT -- AND I WOULD

14   AGREE, IT IS HYPERBOLE IN MANY SENSES.

15              BUT WHAT'S MORE IMPORTANT IS WHAT IS AN

16   APPROPRIATE SENTENCE IN THIS CASE?

17              MY CLIENT DOESN'T HAVE ANY RECORD.  AND I KNOW

18   THAT'S ANOTHER, I DON'T WANT TO SAY, CONTENTION IN THE

19   SENSE OF THE PRIOR CHARGE AT STATE LEVEL, YOUR HONOR.  I

20   DON'T KNOW, NOT KNOWING YOUR HONOR'S THOUGHT PROCESS ON

21   THAT, HOW AND FOR WHAT PURPOSE YOUR HONOR IS USING THAT.

22              I'M ASKING YOU TO GIVE IT VERY LITTLE WEIGHT,

23   YOUR HONOR, FOR THE FOLLOWING REASONS:

24              ONE, IT DIDN'T ARISE TO A CONVICTION.  AND THE

25   GUIDELINES, ALTHOUGH IT ALLOWS THE COURT TO LOOK AT A
```

```
 1   NUMBER OF THINGS, BUT EVEN FOR CRIMINAL HISTORY THERE'S
 2   NOTES IN THERE THAT TALK ABOUT ARRESTS THAT DON'T AMOUNT
 3   TO CONVICTIONS SHOULD BE LOOKED AT CAREFULLY AS TO VERSUS
 4   A CONVICTION WHERE YOU AT LEAST HAVE SOME DEGREE OF
 5   CERTAINTY VIA A PLEA AGREEMENT, A DEFENDANT ADMITTING HIS
 6   GUILT, OR A JURY WHERE ALL THE PANOPLY OF RIGHTS ARE
 7   AFFORDED AND THE JURY HAS FOUND BEYOND A REASONABLE DOUBT,
 8   BY UNANIMOUS VERDICT, THAT A PERSON IS GUILTY, YOUR HONOR.
 9            AND I APPRECIATE EVEN THERE'S NINTH CIRCUIT LAW
10   AND MAYBE U.S. SUPREME COURT LAW THAT SAYS THAT EVEN
11   ACQUITTED CONDUCT MAY BE EVEN USED FOR SENTENCING.
12            BUT MY CONCERN IN THIS CASE, YOUR HONOR -- AND I
13   SPEAK FROM FIRST PERSON IN THIS SENSE:  I WAS
14   MR. KAZARYAN'S ATTORNEY OF RECORD IN THAT STATE CASE,
15   YOUR HONOR.  AND I CAN SAY AS AN OFFICER OF THE COURT TO
16   YOUR HONOR THAT I KNEW THAT CASE VERY WELL.  I KNEW IT
17   MORE THAN JUST COMING IN ON THIS CASE AND PICKING UP SOME
18   DOCUMENTS.  I INTERVIEWED WITNESSES.  I SENT OUT
19   INVESTIGATORS TO FIND OUT THE BACKGROUND OF THIS YOUNG
20   LADY.
21            IN STATE COURT, THE PEOPLE COME IN ON THE DAY OF
22   TRIAL.  MY CLIENT DIDN'T WANT TO TAKE THE PLEA AGREEMENT,
23   NOR DID THE OTHER TWO CO-DEFENDANTS.  WE WANTED TO GO TO
24   TRIAL AND TEST THE ALLEGATIONS.  AND WHAT WE WERE TOLD WAS
25   AFTER SUBMITTING ALL OUR DISCOVERY TO THE GOVERNMENT AND
```

1    SHOWING ALL OUR INTERVIEWS OF WITNESSES TO SHOW HOW

2    UNRELIABLE, IF YOU WILL, THE VICTIM WAS, THE PEOPLE CAME

3    IN, AND THEY TOLD THE JUDGE ON THE DAY OF TRIAL THEY ARE

4    UNABLE TO PROCEED.

5            NOW, I KNOW THERE WAS SOME SUBMISSION FROM THE

6    D.A.'S CONVERSATION WITH THE UNITED STATES ATTORNEY,

7    ASSISTANT UNITED STATES ATTORNEY IN THIS CASE, YOUR HONOR,

8    BUT I CAN TELL YOU I DON'T BELIEVE IT WAS BECAUSE THEY

9    DIDN'T HAVE THE VICTIM.

10           I BELIEVE THAT THAT PHRASE "UNABLE TO PROCEED"

11   WAS -- BECAUSE I MET WITH THE SUPERVISORS IN THAT

12   OFFICE -- AND I'M ONLY ITERATING THIS, YOUR HONOR, TO

13   PROTECT THE RECORD IF YOUR HONOR IS GOING TO GIVE IT SOME

14   CREDENCE.  I WOULD ASK YOU TO DO THAT CAUTIOUSLY FOR THE

15   REASONS THAT I INDICATED, YOUR HONOR.

16           MY CLIENT SUBMITTED LETTERS.  HE ASKED THAT HE

17   DOESN'T WANT TO PERSONALLY ADDRESS YOUR HONOR FOR THE

18   FOLLOWING REASON, THAT I HOPE --

19           DID YOUR HONOR RECEIVE HIS LETTER, MAY I

20   INQUIRE?

21           **THE COURT:**  YES.

22           **MR. KESSEL:**  OKAY.  THANK YOU.

23           AND I THINK THAT LETTER BESPEAKS OF A DEFENDANT

24   ADDRESSING THE COURT AND ADDRESSING THE COURT IN A MORE

25   ARTICULATE FASHION THAN THE RIGHT HE HAS TO ORALLY ADDRESS

```
1   YOUR HONOR.  SO I DON'T WANT HIS PASSING ON --

2          THE COURT:  THAT WAS PART OF YOUR INITIAL REPLY,

3   EXHIBIT A.

4          MR. KESSEL:  IT WAS, YOUR HONOR.  THANK YOU.

5          I DON'T WANT THAT TO -- THE FACT THAT HE

6   SUBMITTED SOMETHING IN WRITING AND DOESN'T WANT TO ORALLY

7   ADDRESS THE COURT, TO TAKE AWAY THAT HE TRULY SET FORTH

8   HIS FEELINGS, YOUR HONOR.

9          HE'S DONE ALMOST EIGHT AND A HALF MONTHS OF HOME

10  DETENTION.  NOW, AS YOUR HONOR KNOWS, THERE'S DIFFERENT

11  DEGREES OF HOME DETENTION.  HIS WAS FULL INTENSIVE

12  SUPERVISION.  HE COULDN'T LEAVE FOR ONE MOMENT FROM HIS

13  HOUSE OTHER THAN FOR COURT AND ATTORNEY VISITS, AND I

14  WANTED YOUR HONOR TO KNOW THAT.

15         HE DIDN'T -- HE COULDN'T WORK, HE COULDN'T GO TO

16  SCHOOL.  HE COULD DO NONE OF THAT FOR EIGHT MONTHS.

17         AND I JUST -- AGAIN, YOUR HONOR, I UNDERSTAND IT

18  MAY NOT EQUATE WITH, BY THE BUREAU OF PRISONS, TO PRETRIAL

19  CREDIT.  BUT I WANT YOUR HONOR TO UNDERSTAND THAT THERE'S

20  BEEN SOME PUNITIVE MEASUREMENTS ALREADY AFFECTING MY

21  CLIENT VIA THE HOME DETENTION, YOUR HONOR.

22         AND I BELIEVE, YOUR HONOR, THAT THE 30-MONTH

23  SENTENCE -- I DID READ THE ONE IMPACT LETTER, AND I WOULD

24  ONLY INDICATE, YOUR HONOR, IF YOU ARE LOOKING AT THAT,

25  REVIEW AGAIN THE EXHIBITS THAT THE GOVERNMENT SUBMITTED.
```

```
1          THESE YOUNG WOMEN, CLEARLY BOTHERED BY IT, BUT
2    THEY STAY ON THE LINE WITH HIM, THE COMPUTER LINE IN THAT
3    SENSE.  THEY CONTINUE TO TALK WITH HIM.  THEY CONTINUE --
4    HE EVEN ADVISES THEM NEXT TIME WHAT THEY SHOULD DO TO NOT
5    HAVE AN INVASION OF THAT, AND THEY THANK HIM.
6          AND I'M NOT SUGGESTING HE SHOULD BE PATTED ON
7    THE BACK.  I'M JUST SIMPLY INDICATING TO YOU THE LEVEL OF
8    INVOLVEMENT THAT THESE YOUNG WOMEN HAD WHEN THEY LEARNED,
9    YOUR HONOR, THAT THEY WERE NOT THEIR FRIEND OR THEIR
10   COUSIN OR SOMETHING AND THEY REMAINED ON THE LINE.
11         AND BE THAT AS IT MAY, YOU KNOW, WHAT WE DO IN
12   PRIVATE, THAT'S OUR BUSINESS.  BUT MY CLIENT DIDN'T FORCE
13   THESE GIRLS TO TAKE PICTURES.  THE PICTURES HE GOT WERE
14   TWO FORMS.  AND I'M NOT AT ALL CONDONING HIS INVASION.
15         THERE WERE TWO WAYS.  THESE GIRLS ALREADY HAD IN
16   THEIR EMAILS PHOTOGRAPHS OF THEIR NAKED BREASTS ALREADY,
17   SHARING WITH ONE ANOTHER, AND THINKING THAT HE WAS THEIR
18   FRIEND, THEY WERE ON THE INTERNET SHOWING THEMSELVES.
19         IT IN NO WAY JUSTIFIES HIS INVASION, YOUR HONOR,
20   BUT I'M JUST TRYING TO INDICATE TO YOU THERE MAY BE SOME
21   WOMEN THAT WOULD EVEN GO TO THAT LEVEL OF PROJECTING
22   THEMSELVES TO FRIENDS OR IN E-MAILS IN THAT WAY.
23         AND I WOULD SIMPLY, AGAIN -- THAT WAS MADE FOR
24   THE ARGUMENT OF HOW AGGRAVATING THE CIRCUMSTANCES ARE AND
25   HOW, AGAIN, THE PSYCHOLOGICAL DAMAGE TO THESE YOUNG WOMEN
```

```
 1   HASN'T ROSE TO THE LEVEL JUSTIFYING THE DEPARTURE.  AND I
 2   WOULD URGE YOUR HONOR TO SENTENCE WITHIN THE GUIDELINES,
 3   YOUR HONOR.
 4             THANK YOU VERY MUCH.
 5        THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.
 6             MR. KAZARYAN, I KNOW YOUR COUNSEL HAS SAID THAT
 7   YOU DO NOT WISH TO BE HEARD ORALLY IN COURT, BUT
 8   NEVERTHELESS, THE LAW REQUIRES ME TO PROVIDE YOU WITH THAT
 9   OPPORTUNITY.  SO I AM GOING TO TELL YOU THAT YOU HAVE THE
10   RIGHT TO ADDRESS THE COURT HERE IN OPEN COURT ORALLY, IF
11   YOU WISH TO DO SO BEFORE I IMPOSE SENTENCE.
12             DO YOU WISH TO DO SO?
13        THE DEFENDANT:  NO, YOUR HONOR.
14        THE COURT:  ALL RIGHT.
15             MS. WILKINSON, ON BEHALF OF THE UNITED STATES.
16        MS. WILKINSON:  YES, YOUR HONOR.
17                  GOVERNMENT'S ARGUMENT
18        MS. WILKINSON:  THE GOVERNMENT VERY MUCH
19   BELIEVES THAT BASED ON THE NATURE AND CIRCUMSTANCES OF
20   THIS OFFENSE, THE 72-MONTH SENTENCE, WHICH IS THE SENTENCE
21   THAT WE RECOMMENDED, IS APPROPRIATE; AND THAT IS PRIMARILY
22   BECAUSE SUBSECTION 2B1.1 OF THE SENTENCING GUIDELINES
23   SIMPLY DOES NOT CAPTURE THE KIND OF HARM THAT THE
24   DEFENDANT PUT UPON HIS VICTIMS.
25             THE FOCUS OF THAT SECTION IS MONETARY LOSS, AND
```

```
 1    FOR THESE WOMEN, IT WAS A MUCH MORE EMOTIONAL AND

 2    PSYCHOLOGICAL HARM.  AND I WANT TO POINT OUT THAT WE'RE

 3    NOT TALKING ABOUT A DEPARTURE FROM THE GUIDELINES UNDER

 4    SECTION 5K2.3, WHICH IS WHAT DEFENSE COUNSEL KEEPS HARPING

 5    ON.

 6              THIS IS A COMMENT WITHIN 2B1.1. THAT SAYS, HEY,

 7    SOMETIMES THERE ARE GOING TO BE CONVICTIONS UNDER THIS

 8    SUBSECTION THAT DON'T HAVE A MONETARY LOSS, WHERE THE GOAL

 9    WAS SOMETHING ELSE, AND THAT IS THIS PARTICULAR CASE.

10              AND THE COMMENTARY TO 2B1.1 SAYS ITSELF THIS IS

11    A CASE WHERE A DEPARTURE, OR NOW THAT WE'RE, YOU KNOW, IN

12    THE POST-BOOKER WORLD, A VARIANCE UNDER 3553(A) IS

13    APPROPRIATE, AND IT DOESN'T HAVE TO RISE TO ANY KIND OF

14    LEVEL OF REPORTS AND ANALYSIS.

15              I SUBMIT TO YOUR HONOR THAT THE REPORTS TO LAW

16    ENFORCEMENT MADE BY THESE VICTIMS IN THE LETTER THAT WAS

17    SUBMITTED ARE SUFFICIENT.  AND, IN FACT, I WANT TO SAY

18    SOME OF THE LETTERS -- OR SOME OF THE WORDS THAT THE

19    VICTIMS THEMSELVES USED IN SPEAKING TO LAW ENFORCEMENT

20    ABOUT THIS CASE IN THE LETTER, THEY SAID THAT THEY FELT

21    RAPED, THEY FELT THREATENED, THEY FELT ATTACKED,

22    TERRORIZED, TRAUMATIZED, PARANOID, EMOTIONALLY DISTRAUGHT,

23    UNSAFE.

24              THE GOVERNMENT ISN'T CALLING THIS RAPE,

25    YOUR HONOR.  THE VICTIMS CALLED IT RAPE, AND THEY CALLED
```

1   IT RAPE BECAUSE IT FELT LIKE RAPE TO THEN.  YOU COULD SEE

2   IN THE SKYPE CONVERSATIONS THAT THESE WOMEN ARE

3   PLEADING WITH HIM TO STOP.  THEY ARE ASKING HIM TO PLEASE

4   STOP, AND I WOULD LIKE THE OPPORTUNITY TO READ THE LETTER

5   ALOUD IN COURT WHEN THE OPPORTUNITY ARISES.

6           I WANT TO TALK A LITTLE ABOUT THE FACT THAT

7   THERE ARE NO VICTIMS HERE TODAY.  I WANT TO SAY THAT THIS

8   IS BECAUSE I SPOKE WITH THEM.  I SPOKE TO, I DON'T KNOW,

9   PROBABLY TEN OF THEM.

10          AND TO A WOMAN, THEY WERE DESPERATELY AFRAID TO

11  COME HERE BECAUSE IN THIS PARTICULAR CASE THE DEFENDANT

12  KNEW A HUGE NUMBER OF HIS VICTIMS.  HE WENT AFTER WOMEN

13  THAT HE KNEW.  HE WENT AFTER PEOPLE THAT HE COULD FIGURE

14  OUT THEIR USER NAMES AND THEIR PASSWORDS, AND HE SPREAD

15  OUT FROM THERE.

16          AND THAT IS HORRIFYING TO THESE WOMEN, THAT THEY

17  WOULD HAVE TO COME IN HERE AND SEE SOMEONE THAT THEY KNEW

18  AND SPEAK ABOUT THIS AWFUL THING.  AND THEY FELT AFRAID OF

19  HIM.  THE VICTIM THAT DID SUBMIT A LETTER WOULD NOT LET ME

20  PUT HER NAME ON IT AND DIDN'T WANT TO COME IN BECAUSE SHE

21  WAS AFRAID, AND SHE CONTINUES TO BE AFRAID TO THIS DAY

22  BASED IN PART ON THE TRAUMA THAT COMES FROM KNOWING THAT

23  YOU KNOW THIS PERSON AND YOU KNOW WHO DID IT TO YOU.

24          I DON'T THINK THAT THAT SHOULD INURE TO THE

25  DEFENDANT'S BENEFIT.  AND THE IDEA THAT OH, THE VICTIMS

```
 1   AREN'T HERE OR THAT OH, THERE'S NOT ENOUGH FROM THEM TO

 2   BASE ON THIS, I DON'T THINK THE FACT THAT HE HAS SCARED

 3   AND TORTURED PEOPLE THAT HE KNOWS SHOULD INURE TO HIS

 4   BENEFIT.

 5         I WANT TO FURTHER TALK ABOUT HOW THE DEFENSE

 6   ATTORNEY HAS TALKED ABOUT HOW HIS CASE IS LESS SERIOUS

 7   THAN MIJANGOS IN SUBSTANCE.  AND HE MAKES A COUPLE OF

 8   ARGUMENTS, FOR EXAMPLE, THAT THE PICTURES IN MIJANGOS WERE

 9   SEXUALLY EXPLICIT, AND HERE IN THIS CASE, HE WAS JUST

10   LOOKING FOR THEIR BREASTS.

11         I THINK THAT IS OFFENSIVE AND SHOULD BE

12   REJECTED.  THESE WERE SEXUALLY EXPLICIT PHOTOS OF THESE

13   WOMEN'S BREASTS THAT THEY DID NOT WANT TO SHOW DEFENDANT,

14   AND THEY WERE SEXUALLY EXPLICIT PHOTOS OF THEIR NAKED

15   BODIES THAT HE WENT IN TO REACH HIS HANDS INTO THEIR EMAIL

16   ACCOUNTS AND GRAB, AND TO TRY AND DRAW SOME SORT OF

17   GRADATION THERE IS SOMETHING THAT SHOULD BE REJECTED.

18         ALSO SHOULD BE REJECTED IS THE ARGUMENT THAT IN

19   SOME FASHION BY HAVING A PICTURE OF THEMSELVES NAKED IN

20   THEIR EMAILS, THINKING THAT THEY HAD A PRIVATE RIGHT TO

21   THAT, THAT SOMEHOW THESE WOMEN WERE ASKING FOR THE CRIME

22   TO HAPPEN TO THEM AND THAT SOMEHOW THEY AREN'T AS AFFECTED

23   AS THEY SAY; WHEN THEY SAY THAT THEY ARE TERRORIZED, THEY

24   DON'T REALLY MEAN IT BECAUSE THEY WOULD SHOW THEIR NAKED

25   BODIES TO THEIR FRIEND.  THAT IS AN OFFENSIVE ARGUMENT,
```

```
 1    HONESTLY, AND SHOULD BE REJECTED.

 2            HERE THE PICTURES WERE EXPLICIT.  AND FRANKLY,

 3    REGARDLESS OF WHETHER THE PICTURES ARE OF ONE PART OF THE

 4    BODY OR ANOTHER, THIS IS ABOUT POWER.  THE DEFENDANT SAID

 5    IN ONE OF HIS SKYPE CONVERSATIONS, "I HAVE THE POWER NOW,"

 6    AND THAT'S WHAT THIS WAS ABOUT.  HE WAS EXERTING HIS POWER

 7    OVER THESE WOMEN, AND THEY FELT IT.  THEY FELT IT EVEN

 8    THOUGH THERE WAS A COMPUTER SCREEN AND THEY WEREN'T

 9    PHYSICALLY THERE.  AND THAT'S WHY I THINK THAT THESE

10    WOMEN -- NOT THE GOVERNMENT -- THESE WOMEN CALLED IT

11    "RAPE" BECAUSE THEY FELT THAT THEY DIDN'T HAVE CONTROL

12    OVER WHAT THEY COULD DO.

13            AND I WANT TO CONNECT TO THAT THIS ARGUMENT THAT

14    THE PICTURES WEREN'T POSTED PUBLICLY.  THEY WERE POSTED

15    PUBLICLY.  TIME AND TIME AGAIN IN THE REPORTS -- AND THEY

16    WERE SUBMITTED -- WE SEE THAT THEY ARE POSTED ON PEOPLE'S

17    FACEBOOK ACCOUNTS.  THAT'S EXTREMELY PUBLIC SOCIAL MEDIA

18    AND TO THESE GIRLS' FRIENDS.

19            ONE WOMAN TALKED ABOUT HOW HER PICTURE WAS

20    POSTED ON ANOTHER FRIEND'S FACEBOOK WALL, AND SO SHE CAN'T

21    GET TO IT.  SHE CAN'T TAKE IT DOWN.  SHE'S CALLING UP HER

22    FRIEND AND CRYING.  ALL OF HER FRIENDS ARE CALLING HER AND

23    SAYING, "WHY IS THERE A NAKED PICTURE OF YOU ON FACEBOOK?"

24            THIS WAS PUBLIC, AND HE DID HAVE POWER OVER

25    THEM.  AND TO SUGGEST THAT THEY SOMEHOW COULD HAVE TURNED
```

1    OFF THE COMPUTER AND, THEREFORE, IT'S NOT RAPE DOESN'T

2    UNDERSTAND THAT THEY -- THE POWER THAT HE DID HAVE OVER

3    THEM.  HE HAD THESE NAKED PICTURES, AND HE USED THAT TO

4    GET MORE.

5              I WANTED TO TALK ABOUT THAT HE MENTIONED THAT

6    MIJANGOS HAD CHILD PORNOGRAPHY AND THIS CASE DIDN'T.

7              THAT'S JUST SIMPLY NOT TRUE.  THERE WERE

8    UNDERAGE PICTURES IN THIS CASE.  THE GOVERNMENT DECIDED

9    NOT TO PROSECUTE HIM FOR CHILD PORNOGRAPHY, BUT THE WHOLE

10   REASON THAT WE COULDN'T TURN OVER THE COMPUTER TO HIM WAS

11   THAT THERE WERE GIRLS THAT WE KNEW OF THAT WERE UNDERAGE,

12   17 -- 16 OR 17 YEARS OLD.  AND FRANKLY, GIVEN THE LARGE

13   NUMBER OF PICTURES IN THIS CASE THAT WE COULDN'T IDENTIFY,

14   WE DIDN'T KNOW HOW MANY MORE THERE WERE.  SO IT'S JUST

15   SIMPLY NOT TRUE TO DISTINGUISH IT ON THAT BASIS.

16             THE OTHER POINT THAT I WANTED TO MAKE WAS THAT

17   IT DID DISRUPT THEIR LIVES.  HE SAID THAT MIJANGOS WAS

18   ABLE TO DISRUPT THEIR COMPUTERS, AND IT'S TRUE THAT

19   MIJANGOS WAS A MORE TECHNICAL MEANS.  HE USED A VIRUS, AND

20   THAT IS A DISTINGUISHING FACTOR.  BUT HE WAS ABLE TO

21   DISRUPT THEIR LIVES BY HIS SOCIAL ENGINEERING AND TAKING

22   OVER THEIR ACCOUNTS.

23             THE PSR POINTS OUT THAT THEY HAD THEIR -- THAT

24   THEY WERE LOCKED OUT OF THEIR ACCOUNTS, THEY HAD THEIR

25   PASSWORDS CHANGED.  AND MOREOVER, ONCE THESE THINGS

1  HAPPENED, THEY NEEDED TO RESTART UP THEIR EMAIL ACCOUNTS

2  AND ALL OF THEIR PASSWORD ACCOUNTS AND ALL OF THOSE

3  THINGS, WHICH WAS A TREMENDOUS HASSLE.  AND SO THERE WAS A

4  DISRUPTION OF THEIR LIVES BEYOND THE TORTURE OF THE

5  IMMEDIATE ACT.

6          I WANTED TO TALK FURTHER ABOUT THE NUMBERS

7  BECAUSE I FEEL LIKE THEY ARE GETTING LOST HERE.

8          DEFENSE COUNSEL KEEPS TALKING ABOUT HOW THIS

9  ONLY HAPPENED EIGHT OR NINE TIMES, AND FOR SOME REASON WE

10 KEEP IGNORING THE RELEVANT CONDUCT BEYOND THAT WHICH IS IN

11 THE INDICTMENT.

12         THE INDICTMENT DOES REFERENCE EIGHT TO NINE

13 TIMES.  BUT AS THE GOVERNMENT SHOWED IN ITS PAPERS AND ITS

14 REFERENCE IN THE PSR, WE HAVE 372 VICTIMS; WE HAVE 1,100

15 NAKED PICTURES, 400 OF WHICH ARE FROM WEBCAMS OR SKYPE.

16 SO 400 PICTURES OF WOMEN SHOWING THEIR BREASTS TO THE

17 DEFENDANT.  THAT IS MORE THAN EIGHT OR NINE TIMES.  THAT'S

18 WAY MORE THAN EIGHT OR NINE TIMES, AND IT'S WAY MORE THAN

19 MIJANGOS.

20         SO THE SHEER VOLUME IN THIS CASE IS ONE OF THE

21 THINGS THAT SETS THE DEFENDANT ABOVE MIJANGOS IN TERMS OF

22 WHAT HIS CONDUCT WAS.

23         WE HAVE HIS DAILY ACCESS.  I THOUGHT THE -- ONE

24 OF THE EXHIBITS WAS THE FACEBOOK ACCESS LOGS WHERE WE WENT

25 THROUGH AND WE SHOWED HOW OFTEN HE WAS ACCESSING BOTH HIS

1    OWN ACCOUNTS AND HIS VICTIM ACCOUNTS, AND THAT WAS JUST

2    FOR A VERY SHORT PERIOD OF TIME.  AND WHEN IT'S OVER AND

3    OVER AND OVER AGAIN, DAILY, AND IT'S ONE OF THOSE THINGS

4    WHERE YOU JUST SEE THE SHEER VOLUME OF IT; AND YOU HAVE TO

5    COMPARE IT TO SOME OF THE LETTERS THAT YOU RECEIVED, YOUR

6    HONOR, FROM THE DEFENDANT'S FAMILY AND FIANCÉE, WHERE THEY

7    ARE SAYING, "OH, HE WAS WITH US DAILY, AND HE WASN'T

8    SHOWING ANY OF THIS BEHAVIOR."  YOU HAVE TO WONDER ABOUT

9    THE PERSUASIVE VALUE OF THOSE LETTERS WHEN COMPARED WITH

10   THE ACTUAL FACTS FOUND ON THE DEFENDANT'S COMPUTER AND HIS

11   I.P. ADDRESS.

12        I THINK THAT IT IS CLEAR THAT WHEN YOU COMPARE

13   DEFENDANT'S CONDUCT TO OTHER CASES, WHEN YOU HAVE THE

14   EXTREME EMOTIONAL VIOLENCE, THE DAILY PERSISTENT EFFORT,

15   THE SHEER VOLUME, THE NATURE AND CIRCUMSTANCES OF THE CASE

16   ABSOLUTELY CALL FOR THE 72 MONTHS.

17        BUT I DO ALSO WANT TO TALK ABOUT THE DEFENDANT'S

18   HISTORY AND CIRCUMSTANCES BECAUSE I THINK THAT'S SOMETHING

19   IMPORTANT TO TALK TO AS WELL.

20        THE DEFENDANT PROFFERED TO PUT FORTH SOME

21   LETTERS AND A LETTER FROM DR. MARKMAN.  AND I THINK, IN

22   CONSIDERING THOSE, YOU HAVE TO CONSIDER THE RAPE

23   ALLEGATION.

24        AND I WANT TO BE VERY CLEAR ABOUT WHAT I'M

25   ASKING THE COURT TO DO BECAUSE I'M NOT ASKING THE COURT TO

```
1    MAKE AN UP-AND-DOWN FINDING ABOUT WHETHER OR NOT THE RAPE

2    OCCURRED.  I'M NOT SAYING THAT THE RAPE ALLEGATION IS THE

3    REASON FOR THE ENHANCEMENT IN THE FIRST PLACE OR THE

4    REASON FOR THE VARIANCE IN THE FIRST PLACE.

5              BUT WHEN THE COURT IS CONSIDERING THE

6    DEFENDANT'S LETTERS IN MITIGATION AND TRYING TO DECIDE

7    WHETHER OR NOT THERE ARE MITIGATING FACTORS THAT SUPPORT A

8    LOWER SENTENCE, I THINK YOU CAN CONSIDER WHAT THESE OTHER

9    PEOPLE HAVE SAID ABOUT THE DEFENDANT -- WHAT THE VICTIMS

10   SAID, WHAT THE WITNESS SAID.

11             AND, YOU KNOW, THE DEFENSE ATTORNEY HAS MADE A

12   LOT OF OBJECTIONS AS TO THE FORM THAT IT'S COMING TO YOUR

13   HONOR, AND NOW YOUR HONOR HAS SOME OF THE PRELIMINARY

14   HEARING TRANSCRIPTS.  BUT THERE'S NOT A LOT -- ANY WAY TO

15   DISPUTE WHAT THEY ACTUALLY SAID.

16             THIS IS WHAT THEY SAID, AND I THINK THAT WHEN

17   YOU CONSIDER WHAT THEY SAID ABOUT DEFENDANT'S BEHAVIOR IN

18   THE RAPE ALLEGATION, WHICH IS THAT THE VICTIM POINTED

19   OUT -- THE DEFENDANT AS RAPING HER.

20             AND ONE OF THE WITNESSES SAID THAT HE ARRIVED,

21   SAW THE DEFENDANT OUTSIDE OF THE CAR.  THE DEFENDANT SAID

22   THAT THE VICTIM WAS INSIDE AND WOULD BE OUT IN FIVE

23   MINUTES, INDICATING KNOWLEDGE OF WHAT WAS HAPPENING.  THE

24   WITNESS GOES IN, PULLS HER OFF AS SHE SORT OF COLLAPSED ON

25   A MAN WITH HIS PANTS DOWN, AND PUTS HER IN THE CAR.  AND
```

1  THAT THEN D.N.A., THE DEFENDANT'S D.N.A. IS FOUND IN THE

2  VICTIM'S VAGINA, AND THE VICTIM'S D.N.A. IS FOUND ON THE

3  DEFENDANT'S PENIS.

4          THERE'S, I THINK, STATEMENTS THERE THAT ALLOW

5  THE COURT TO COMPARE THE MITIGATING ALLEGATIONS FROM THE

6  DEFENSE TO THESE OTHER STATEMENTS MADE, AND I THINK THAT

7  MY POINT IS -- IF I COULD GET TO MY POINT -- WHICH IS WHAT

8  THESE THINGS SAY IS THAT THE DEFENDANT VALUES POWER OVER

9  WOMEN.  THE CONDUCT IS VERY SIMILAR.  WHAT THEY SAY HE DID

10  AS TO WHAT HE SAID HAPPENED HERE, HE'S VALUING THE POWER

11  OVER WOMEN.  HE DISRESPECTS WOMEN.  HE HAS A DISREGARD FOR

12  OTHERS.  HE HAS DISREGARD FOR LAW ENFORCEMENT.

13          IN FACT, I WAS STRUCK BY HOW THE DEFENDANT

14  DESCRIBED THE OFFENSE TO DR. MARKMAN VERSUS HOW THE

15  VICTIMS DESCRIBED IT, AND I HAVE TOLD YOU HOW THE VICTIMS

16  DESCRIBED IT.  BUT IN DR. MARKMAN'S LETTER, HE STATES THAT

17  THE VICTIM -- HE SAYS -- HE REPORTS WHAT THE DEFENDANT

18  SAYS.  ONE MOMENT, PLEASE.

19          *(GOVERNMENT COUNSEL REVIEWING DOCUMENTS.)*

20          **MS. WILKINSON:**  DR. MARKMAN IS JUST SORT OF

21  REPORTING HIS CONVERSATION WITH THE DEFENDANT.  AND HE

22  SAYS WITH RESPECT TO THE RAPE ALLEGATION (AS READ:)

23          *"WE WERE DRINKING, AND SHE WALKED IN AND*

24          *CLAIMED RAPE WHEN A FRIEND SAW HER.  ONE WEEK IN*

25          *CUSTODY, DISMISSED WITH PREJUDICE AFTER THREE*

```
 1        YEARS."

 2                    (END QUOTED MATERIAL.)

 3        MS. WILKINSON:  AND THAT WAS REALLY TELLING TO

 4   ME IN TERMS OF HOW THE DEFENDANT SAW THAT SITUATION AND

 5   HOW THE DEFENDANT SEES THIS SITUATION AND HOW THE FACTORS

 6   IN MITIGATION REALLY AREN'T EXISTING AT ALL.

 7            AND SPEAKING OF DR. MARKMAN'S REPORT, I DO WANT

 8   TO POINT OUT -- I'M NOT SAYING THAT I DON'T THINK

 9   DR. MARKMAN IS A DOCTOR.  I THINK HE'S A DOCTOR.  HE COULD

10   BE FREUD FOR ALL I CARE.  BUT IF ALL YOU ARE DOING IS

11   SITTING DOWN WITH SOMEBODY, READING THE INDICTMENT, AND

12   RECITING BACK TO US WHAT THE DEFENDANT HAS SAID, IT'S JUST

13   NOT A PERSUASIVE LETTER.

14            AND SO I WOULD SUBMIT TO THE COURT THAT THAT IS

15   JUST SIMPLY NOT A PERSUASIVE AMOUNT OF INFORMATION TO

16   CONCLUDE THAT THERE ARE MITIGATING FACTORS IN THIS CASE

17   THAT WARRANT A LOWER SENTENCE.

18            I THINK THAT IS SORT OF MY POINT WITH RESPECT TO

19   ALL OF THIS, THAT THERE'S NO MITIGATING FACTORS THAT

20   SUPPORT A LOWER SENTENCE AND THAT, IN COMPARISON WITH THE

21   EXTREME CONDUCT THAT IS NOT ACCOUNTED FOR BY 2B1.1, A

22   VARIANCE IS ABSOLUTELY APPROPRIATE AND A 72-MONTH SENTENCE

23   IS ABSOLUTELY APPROPRIATE.

24            THANK YOU.

25        THE COURT:  YOU WERE GOING TO ALSO READ A LETTER
```

```
 1   THAT YOU SAID YOU WANTED TO.

 2           MS. WILKINSON:  YES.

 3           MR. KESSEL:  MAY I INDICATE THE OBJECTION I HAVE

 4   TO READING THE LETTER?  ONLY BECAUSE IT'S BEEN SUBMITTED

 5   AND IS PART OF THE RECORD, YOUR HONOR.  UNLESS THE COURT

 6   FEELS -- I ASSUME THE GOVERNMENT WANTS TO READ THE LETTER

 7   TO GIVE THE COURT THE INFORMATION WHICH THE COURT ALREADY

 8   HAS.

 9           THAT'S MY CONCERN ABOUT READING ONE LETTER

10   VERSUS ALL MY CLIENT'S LETTERS AND HIS LETTER IN OPEN

11   COURT.  THE COURT'S RECEIVED THAT, OBVIOUSLY, WAY IN

12   ADVANCE OF TODAY'S HEARING.

13           THE COURT:  THE OBJECTION IS OVERRULED.  THIS IS

14   IN THE NATURE OF A STATEMENT --

15           I TAKE IT THIS IS A VICTIM STATEMENT?

16           MS. WILKINSON:  VICTIM STATEMENT.

17           THE COURT:  IT IS A VICTIM STATEMENT, AND IF THE

18   VICTIM WERE HERE, THE VICTIM WOULD BE ENTITLED TO ADDRESS

19   THE COURT ORALLY HERE IN COURT, DESPITE THE FACT THAT THE

20   VICTIM MAY HAVE ALSO WRITTEN SOMETHING.

21           SO I THINK THAT IS A DISTINCTION, AND YOUR

22   OBJECTION IS OVERRULED.

23           MR. KESSEL:  THANK YOU, YOUR HONOR.

24           THE COURT:  AND YOU MAY PROCEED, MS. WILKINSON.

25           MS. WILKINSON:  YES, YOUR HONOR.
```

```
1        IT READS (AS READ:)

2              "HONORABLE JUDGE KING, I'M WRITING THIS

3        IMPACT STATEMENT FOR A NUMBER OF REASONS.  I HOPE

4        TO FIRST AND FOREMOST EXPRESS MY FEELINGS ABOUT

5        THE CRIME THAT WAS COMMITTED.  I WILL ALSO SPEAK

6        TO THE RESIDUAL EFFECTS OF THE CRIME SUCH AS MY

7        FEELINGS FOR THE DEFENDANT, MYSELF, AS WELL AS THE

8        INTERNET.

9              "I NEVER IMAGINED THAT I WOULD BE THE

10       VICTIM OF A CRIME THAT WAS COMMITTED BY THE

11       DEFENDANT.  IT WAS ONE OF THOSE THINGS THAT PEOPLE

12       NEVER IMAGINE HAPPENING TO THEMSELVES.  IF

13       ANYTHING, PEOPLE, INCLUDING MYSELF, BEFORE IT

14       HAPPENED TO ME OFTEN ATTRIBUTE IT TO THE

15       CARELESSNESS OR THE CHARACTER OF THE VICTIMS LIKE

16       MANY OTHER CRIMINAL OFFENSES AGAINST WOMEN THAT

17       ARE NOT WELL UNDERSTOOD BY OUR SOCIETY.

18             "I ATTEND A TOP-TEN LAW SCHOOL.  I WAS

19       A JUDICIAL EXTERN FOR THE (REDACTED) OF

20       CALIFORNIA, AND I HAVE ALWAYS BEEN EXTREMELY

21       CAREFUL WITH EVERY ASPECT OF MY LIFE.  THIS WAS

22       BEYOND THAT.  THIS WAS BEYOND ME.

23             "THE DEFENDANT STOLE INFORMATION, WAS

24       MANIPULATIVE BEYOND BELIEF, AND HURT ME

25       REPEATEDLY.  EVEN AFTER, THE FEAR OF SOMETHING
```

1    *LIKE THAT HAPPENING AGAIN HAS NOT LEFT MY MIND.*

2    *THE DEFENDANT IS AN INDIVIDUAL WHO IS A FAMILY*

3    *FRIEND, WHO ATTENDED MY HIGH SCHOOL, AND WHO*

4    *OCCASIONALLY DROVE ME TO SCHOOL MANY YEARS AGO.*

5    *I'M CONVINCED THAT HE WILL BE A THREAT TO BOTH MY*

6    *COMMUNITY AND ME.  HE CERTAINLY MADE THREATENING*

7    *COMMENTS PRIOR TO HIS ARREST, AND I FEAR THE*

8    *EFFECTS OF SUCH AN INDIVIDUAL BEING RELEASED INTO*

9    *OUR COMMUNITY SHOULD HE NOT FACE THE APPROPRIATE*

10   *CONSEQUENCES FOR HIS CRIME.*

11          *"IT'S DIFFICULT TO UNDERSTAND HOW*

12   *SOMEONE CAN DO WHAT THE DEFENDANT DID AND HIS*

13   *MOTIVES BEHIND THE CRIME.  IT HAS MADE IT*

14   *DIFFICULT FOR ME TO TRUST ANY INDIVIDUAL THAT I*

15   *MEET WHEN SOMEONE THAT I KNEW PERSONALLY COULD*

16   *HAVE DONE SOMETHING SO ABOMINABLE.*

17          *"FINALLY, WHILE MY COMPUTER AND THE*

18   *INTERNET ARE ESSENTIAL TO NETWORKING, LEARNING,*

19   *STORING INFORMATION, AND WORKING, I NO LONGER FEEL*

20   *FULLY COMFORTABLE USING EITHER ONE.  I HAVE NO*

21   *PEACE OF MIND.  I MAKE SURE TO DELETE EMAILS THAT*

22   *CONTAIN CONFIDENTIAL INFORMATION.  I NO LONGER*

23   *STORE PHOTOGRAPHS ON MY COMPUTER, AND I HAVE*

24   *DEACTIVATED MY SOCIAL NETWORKING ACCOUNTS.*

25          *"IT GOES WITHOUT SAYING THAT EVERYONE*

1    *MUST TAKE PROPER PRECAUTIONS WHEN DEALING WITH*

2    *UNKNOWN INDIVIDUALS ON THE INTERNET.  HOWEVER,*

3    *THAT WAS FAR FROM THE CASE HERE AT HAND.*

4              *"NO ONE SHOULD BE KEPT FROM USING*

5    *COMPUTER PROGRAMS TO COMMUNICATE WITH FRIENDS AND*

6    *FAMILY, BUT THAT IS ONE OF THE MANY CONSEQUENCES*

7    *OF THE DEFENDANT'S CRIME.*

8              *"THANK YOU FOR YOUR TIME."*

9              *(END QUOTED MATERIAL.)*

10       **THE COURT:**  ALL RIGHT.  THANK YOU VERY MUCH.

11       MR. KESSEL, IF YOU WANT TO HAVE A FEW MINUTES TO

12   RESPOND TO THE GOVERNMENT'S ARGUMENT, YOU MAY.

13              **DEFENSE FURTHER ARGUMENT**

14       **MR. KESSEL:**  JUST LESS THAN A FEW MINUTES, YOUR

15   HONOR.  THANK YOU, YOUR HONOR.

16       I WANT TO KNOW A COUPLE THINGS:

17       ONE, MY CLIENT'S LETTERS IN MITIGATION ARE FROM

18   PEOPLE THAT CARE ABOUT HIM, NATURALLY.  MANY OF THE

19   PICTURES, WHEN WE WENT TO GO AND PROFFER WITH THE

20   GOVERNMENT, AT LEAST ON ONE OCCASION WHERE THEY GAVE US

21   SOMEWHAT, WHAT WAS CALLED A "REVERSE PROFFER," MANY OF

22   THOSE -- AND THEY DIDN'T KNOW THOSE WERE PICTURES OF HIS

23   OWN FIANCÉE.

24       I WANT TO NOTE THAT, YOUR HONOR, WHO WROTE THE

25   LETTER, WHO'S ALSO GOING TO LAW SCHOOL AND THE LIKE.  I'M

```
1    NOT SUGGESTING THAT SHE'S ASKING YOUR HONOR TO DEEM THIS

2    PERSON NOT GUILTY; IT JUST GIVES A BACKGROUND INTO THE

3    PEOPLE THAT HE WAS AROUND, YOUR HONOR.

4           THE OTHER THING I WANTED TO NOTE, YOUR HONOR, IS

5    THAT -- AGAIN, I KNOW YOUR HONOR PROBABLY PERUSED THE

6    COMPUTER MESSAGES.  AND I JUST HEARD A LETTER FROM A

7    VICTIM, AND THEN I ALSO HEARD THE GOVERNMENT SAYS THEY

8    DON'T WANT TO BE HERE, NOBODY ELSE SEEMED TO WANT TO

9    ADDRESS THE COURT IN WRITING.

10          MY ONLY CONCERN IS, YOUR HONOR, I THINK WHAT

11   BESPEAKS OF THE NATURE OF THESE WOMEN'S FEELINGS ARE THE

12   TEXT MESSAGES WHERE, AGAIN, THEY'RE ENGAGING MY CLIENT

13   EVEN AFTER LEARNING THAT THEIR COMPUTER HAD BEEN HACKED.

14          NOW, I'M NOT SUGGESTING, YOUR HONOR --

15          THE COURT:  WHAT ARE YOU TALKING ABOUT IN TERMS

16   OF ENGAGING?  GIVE ME SOME EXAMPLES.

17          MR. KESSEL:  YES.

18          THE COURT:  I HAVE ACTUALLY READ THESE MESSAGES

19   AND THE VARIOUS GOVERNMENT EXHIBITS.  NOT ALL OF IT IS AS

20   DISTURBING AS OTHERS, BUT CLEARLY THERE'S SOME VERY

21   DISTURBING PLEAS FOR YOUR CLIENT TO PLEASE STOP, AND YOUR

22   CLIENT SEEMED TO BE QUITE CALLOUS TO IT.

23          SO I WOULD LIKE TO UNDERSTAND YOUR ARGUMENT,

24   MR. KESSEL.

25          MR. KESSEL:  I AGREE IN THERE THERE'S TIMES THEY
```

1  ARE SAYING, "STOP," YOUR HONOR.  BUT I'M ALSO AGREEING

2  THAT WHAT YOU CAN DO -- THEY DON'T TURN OFF AND UN-CLICK

3  THE COMPUTER AND STOP CHATTING WITH HIM, YOUR HONOR.

4          **THE COURT:**  YOU DON'T THINK THE FEAR THAT HE

5  INSTILLED IN THEM MAY HAVE SOMETHING TO DO WITH IT?

6          **MR. KESSEL:**  THEY DON'T SAY THAT IN THEIR --

7          **THE COURT:**  NO, IF SOMEBODY CALLS ME UP AND

8  SAYS, "I HAVE SOME REALLY COMPROMISING PICTURES OF YOU.

9  UNLESS YOU DO SOMETHING FOR ME, I'M GOING TO PUBLISH IT,"

10  AND YOU THINK I'M JUST GOING TO NECESSARILY SAY, "OH,

11  FINE."  CLICK.  "SEE YOU LATER."

12          YOU THINK THAT JUST WIPES IT OUT CLEAN?

13          **MR. KESSEL:**  NO.  I DIDN'T SAY THAT JUST MAKES

14  IT JUSTIFIABLE, YOUR HONOR.

15          I'M SIMPLY INDICATING IT -- IT WAS NOT ONLY JUST

16  NOT HANGING UP, IT WAS MORE ASKING HIM, "WELL, IF I SHOW

17  YOU THIS PICTURE," NOT -- NOT "WILL YOU GO AWAY," THERE

18  WAS MORE COMMENTS ABOUT THESE WOMEN TALKING ABOUT WHAT IS

19  HE GOING TO DO WITH THE PICTURE.  THERE'S MORE COMMENTS --

20          **THE COURT:**  YOU DON'T THINK THAT'S RELEVANT?

21          IF SOMEBODY IS SAYING SEND ME SOME COMPROMISING

22  PICTURES OF YOURSELF, YOU KNOW, AND THEY ARE BEING

23  THREATENED TO DO SO, YOU DON'T THINK THAT'S REASONABLE

24  THAT SOMEBODY MIGHT WANT TO KNOW, "WELL, WHAT EXACTLY ARE

25  YOU GOING TO DO WITH THIS COMPROMISING PICTURE THAT YOU

```
 1   WANT ME TO SEND TO YOU?"

 2           I WOULD REALLY LIKE YOU TO TELL ME SPECIFICS

 3   RATHER THAN THE --

 4           MR. KESSEL:  YES.

 5           THE COURT:  -- NON-SPECIFICS IN TERMS OF --

 6           WELL, WHAT ARE YOU EXACTLY SAYING?  I'M

 7   CONCERNED ABOUT THAT.

 8           MR. KESSEL:  I'M LOOKING AT EXHIBIT E, FOR

 9   EXAMPLE, YOUR HONOR.

10           THE COURT:  ALL RIGHT.  LET'S LOOK AT EXHIBIT E.

11           MR. KESSEL:  THANK YOU.

12           THE COURT:  WHAT PAGE?

13           MR. KESSEL:  IT'S A FACEBOOK FROM (NAME

14   REDACTED) AND (REDACTED) -- WHICH IS PURPORTEDLY MY

15   CLIENT.  THERE'S A NUMBER OF SCREEN SHOTS, IF YOU WILL,

16   YOUR HONOR, WHERE THERE'S SOME PHOTOS OF THE PERSON AS

17   WELL.  IF THE COURT CAN SEE THAT UNDER THE --

18           THE COURT:  JUST GIVE ME THE PAGE.  REFER ME TO

19   SPECIFICALLY WHAT YOU'RE TALKING ABOUT THAT BEARS OUT YOUR

20   ARGUMENT THAT SOMEHOW THESE VICTIMS WERE NOT SO AFFECTED

21   BY IT AS, IN FACT, THAT THEY CONTINUED TO CONVERSE WITH

22   YOUR CLIENT.

23           SO TELL ME WHERE IS IT THAT I CAN LOOK TO

24   SUPPORT YOUR ARGUMENT.

25           MR. KESSEL:  I'M TRYING TO GET A PAGE NUMBER.
```

1    **THE COURT:**  YOU CAN JUST TELL ME HOW MANY PAGES

2    FROM THE TOP, FROM THE BEGINNING, FROM THE FIRST PAGE.

3    **MR. KESSEL:**  IT'S THAT WHOLE CHAT, YOUR HONOR.

4    IT'S ONLY FIVE -- I BELIEVE, SIX PAGES IN TOTAL.  EXCUSE

5    ME, IT'S ONLY FIVE PAGES IN TOTAL.  EXHIBIT E IS FIVE

6    PAGES.

7         IT'S ONE SCREEN CAPTION COMMUNICATION, YOUR

8    HONOR.  AND IT HAS PICTURES, AND IT HAS THE SPEAKERS AS

9    (REDACTED) -- I DIDN'T KNOW IF I COULD PUT IT IN THE

10   RECORD, BUT IT'S IN THE RECORD.  THESE ARE DISCLOSED IN

11   THE EXHIBITS, YOUR HONOR.  BUT I'M JUST TRYING TO

12   HIGHLIGHT.  AND THEN THERE'S A (REDACTED).

13        DOES THE COURT SEE THAT?

14   **THE COURT:**  I DO.

15   **MR. KESSEL:**  THAT TYPE OF COMMENT WHERE --

16   **THE COURT:**  WHAT KIND OF COMMENT ARE YOU TALKING

17   ABOUT?

18   **MR. KESSEL:**  I'M GOING TO THE FOURTH PAGE, THE

19   FIRST PAGE FROM THE LAST PAGE.

20   **THE COURT:**  FIRST PAGE FROM -- THE

21   SECOND-TO-THE-LAST PAGE.  RIGHT?

22   **MR. KESSEL:**  YES.

23   **THE COURT:**  ALL RIGHT.  OKAY.  WHERE?  STARTING

24   WHERE?  THERE ARE ONE, TWO, THREE, FOUR, FIVE ENTRIES.

25   **MR. KESSEL:**  THE FOURTH CAPTION DOWN,

1    (REDACTED) AT DECEMBER 18, 2:26.  DO YOU SEE THAT, YOUR

2    HONOR?

3              **THE COURT:**  YES, I DO.

4              **MR. KESSEL:**  OKAY.  IF YOU READ THAT, THEY KNOW

5    THAT MY CLIENT'S NOT (REDACTED), AND THEY ARE ASKING, "IF

6    YOU WANT OUR PICTURE" --

7              AND THEY'RE TALKING ABOUT IF YOU WANT ME AND

8    {REDACTED), WHY DON'T YOU TRY TO ADD US ON YOUR OWN

9    ACCOUNT?

10             SO WHAT THEY ARE SAYING IS DON'T BE SECRET AND

11   DON'T USE OUR ACCOUNT AND HIDE, USE OUR OWN ACCOUNTS.  WHY

12   DON'T YOU PUT OUR PICTURES ON YOUR OWN ACCOUNT?  MEANING

13   THE DEFENDANT'S OWN ACCOUNT.

14             I'M TRYING TO GIVE YOUR HONOR A FLAVOR OF THAT

15   THESE GIRLS AREN'T SAYING OH, WE'RE SCARED; WE'LL DO IT.

16   THEY ARE EVEN GIVING HIM A SUGGESTION THAT HE PUT THEIR

17   PICTURES -- AND THERE ARE FRIENDS IN THE PICTURES.

18             YOU GOT TO UNDERSTAND THESE ARE PICTURES WHERE

19   SOME OF THE GIRLS WOULD SHOW THEIR BREASTS, YOU KNOW, IN

20   HUGGING OR SOMETHING LIKE THAT.

21             THAT'S AN EXAMPLE, YOUR HONOR, THAT I'M

22   INDICATING THAT THEY'RE EVEN SUGGESTING YOU DON'T HAVE TO

23   SNEAK AROUND.  JUST PUT IT ON YOUR OWN ACCOUNT.

24             THAT WAS THE KIND OF COMMENT THAT I MADE, AND

25   THAT NONE OF IT --

1          AND ON THE NEXT PAGE, YOUR HONOR, THE NEXT PAGE,

2    THE LAST PAGE.

3          **THE COURT:**  YES.

4          **MR. KESSEL:**  AT THE TOP, (REDACTED), THAT'S

5    THE VICTIM, YOU'LL FIND, "IF YOU DON'T WANT TO COME TO US,

6    ENJOY YOUR DAY, SWEETIE" AND THERE'S COMMENTS LIKE --

7          YOUR HONOR, I UNDERSTAND ABOUT VICTIMS BEING

8    SCARED AND DOING THINGS, BUT THEIR COMMENTS TO MY CLIENT

9    "PUT OUR PICTURES ON YOUR OWN THING."  "COME TO US,"

10   MEANING PUT US ON YOUR OWN SCREEN.  "ENJOY YOUR DAY,

11   SWEETIE" -- I MEAN, THOSE DON'T SEEM TO BE WOMEN WHO ARE

12   PETRIFIED BY THE FEAR THAT THE GOVERNMENT TALKS ABOUT.

13   THAT'S ALL I WANTED TO NOTE.

14         AND THERE WAS NO DISSEMINATION OF ANY OF THESE

15   PICTURES.

16         **THE COURT:**  THIS IS ONE EXAMPLE OF ONE PERSON IN

17   THIS EXHIBIT E.  RIGHT?

18         **MR. KESSEL:**  YOUR HONOR, THAT WAS THE ONE.  ALL

19   THE OTHERS -- THERE ARE OTHERS, YOUR HONOR.  THERE'S

20   OTHERS IN C AND D WHERE THAT WAS THE ONE SCREEN SHOT THAT

21   THE GOVERNMENT GAVE YOU.  THERE ARE OTHERS, COMPUTER

22   MESSAGES --

23         **THE COURT:**  AND UNDER D, AT LEAST, THERE ARE

24   PARTS OF IT WHERE THIS PERSON IS SUPPOSEDLY SAYING, "I'M

25   NOT GOING TO TAKE IT AS A COMPLIMENT.  YOU'RE GOING TO

1    RUIN MY GOOD REPUTATION."

2         **MR. KESSEL:**  I AGREE, THERE'S THOSE COMMENTS,

3    YOUR HONOR.  I AGREE THAT THOSE COMMENTS --

4         **THE COURT:**  AND AT SOME POINT, YOUR CLIENT

5    SAYS (READING:)

6         *"AND AT THIS POINT, I HAVE POWER."*

7         *AND THEN SHE SAYS, "DO YOU UNDERSTAND YOU*

8    *DON'T HAVE POWER?"*

9         *AND YOUR CLIENT SAYS, "I CAN GET INTO ALL YOUR*

10   *FRIENDS ACCOUNTS AND PUT THAT PIC -- " PICTURE "OF*

11   *YOU HALFWAY FLASHING AS THEIR PROFILE.  WANT ME TO*

12   *NAME YOUR FRIEND AND DO IT NOW?"*

13       *"NO."*

14       *"OKAY.  SO ALL I ASK IS SIMPLE AND IS ALL OVER*

15   *AND YOU'LL NEVER HEAR FROM ME AGAIN AND YOU'LL*

16   *PRETEND IT NEVER" -- I SUPPOSE IT NEVER HAPPENED.*

17       *"PLEASE STOP IT."*

18       *"COME ON AND FLASH REGULARLY."*

19       *"NO.*

20       *"OKAY.  IS THAT YOUR FINAL ANSWER?  I'LL GIVE*

21   *YOU A MINUTE TO THINK.  I CAN SEND YOU THE PIC IF*

22   *YOU WANT, AND YOU DECIDE IS IT GOOD OR BAD.  YOU*

23   *SURE ABOUT THIS?  MAKE SURE YOU'RE ON TOMORROW*

24   *NIGHT.  YOU'LL GET A SURPRISE."*

25       *"HI.*

```
1              "YEAH.

2              "HEY, HOW ARE YOU?

3              "HI."

4                   (END QUOTED MATERIAL.)

5         THE COURT:  THAT SEEMS QUITE THREATENING TO ME,

6    AND THAT SEEMS LIKE SOMETHING THAT IS CERTAINLY

7    JUSTIFIABLE FOR WHAT THE GOVERNMENT HAS CHARACTERIZED AS

8    SOME OF THESE CONVERSATIONS.

9         OBVIOUSLY, I DON'T HAVE ALL OF THE

10   CONVERSATIONS, BUT THERE ARE SOME VERY DISTURBING

11   COMMUNICATIONS THAT YOUR CLIENT ENGAGED IN TO DEMAND THAT

12   THESE INDIVIDUALS COMPLY WITH HIS REQUESTS.

13        MR. KESSEL:  YOUR HONOR, I AGREE WITH THE COURT,

14   AND I'M NOT STANDING UP HERE INDICATING THAT'S WHY HE'S --

15   HE PLED GUILTY.  HE'S BEING SENTENCED AS BEING GUILTY FOR

16   A SERIOUS CRIME.  THERE'S NO QUESTION.

17        I WAS JUST TRYING TO INDICATE TO YOUR HONOR THAT

18   CERTAIN OF THE VICTIMS WHO ACTUALLY SHOWED THEIR PICTURES

19   WERE ENGAGED IN COMMENTS AND EVEN SUGGESTED THAT THEIR

20   PICTURE SHOULD BE PUT ON HIS VERSUS "DON'T USE OUR" AND

21   "YOU DON'T HAVE TO PLAY THIS" -- "TAKE THE IDENTITY OF

22   SOMEBODY AND ACT AS IF YOU'RE SOMEBODY ELSE.  YOU CAN

23   DIRECTLY ASK US, AND WE'LL SEND YOU THE PICTURES

24   DIRECTLY."

25        THAT'S JUST THE TYPE OF THING THAT I WANTED TO
```

```
 1    SHOW, YOUR HONOR.  I AM NOT AT ALL MINIMIZING THE SEVERITY

 2    OF THE CONDUCT HERE, BUT TRYING TO GIVE YOUR HONOR SOME

 3    DEGREE OF EVIDENCE THAT SUGGESTS THAT IT DOESN'T WARRANT

 4    AN UPWARD DEPARTURE.

 5            THE COURT:  MS. WILKINSON.

 6                 GOVERNMENT'S FURTHER ARGUMENT

 7            MS. WILKINSON:  YOUR HONOR, I JUST WANTED TO

 8    TAKE A MOMENT TO CLARIFY THE RECORD WITH RESPECT TO THE

 9    EXHIBIT THAT THE COURT AND DEFENSE COUNSEL ARE JUST

10    LOOKING AT.

11            THE COURT:  WHICH ONE?  WE LOOKED AT MORE THAN

12    ONE EXHIBIT.  ARE YOU TALKING ABOUT E?

13            MS. WILKINSON:  YEAH, EXHIBIT E, PAGE 1, 2, 3 --

14    PAGE 4 OF EXHIBIT E, WHERE IT SAYS, "WHY DON'T YOU TRY TO

15    ADD US ON YOUR OWN ACCOUNT."

16            THE COURT:  YES, I HAVE IT.

17            MS. WILKINSON:  I WANT TO CLARIFY THAT WHAT

18    SHE'S SAYING IS NOT "PLEASE PUT OUR NAKED PICTURES ON YOUR

19    FACEBOOK PAGE."

20            SHE'S SAYING "IF YOU ACTUALLY LIKE ME, GO AND BE

21    ON YOUR FACEBOOK ACCOUNT IN YOUR OWN NAME AND TRY TO ADD

22    ME AS A FRIEND.  ADD ME AS A FRIEND ON YOUR OWN ACCOUNT,"

23    BUT NOT "YOU MAY TAKE OUR PICTURES AND POST THEM PUBLICLY

24    ON YOUR OWN ACCOUNT."

25            SHE'S SAYING -- AND SHE SAYS IT REPEATEDLY --
```

1  "LEAVE US ALONE.  STOP.  WHY ARE YOU DOING THIS?"

2      YOU KNOW, HE HAS POSTED A NAKED PICTURE OF ONE

3  OF HER FRIENDS INTO HER PICTURES, AND SHE'S SAYING, "WHY

4  ARE YOU DOING THIS?  PLEASE STOP.  LEAVE ME ALONE."

5      AND IN FACT, THIS VICTIM IS THE ONE THAT'S

6  REFERENCED IN EXHIBIT G, WHICH HAS THE POLICE REPORTS AT

7  BATES 52, WHERE AT 53, WHERE SHE TALKS ABOUT WHAT

8  HAPPENED, AND SHE SAYS THAT SHE FELT THREATENED AND

9  TERRORIZED BY THIS INDIVIDUAL.  SHE HAD TO CLOSE OUT HER

10  FACEBOOK ACCOUNT, CHANGE HER EMAIL ACCOUNTS, AND IS

11  CURRENTLY FEARFUL OF USING THE INTERNET AND THE COMPUTER.

12      SO, YES, WE HAVE A VICTIM WHO, WHEN THE

13  DEFENDANT ASSAULTS HER, SAYS "PLEASE STOP.  AND WHY ARE

14  YOU DOING THIS?  AND, HEY, CAN I SOMEHOW MAKE YOU FEEL

15  BETTER SO THAT YOU WILL LEAVE ME ALONE AND GO AND LOOK AT

16  SOME OTHER VICTIM?"  BUT THAT DOESN'T MAKE HIS CONDUCT ANY

17  BETTER.

18      SUBMITTED.

19      **THE COURT:**  ALL RIGHT.  THANK YOU VERY MUCH.

20      **MR. KESSEL:**  THANK YOU, YOUR HONOR.

21      **THE COURT:**  I HAVE FULLY CONSIDERED THE RECORD

22  IN THIS CASE, AND I HAVE HEARD EXTENSIVELY FROM COUNSEL,

23  BOTH IN WRITING AS WELL AS ORALLY.  I HAVE GIVEN THE

24  DEFENDANT AN OPPORTUNITY TO BE HEARD.  HE HAS DECLINED,

25  BUT HE HAS SUBMITTED A WRITTEN LETTER WHICH THE COURT HAS,

1   OF COURSE, CONSIDERED AS PART OF THE RECORD.

2             I'LL BEGIN BY MAKING MY RULINGS WITH RESPECT TO

3   THE OBJECTIONS OF THE DEFENDANT.

4             FIRST, WITH RESPECT TO THE OBJECTION TO THE PSR

5   THAT THERE SHOULD NOT BE MORE THAN 250 VICTIM ASSESSMENTS

6   UNDER THE GUIDELINES, THAT OBJECTION IS OVERRULED;

7             MR. KAZARYAN DID, IN FACT, USE A MEANS OF

8   IDENTIFICATION UNLAWFULLY AND WITHOUT AUTHORIZATION TO

9   ACCESS THE ACCOUNTS OF MORE THAN 250 PERSONS WHO ARE ALL

10  VICTIMS WITHIN THE MEANING OF THE GUIDELINES.

11            THE OBJECTION THAT THERE SHOULD BE NO TWO-LEVEL

12  INCREASE FOR SOPHISTICATED MEANS, THAT IS ALSO OVERRULED;

13            THIS IS CLEARLY A SOPHISTICATED USE OF MEANS TO

14  INFILTRATE THE ACCOUNTS OF VARIOUS OTHER INDIVIDUALS AND

15  THEN, THEREAFTER, TO TAKE VARIOUS MEASURES, AS DESCRIBED

16  BY THE GOVERNMENT'S SHOWING IN ITS POSITION PAPERS AS WELL

17  AS THE PSR, TO ACCOMPLISH WHAT IT IS THAT HE WANTED TO

18  ACCOMPLISH.  SO THE SOPHISTICATED MEANS ASSESSMENT IS

19  APPROPRIATE, AND I SO FIND.

20            THIS IS NOT DOUBLE-COUNTING AS ASSERTED BY

21  MR. KESSEL BECAUSE, WHILE A COMPUTER CERTAINLY CAN BE

22  ACCESSED IN ALL CASES, IT DOES NOT HAVE TO BE DONE IN SUCH

23  SOPHISTICATED MEANS AS THIS, NOR IS IT APPROPRIATE FOR ME

24  TO SAY THAT JUST BECAUSE LAW ENFORCEMENT IS ABLE TO

25  ULTIMATELY DETECT THIS CRIMINAL ACTIVITY, THAT SOMEHOW

```
1    THAT MAKES IT UNSOPHISTICATED;

2             IF THAT WERE THE CASE, THEN THE SOPHISTICATED

3    MEANS ASSESSMENT WOULD NEVER BE APPLIED BECAUSE, BY

4    DEFINITION, WE ARE ONLY AT SENTENCING BECAUSE LAW

5    ENFORCEMENT HAS BEEN ABLE TO UNCOVER THE CRIMINAL

6    ACTIVITY.

7             INSOFAR AS THE CRIMINAL HISTORY IS CONCERNED, I

8    AGREE IT SHOULD BE CRIMINAL HISTORY CATEGORY 1.

9    I UNDERSTAND THAT THERE IS NO PRIOR CRIMINAL CONVICTION;

10            NEVERTHELESS, THE GOVERNMENT HAS PRESENTED

11   RELIABLE EVIDENCE IN TERMS OF THE TRANSCRIPTS OF THE

12   PRELIMINARY HEARING AND OTHER EVIDENCE PRESENTED THEREIN

13   SO THAT IT DOES WARRANT THE COURT'S OVERALL CONSIDERATION

14   AS A FACTOR WITHIN THE 3553(A) FACTORS, INCLUDING THE

15   BACKGROUND, CIRCUMSTANCES, AND CHARACTER OF THIS

16   DEFENDANT, AS WELL AS THE NEED TO PROTECT THE PUBLIC FROM

17   FUTURE CRIMES OF THE DEFENDANT.

18            I HAVE ALSO FULLY CONSIDERED THE 3553(A) FACTORS

19   SUGGESTED BY MR. KESSEL IN ALL OF THIS, AND I WILL TAKE

20   ALL THAT INTO CONSIDERATION.

21            INSOFAR AS THE REPLY SAYS THAT THE AGGRAVATED

22   CIRCUMSTANCES HAVE ALREADY BEEN ACCOUNTED FOR IN THE

23   GUIDELINES, THAT SUGGESTION IS REJECTED.

24            THE GUIDELINES DO NOT CONSIDER ADEQUATELY THE

25   NATURE AND EXTENT OF THE WAY THAT THIS CRIME WAS COMMITTED
```

```
 1   AND THE HUMAN TOLL THAT IT TOOK ON THE VICTIMS BY HIS

 2   EGREGIOUS AND TERRORIZING BEHAVIOR.

 3        MOREOVER, THE ARGUMENT THAT THE LEVEL OF

 4   PSYCHOLOGICAL INJURY IS INSUFFICIENT TO WARRANT UPWARD

 5   DEPARTURE UNDER THE GUIDELINES, THAT IS LARGELY IRRELEVANT

 6   BECAUSE I CHOOSE TO CONSIDER THE EFFECT OF MR. KAZARYAN'S

 7   BEHAVIOR ON THE VICTIMS AS PART OF THE 3553(A) FACTORS

 8   RATHER THAN AS A STRICT APPLICATION OF THE GUIDELINES AND

 9   WHETHER OR NOT THERE SHOULD BE AN UPWARD DEPARTURE UNDER

10   THE GUIDELINES.

11        WHETHER THE WORDS "SEXTORTION," "EXTORTION," OR

12   "RAPE" APPLY IN THIS CASE I THINK HAS BEEN TOTALLY

13   OVERBLOWN.  IT IS NOT CRITICAL TO THIS CASE THAT THIS CASE

14   BE EXTORTION OR BE ACTUAL RAPE.  I THINK THE EFFECT OF

15   THIS IS CLEAR, AND THE EFFECT OF THIS CLEARLY COULD

16   WARRANT A VICTIM SAYING THAT SHE FELT THAT SHE HAD BEEN

17   RAPED;

18        SO WE'RE NOT HERE TO REALLY ARGUE WHETHER THE

19   ELEMENTS OF RAPE ARE PRESENT.  THAT'S NOT THE CHARGE.  AND

20   I THINK THE APPLICATION OF THE WORDS BY THE VICTIM I THINK

21   IS JUSTIFIABLE IN THIS CASE, BUT IT DOESN'T MEAN THAT I'M

22   TREATING THIS AS AN ACTUAL RAPE CASE.

23        INSOFAR AS THE DIFFERENCES BETWEEN THE MIJANGOS

24   CASE AND THIS CASE, I HAVE GIVEN THAT SERIOUS

25   CONSIDERATION, AND I WILL ADDRESS THAT DURING MY OVERALL
```

```
1   CONSIDERATION OF THE 3553(A) FACTORS.

2            I BEGIN, THEN, BY CALCULATING THE GUIDELINES AS

3   SUGGESTED.

4            COUNT 12, THERE'S A BASE OFFENSE LEVEL OF 6.

5   I HAVE CONCLUDED THAT THERE ARE MORE THAN 250 VICTIMS, AS

6   DEFINED BY THE GUIDELINES.  SO THERE WILL BE A 6-LEVEL

7   INCREASE.

8            I HAVE DETERMINED THAT MR. KAZARYAN DID USE

9   SOPHISTICATED MEANS IN THE COMMISSION OF THIS OFFENSE; SO

10  THERE'S A 2-LEVEL INCREASE.

11           THE PARTIES AGREE THAT THERE SHOULD BE A 2-LEVEL

12  INCREASE UNDER 2B1.1(B)(16), AND I WILL APPLY THAT.

13           I ALSO DISAGREE THAT APPLICATION OF THIS 2-LEVEL

14  INCREASE UNDER 2B1.1(B)(16) IS EFFECTIVELY DOUBLE COUNTING

15  ANY FURTHER CONSIDERATION OF THE CONDUCT BECAUSE THE

16  NATURE OF THE CONDUCT, THE EFFECT IT HAD UPON THE

17  INDIVIDUAL VICTIMS, THE PSYCHOLOGICAL TERROR INFLICTED

18  UPON THEM IS TOTALLY NOT CAPTURED, OR AT LEAST CERTAINLY

19  NOT SUFFICIENTLY CAPTURED, BY THIS 2-LEVEL INCREASE UNDER

20  2B1.1(B)(16).

21           THERE IS A 3-LEVEL DECREASE FOR ACCEPTANCE OF

22  RESPONSIBILITY.

23           OVERALL, OFFENSE LEVEL 13, CRIMINAL HISTORY

24  CATEGORY 1, YIELDING A RECOMMENDED RANGE OF 12 TO 18

25  MONTHS AS TO COUNT 12.
```

1       COUNT 27, OF COURSE, EVERYONE AGREES, INVOLVES A

2   24-MONTH MANDATORY MINIMUM CONSECUTIVE SENTENCE.

3       SO UNDER THE GUIDELINE CALCULATION, THE RANGE

4   WOULD THUS BE 36 TO 42 MONTHS IN THIS CASE.  I AM OF THE

5   VIEW THAT THIS RANGE IS INSUFFICIENT TO ADDRESS THE

6   SERIOUSNESS OF THE CRIME AND THE TRUE NATURE AND

7   CIRCUMSTANCES OF THIS OFFENSE.  IT FAILS TO ADEQUATELY

8   TAKE INTO CONSIDERATION, AS I SAID, THE NONMONETARY AND

9   PSYCHOLOGICAL HARM AND FEAR AND TERROR AND THE CALLOUSNESS

10  BY WHICH MR. KAZARYAN INFLICTED THOSE HARMS ON HIS

11  VICTIMS.

12      I HAVE CONSIDERED THE NATURE AND CIRCUMSTANCES

13  OF THIS CASE.  IT IS THAT OF AN UNAUTHORIZED ACCESS TO A

14  PROTECTED COMPUTER AND AGGRAVATED IDENTITY THEFT.

15      DEFENDANT GAINED UNAUTHORIZED ACCESS TO THE

16  VICTIMS' EMAIL, FACEBOOK, AND SKYPE ACCOUNTS; CHANGED THE

17  PASSWORDS TO OBTAIN SOLE ACCESS TO THOSE ACCOUNTS FOR A

18  PERIOD OF TIME; AND THEN OBTAINED INFORMATION AND PROPERTY

19  FROM THE VICTIMS' COMPUTERS AND PRETENDED TO BE THE ACCESS

20  VICTIMS, AS THE PROBATION OFFICER CALLS IT, AND CONTACTED

21  THEIR FRIENDS AND ASSOCIATES TO PERSUADE OR TO DEMAND

22  THOSE -- WHAT THE PROBATION OFFICER CALLS THE "DEMAND

23  VICTIMS" -- THAT THEY REMOVE CLOTHING SO THAT HE CAN VIEW

24  THEM AS WELL AS TAKE PICTURES OF THEM.

25      HE BLACKMAILED THE VICTIMS INTO EXPOSING THEIR

1    NAKED OR SEMI-NAKED BODIES BY THREATENING TO EXPOSE SUCH

2    PICTURES IN A PUBLIC FORUM.

3            THE NATURE OF THIS IS, AS I SAID PREVIOUSLY,

4    AKIN TO CYBER TERRORISM THAT INSTILLED GREAT FEAR AND

5    DESPERATION AND DISTRESS ON NUMEROUS VICTIMS.  THIS IS NOT

6    A LIMITED OR ISOLATED EPISODE, BUT A FULL-ON ASSAULT

7    AGAINST NUMEROUS PEOPLE OVER A PERIOD OF TIME.

8            HISTORY AND CHARACTERISTICS OF THE DEFENDANT

9    SHOWS THAT HE IS NOW 27 YEARS OLD; HE HAS ACCEPTED

10   RESPONSIBILITY FOR HIS ACTIONS.  HE HAS USEFUL SKILLS, BUT

11   UNFORTUNATELY HE HAS USED THOSE SKILLS TO COMMIT CRIMES

12   RATHER THAN FOR LAWFUL PURPOSES.

13           HE HAS HAD PRIOR VARYING EMPLOYMENT.  HE DOES

14   NOT HAVE ANY PRIOR CONVICTIONS, BUT HE DOES HAVE A

15   DISTURBING ARREST -- OR REFLECTED DISTURBING FACTS WHICH

16   WE CONSIDER IN THE OVERALL SCHEME OF THINGS.

17           THERE IS A NEED TO REFLECT THE SERIOUSNESS OF

18   THIS OFFENSE, WHICH IS EXTRAORDINARILY SERIOUS.  IT CAUSED

19   SERIOUS DISRUPTION AND EMOTIONAL HARM ON AN ONGOING BASIS

20   AS WELL AS FEAR IN MANY OF THE VICTIMS RESULTING IN

21   LONG-LASTING EFFECTS, INCLUDING SEVERAL OF THEM TURNING

22   AWAY FROM ELECTRONIC MEANS OF COMMUNICATION OF THEIR

23   COMPUTERS.

24           I DISAGREE WITH MR. KESSEL IN HIS UNDERSTANDABLE

25   ATTEMPT TO BE AS ZEALOUS ON BEHALF OF HIS CLIENT AS

1   POSSIBLE, BUT I CANNOT AGREE WITH MR. KESSEL TO THE EXTENT

2   THAT THERE'S ANY SUGGESTION THAT SOMEHOW THIS WAS NOT AS

3   SERIOUS AS IT MIGHT HAVE BEEN, THAT THIS DID NOT HAVE THAT

4   MUCH OF A PSYCHOLOGICAL EFFECT ON PEOPLE.

5         "THEY HAD THESE PICTURES ON THEIR COMPUTER

6   ANYWAY."  I THINK THAT -- AND I DON'T BLAME COUNSEL FOR IT

7   BECAUSE I DON'T THINK HE IS TRULY INSENSITIVE.  I HAVE

8   KNOWN COUNSEL FOR A LONG TIME IN HIS APPEARANCES BEFORE

9   ME, AND I DON'T BELIEVE THAT HE IS AN INSENSITIVE PERSON.

10  BUT I THINK IT DOES MISS THE POINT.

11        REGARDLESS OF WHAT PEOPLE MIGHT DO VOLUNTARILY

12  WITH PEOPLE THAT THEY KNOW, IT IS A TOTALLY, TOTALLY

13  DIFFERENT SITUATION WHEN THOSE PRIVATE MOMENTS THAT THEY

14  CHOOSE TO SHARE WITH THEIR SELECTED PEOPLE ARE NOW SHARED

15  WITH ONES WITH WHOM THEY DO NOT HAVE THAT DESIRE.  AND NOW

16  THEY ARE FORCED TO PERFORM IN A DEGRADING MANNER IN FRONT

17  OF A PERSON THEY DO NOT CHOOSE TO DO THIS WITH UNDER THE

18  THREAT THAT THERE WOULD BE EVEN GREATER EXPOSURE OF THEIR

19  PRIVATE MOMENTS.

20        I DON'T KNOW HOW -- WE ALL HAVE PRIVATE MOMENTS.

21  WE ALL HAVE INTIMATE MOMENTS WITH OUR SPOUSES OR WHATEVER.

22  IMAGINE IF THOSE MOMENTS WERE THREATENED TO BE PUT ON THE

23  INTERNET OR PUT ON SOMEBODY'S FACEBOOK.  I DON'T THINK

24  THAT JUSTIFIES THE FACT THAT WE HAVE INTIMATE MOMENTS.  I

25  THINK IT IS, IF ANYTHING, OUTRAGEOUS CONDUCT THAT ATTEMPTS

1    TO STRIP AWAY A REALLY SERIOUS LEVEL OF HUMANITY WHICH WE

2    MUST BE ALLOWED TO HAVE, OUR PRIVATE MOMENTS WITH PERSONS

3    OF OUR CHOOSING.  HE STRIPPED, LITERALLY, THE VICTIMS OF

4    THAT RIGHT.  THAT MAKES THIS A VERY SERIOUS CRIME.

5           THERE IS ALSO A NEED TO PROMOTE RESPECT FOR THE

6    LAW, WHICH IS MUCH NEEDED IN THIS CASE.  ALTHOUGH

7    MR. KAZARYAN HAS NO PRIOR CONVICTION, HIS REPEATED AND

8    CALLOUS VIOLATIONS OF THE VICTIMS' PRIVACY INTERESTS SHOW

9    THAT HE DOES HAVE A SERIOUS LACK OF RESPECT FOR THE LAW.

10           MOREOVER, DEFENDANT COMMITTED THIS OFFENSE WHILE

11    THE OTHER CRIMINAL PROCEEDINGS WERE PENDING, SHOWING MORE

12    DISRESPECT FOR THE LAW.

13           THERE IS A NEED TO PROVIDE JUST PUNISHMENT AND

14    TO AFFORD ADEQUATE DETERRENCE.

15           SPECIFIC DETERRENCE IS PARTICULARLY NEEDED.  HE

16    MUST KNOW THAT THESE ARE SERIOUS MATTERS THAT CANNOT BE

17    REPEATED AND CANNOT BE REMEDIED BY MERE LIGHT SENTENCES.

18           GENERAL DETERRENCE IS PARTICULARLY NEEDED

19    BECAUSE SOCIETY MUST SIMPLY KNOW THAT DESPITE THIS DAY AND

20    AGE OF COMPUTERS AND ELECTRONIC MEANS, THIS TYPE OF

21    EGREGIOUS BEHAVIOR HAS NO PLACE AND WILL RESULT IN SERIOUS

22    CONSEQUENCES.

23           THERE IS A NEED TO PROTECT THE PUBLIC FROM

24    FUTURE CRIMES BY THIS DEFENDANT.

25           MY VIEW IS THAT UNLESS HE'S ADEQUATELY DETERRED,

```
 1    THE DEFENDANT IS LIKELY TO RECIDIVATE BECAUSE HE DOES NOT

 2    APPEAR TO ME TO LEARN EASILY FROM HIS PRIOR BRUSHES WITH

 3    THE LAW.

 4              EDUCATION, VOCATIONAL TRAINING, MEDICAL CARE,

 5    AND CORRECTIONAL TREATMENT DO NOT APPEAR TO BE APPLICABLE

 6    IN THIS CASE.  THE COURT HAS AVAILABLE TO IT THE FULL

 7    RANGE OF SENTENCES, EXCEPT THAT COUNT 27 DOES REQUIRE,

 8    UNDER ANY CIRCUMSTANCES, A 24-MONTH MANDATORY MINIMUM

 9    CONSECUTIVE SENTENCE.

10              I HAVE CONSIDERED ALL RELEVANT POLICY

11    STATEMENTS, INCLUDING THE POLICY STATEMENTS SUGGESTING

12    THAT IT MAY BE APPROPRIATE TO HAVE UPWARD DEPARTURE EVEN

13    WITHIN THE MEANING OF THE GUIDELINES TO CAPTURE THE HARM

14    OF A NONMONETARY NATURE THAT EXISTS IN THIS CASE.

15              RESTITUTION IS NOT AN ISSUE.

16              I HAVE CAREFULLY CONSIDERED THE NEED TO AVOID

17    UNWARRANTED SENTENCING DISPARITIES.  I DON'T HAVE THE

18    OTHER CASES BEFORE ME.  THOSE WERE NOT MY CASES.  THE ONLY

19    CASE THAT WAS BEFORE ME WAS THE MIJANGOS CASE, AND I HAVE

20    CAREFULLY CONSIDERED THE PLUSSES AND MINUSES OF THAT CASE.

21              I DO FIND THAT THERE ARE INSTANCES WHERE

22    MR. MIJANGOS' CASE SUGGESTS MORE EGREGIOUS BEHAVIOR, AND

23    THEN THERE ARE OTHER INSTANCES WHERE MR. KAZARYAN'S CASE

24    SUGGESTS MORE EGREGIOUS BEHAVIOR.

25              FOR INSTANCE, MUCH MORE NUMBER OF VICTIMS AS TO
```

1   MR. KAZARYAN; MORE PUBLIC POSTINGS THAN THE INSTANCE OF A

2   POSTING, SINGULAR POSTING, AS I RECALL ON THE MYSPACE PAGE

3   AS TO MR. MIJANGOS.

4          ON THE OTHER HAND, MR. MIJANGOS ALSO HAD SERIOUS

5   MEDICAL ISSUES WHICH AFFECT THE SEVERITY OF HIS PUNISHMENT

6   WHILE IN CUSTODY, WHICH MR. KAZARYAN DOES NOT HAVE.

7          BUT ON THE OTHER HAND, MR. MIJANGOS ALSO HAD THE

8   MORE EGREGIOUS BEHAVIOR, WHICH WE ALL RECOGNIZE.  HE USED

9   HIGHER TECHNICAL SKILL IN INSTALLING THIS MAL-WARE IN

10  ORDER TO GAIN ACCESS.  HE ALSO OBTAINED FINANCIAL

11  INFORMATION, WHICH MR. KAZARYAN DID NOT DO.

12         MR. MIJANGOS ALSO WAS HERE ILLEGALLY.

13  MR. MIJANGOS ALSO WARRANTED AN UPWARD ADJUSTMENT FOR

14  OBSTRUCTION OF JUSTICE, WHICH THERE IS NO EVIDENCE TO

15  APPLY THAT ADJUSTMENT AS TO MR. KAZARYAN.

16         HAVING, THEREFORE, CAREFULLY CONSIDERED ALL OF

17  THE RELEVANT FACTORS, I DO CONCLUDE THAT A GUIDELINE

18  SENTENCE IS INSUFFICIENT FOR ALL THE REASONS THAT I HAVE

19  SET FORTH.

20         THE FOLLOWING, THEN, IS THE SENTENCE OF THE

21  COURT.

22              *IT IS ORDERED THAT DEFENDANT SHALL PAY*

23          *THE UNITED STATES A SPECIAL ASSESSMENT OF $200,*

24          *WHICH IS DUE IMMEDIATELY.*

25                  *ANY UNPAID BALANCE SHALL BE DUE DURING*

1    *THE PERIOD OF IMPRISONMENT AT A RATE OF NOT LESS*

2    *THAN $25 PER QUARTER AND PURSUANT TO THE BUREAU OF*

3    *PRISONS' INMATE FINANCIAL RESPONSIBILITY PROGRAM.*

4            *ALL FINES ARE WAIVED AS IT IS FOUND THAT*

5    *THE DEFENDANT DOES NOT HAVE AN ABILITY TO PAY A*

6    *FINE.*

7            *IT IS THE JUDGMENT OF THE COURT THAT*

8    *DEFENDANT, KAREN KAZARYAN, IS HEREBY COMMITTED ON*

9    *COUNTS 12 AND 27 OF THE INDICTMENT TO THE CUSTODY*

10   *OF THE BUREAU OF PRISONS TO BE IMPRISONED FOR A*

11   *TOTAL OF 60 MONTHS.  THIS TOTAL CONSISTS OF*

12   *36 MONTHS ON COUNT 12 TO BE SERVED CONSECUTIVELY*

13   *TO THE TERM OF 24 MONTHS IMPOSED ON COUNT 27,*

14   *WHICH SHALL TOTAL 60 MONTHS.*

15           *THE COURT RECOMMENDS THAT THE BUREAU OF*

16   *PRISONS CONDUCT A MENTAL HEALTH EVALUATION OF THE*

17   *DEFENDANT TO PROVIDE ALL NECESSARY TREATMENT.*

18           *UPON RELEASE FROM IMPRISONMENT,*

19   *DEFENDANT SHALL BE PLACED ON SUPERVISED RELEASE*

20   *FOR A TERM OF THREE YEARS.  THIS TERM CONSISTS OF*

21   *THREE YEARS ON COUNT 12 AND ONE YEAR ON COUNT 27,*

22   *TO RUN CONCURRENTLY UNDER THE FOLLOWING TERMS AND*

23   *CONDITIONS:*

24           *1.  DEFENDANT SHALL COMPLY WITH THE*

25   *RULES AND REGULATIONS OF THE U.S. PROBATION OFFICE*

1       *AND GENERAL ORDER 05-02;*

2               *2.   DEFENDANT SHALL REFRAIN FROM ANY*

3       *UNLAWFUL USE OF A CONTROLLED SUBSTANCE.   THE*

4       *DEFENDANT SHALL SUBMIT TO ONE DRUG TEST WITHIN*

5       *15 DAYS OF RELEASE FROM IMPRISONMENT AND AT LEAST*

6       *TWO PERIODIC DRUG TESTS THEREAFTER, NOT TO EXCEED*

7       *EIGHT TESTS PER MONTH AS DIRECTED BY THE PROBATION*

8       *OFFICER;*

9               *3.   DEFENDANT SHALL PARTICIPATE IN*

10      *OUTPATIENT SUBSTANCE ABUSE TREATMENT AND*

11      *COUNSELING THAT INCLUDES URINALYSIS, BREATH AND/OR*

12      *SWEAT-PATCH TESTING AS DIRECTED BY THE PROBATION*

13      *OFFICER.   DEFENDANT SHALL ABSTAIN FROM USING*

14      *ILLICIT DRUGS AND ALCOHOL AND ABUSING PRESCRIPTION*

15      *MEDICATION DURING THE PERIOD OF SUPERVISION;*

16              *4.   DURING THE COURSE OF THE*

17      *SUPERVISION, THE PROBATION OFFICER, WITH THE*

18      *AGREEMENT OF DEFENDANT AND HIS COUNSEL, MAY PLACE*

19      *THE DEFENDANT IN A RESIDENTIAL DRUG TREATMENT*

20      *PROGRAM APPROVED BY THE UNITED STATES PROBATION*

21      *OFFICE FOR TREATMENT OF NARCOTIC ADDICTION OR DRUG*

22      *DEPENDENCY, WHICH MAY INCLUDE COUNSELING AND*

23      *TESTING TO DETERMINE IF THE DEFENDANT HAS REVERTED*

24      *TO THE USE OF DRUGS.   AND THE DEFENDANT SHALL*

25      *RESIDE IN THAT TREATMENT PROGRAM UNTIL DISCHARGED*

```
 1        BY THE PROGRAM DIRECTOR AND THE PROBATION OFFER;

 2               5.  DEFENDANT SHALL PARTICIPATE IN

 3        MENTAL HEALTH TREATMENT, WHICH MAY INCLUDE

 4        EVALUATION AND COUNSELING, UNTIL DISCHARGED BY THE

 5        TREATMENT PROVIDER, WITH THE APPROVAL OF THE

 6        PROBATION OFFICER;

 7               6.  AS DIRECTED BY THE PROBATION

 8        OFFICER, THE DEFENDANT SHALL PAY ALL OR PART OF

 9        THE COST OF TREATING HIS SUBSTANCE ABUSE AND

10        MENTAL HEALTH TREATMENT TO THE AFTERCARE

11        CONTRACTOR DURING THE PERIOD OF COMMUNITY

12        SUPERVISION.  DEFENDANT SHALL PROVIDE PAYMENT AND

13        PROOF OF PAYMENT AS DIRECTED BY THE PROBATION

14        OFFICER;

15               7.  DURING THE PERIOD OF COMMUNITY

16        SUPERVISION, DEFENDANT SHALL PAY THE SPECIAL

17        ASSESSMENT IN ACCORDANCE WITH THIS JUDGMENT'S

18        ORDERS PERTAINING TO SUCH PAYMENT;

19               8.  DEFENDANT SHALL NOT OBTAIN OR

20        POSSESS ANY DRIVER'S LICENSE, SOCIAL SECURITY

21        NUMBER, BIRTH CERTIFICATE, PASSPORT, OR ANY OTHER

22        FORM OF IDENTIFICATION IN ANY NAME OTHER THAN HIS

23        TRUE LEGAL NAME, NOR SHALL THE DEFENDANT USE FOR

24        ANY PURPOSE OR ANY MANNER ANY NAME OTHER THAN HIS

25        TRUE LEGAL NAME OR NAMES WITHOUT THE PRIOR
```

```
 1        APPROVAL OF THE PROBATION OFFICER;

 2                9.   DEFENDANT SHALL COOPERATE IN THE

 3        COLLECTION OF A D.N.A. SAMPLE FROM HIM;

 4                10.  BEFORE USING ANY COMPUTER OR

 5        COMPUTER-RELATED DEVICE CAPABLE OF ACCESSING THE

 6        INTERNET, SCREEN NAME, PASSWORD, EMAIL ACCOUNT, OR

 7        I.S.P. FOR THE FIRST TIME, THE DEFENDANT SHALL

 8        NOTIFY HIS PROBATION OFFICER.

 9                COMPUTER AND COMPUTER-RELATED DEVICES

10        INCLUDE BUT ARE NOT LIMITED TO PERSONAL COMPUTERS,

11        PERSONAL DATA ASSISTANCE, INTERNET APPLIANCES,

12        ELECTRONIC GAMES, AND CELLULAR TELEPHONES, AS WELL

13        AS THEIR PERIPHERAL EQUIPMENT THAT CAN ACCESS OR

14        BE MODIFIED TO ACCESS THE INTERNET, ELECTRONIC

15        BULLETIN BOARDS, AND OTHER COMPUTER OR SIMILAR

16        MEDIA;

17                11.  AFTER NOTIFYING HIS PROBATION

18        OFFICER ABOUT A PARTICULAR COMPUTER,

19        COMPUTER-RELATED DEVICE, SCREEN NAME, PASSWORD,

20        EMAIL ACCOUNT, OR ISP, DEFENDANT NEED NOT NOTIFY

21        HIS PROBATION OFFICER ABOUT SUBSEQUENT USE OF THAT

22        PARTICULAR ITEM.

23                DEFENDANT SHALL, HOWEVER, NOTIFY HIS

24        PROBATION OFFICER OF ANY ADDITIONS TO, REMOVALS

25        FROM, UPGRADES OF, UPDATES OF, REINSTALLATIONS OF,
```

1     *REPAIRS OF, OR OTHER MODIFICATIONS OF THE HARDWARE*

2     *OR SOFTWARE ON ANY COMPUTERS, COMPUTER-RELATED*

3     *DEVICES, OR PERIPHERAL EQUIPMENT IN THE*

4     *AFOREMENTIONED ITEMS WITHIN ONE WEEK OF THE*

5     *CHANGE;*

6         *12.  DEFENDANT SHALL PROVIDE HIS*

7     *PROBATION OFFICER WITH ALL BILLING RECORDS FOR*

8     *PHONE, CABLE, INTERNET, AND SATELLITE SERVICES*

9     *THAT HE PURCHASED AS REQUESTED BY THE PROBATION*

10     *OFFICER SO THAT THE PROBATION OFFICER CAN VERIFY*

11     *HIS COMPLIANCE WITH THESE REQUIREMENTS;*

12         *13.  ALL COMPUTERS AND COMPUTER-RELATED*

13     *DEVICES AND THEIR PERIPHERAL EQUIPMENT USED BY*

14     *DEFENDANT SHALL BE SUBJECT TO SEARCH AND SEIZURE*

15     *BY MAKING A MIRROR IMAGE OF THE DEVICE OR*

16     *SEARCHING THE COMPUTER ON SITE.*

17         *DEFENDANT SHALL NOT HIDE OR ENCRYPT*

18     *FILES OR DATA WITHOUT PRIOR APPROVAL FROM THE*

19     *PROBATION OFFICER;*

20         *14.  DEFENDANT SHALL NOT KNOWINGLY*

21     *CONTACT OR ATTEMPT TO CONTACT ANY OF THE VICTIMS*

22     *IN THIS CASE OR PERSONS KNOWN TO DEFENDANT TO BE*

23     *THE VICTIMS' FAMILIES, INCLUDING BUT NOT LIMITED*

24     *TO THEIR PARENTS, SIBLINGS, OTHER RELATIVES, ANY*

25     *SPOUSES OR SIGNIFICANT OTHERS WITH WHOM THE*

```
 1        VICTIMS MAY SHARE AN INTIMATE RELATIONSHIP,

 2        WHETHER EXISTING NOW OR DURING THE PENDENCY OF ANY

 3        TERM OF SUPERVISED RELEASE, AND ANY CHILDREN OF

 4        THE VICTIM, WHETHER EXISTING NOW OR DURING THE

 5        PENDENCY OF THE TERM OF SUPERVISED RELEASE --

 6        THESE INDIVIDUALS ARE COLLECTIVELY DEFINED AS

 7        'VICTIMS' FAMILIES' -- DIRECTLY OR INDIRECTLY BY

 8        ANY MEANS, INCLUDING BUT NOT LIMITED TO IN PERSON,

 9        BY MAIL, TELEPHONE, EMAIL, TEXT MESSAGE, OR

10        OTHERWISE VIA THE INTERNET OR OTHER ELECTRONIC

11        MEANS OR THROUGH A THIRD PARTY;

12               15.  DEFENDANT SHALL NOT ATTEMPT TO

13        LOCATE THE VICTIMS OR THE VICTIMS' FAMILIES OR

14        ATTEMPT TO OBTAIN INFORMATION CONCERNING THE

15        WHEREABOUTS, PHONE NUMBERS, EMAIL ADDRESSES, OR

16        OTHER PERSONAL IDENTIFIERS OF THE VICTIMS OR THE

17        VICTIMS' FAMILIES;

18               16.  DEFENDANT SHALL REMAIN AT LEAST

19        100 YARDS AWAY FROM THE VICTIMS AT ALL TIMES;

20               17.  DEFENDANT SHALL NOT POSSESS OR

21        ATTEMPT TO POSSESS ANY MATERIALS WHETHER IN HARD

22        COPY, DIGITAL, ELECTRONIC, OR ANY OTHER FORM, THAT

23        DEPICT SEXUALLY EXPLICIT AND/OR NUDE IMAGES OF THE

24        VICTIMS AND/OR THAT CONTAIN PERSONAL IDENTIFYING

25        INFORMATION, INCLUDING ANY ACCESS DEVICE AND BANK
```

1        *OR CREDIT CARD ACCOUNT NUMBERS OF THE VICTIMS;*

2                *THE COURT AUTHORIZES THE PROBATION*

3        *OFFICER TO DISCLOSE THE PRESENTENCE REPORT TO THE*

4        *SUBSTANCE ABUSE TREATMENT PROVIDER TO FACILITATE*

5        *THE DEFENDANT'S TREATMENT FOR NARCOTIC ADDICTION*

6        *OR DRUG DEPENDENCY.  FURTHER RE-DISCLOSURE OF THE*

7        *PRESENTENCE REPORT BY THE TREATMENT PROVIDER IS*

8        *PROHIBITED WITHOUT THE CONSENT OF THE COURT;*

9                *THE COURT ALSO AUTHORIZES THE PROBATION*

10       *OFFICE TO DISCLOSE THE PRESENTENCE REPORT AND/OR*

11       *ANY PREVIOUS MENTAL HEALTH OR EVALUATIONS OR*

12       *REPORTS TO THE TREATMENT PROVIDER;*

13               *THE TREATMENT PROVIDER MAY PROVIDE ANY*

14       *INFORMATION, EXCLUDING THE PRESENTENCE REPORT, TO*

15       *STATE OR LOCAL SOCIAL SERVICES AGENCIES FOR THE*

16       *PURPOSES OF THE DEFENDANT'S REHABILITATION.*

17               *(PAUSE IN THE PROCEEDINGS.)*

18       **THE COURT:**  MS. WILKINSON, I BELIEVE THAT THERE

19   ARE OTHER COUNTS TO DISPOSE OF AT THIS TIME.

20       **MS. WILKINSON:**  YES, YOUR HONOR.  THE GOVERNMENT

21   WOULD MOVE TO DISMISS COUNTS 1 THROUGH 11, 13 THROUGH 15,

22   16 THROUGH 26, AND 28 THROUGH 30 IN THE INTEREST OF

23   JUSTICE.

24       **THE COURT:**  THAT MOTION IS GRANTED.

25       MR. KAZARYAN, YOU ARE ADVISED THAT YOU HAVE THE

```
 1   RIGHT TO APPEAL THE SENTENCE WHICH THE COURT HAS JUST

 2   IMPOSED UPON YOU.

 3           IF YOU WISH TO DO SO, YOU SHOULD DISCUSS THIS

 4   MATTER WITH YOUR LAWYER WHO WILL ASSIST YOU IN THE FILING

 5   OF A TIMELY NOTICE OF APPEAL; AND IF YOU DO NOT HAVE THE

 6   MONEY TO PAY FOR THAT APPEAL, YOU HAVE THE RIGHT, UPON

 7   PROPER APPLICATION, TO ASK THE COURT TO WAIVE THOSE COSTS.

 8           DO YOU UNDERSTAND THAT?

 9       THE DEFENDANT:  YES, YOUR HONOR.

10       THE COURT:  ALL RIGHT.

11       MR. KESSEL:  MAY I ADDRESS THE COURT ON A COUPLE

12   OTHER SENTENCING CONSIDERATIONS?

13       THE COURT:  YES.

14       MR. KESSEL:  THANK YOU, YOUR HONOR.

15           ONE, I WOULD ASK THE COURT TO RECOMMEND TO THE

16   BUREAU OF PRISONS DEFENDANT'S PARTICIPATION IN THE

17   500-HOUR R.D.A.P. PROGRAM, YOUR HONOR.  I THINK IT'S

18   APPROPRIATE, AND I THINK IT WOULD BE REHABILITATIVE, AND

19   IT DOVETAILS WITH SOME OF THE RECOMMENDATIONS ABOUT DRUG

20   USE.

21           TWO, YOUR HONOR, WE WOULD RECOMMEND -- FAMILY

22   HERE, IF THE COURT WOULD RECOMMEND A FACILITY IN SOUTHERN

23   CALIFORNIA.

24           AND, THREE, WE WOULD BE ASKING FOR A

25   SELF-SURRENDER, YOUR HONOR.  THE DEFENDANT HAS BEEN ON
```

1    HOME DETENTION FOR -- I BELIEVE IT'S COMING ON NINE MONTHS

2    NOW.  THERE HAS BEEN NO TRANSGRESSIONS.  HE'S COMPLIED

3    WITH EVERY CONDITION, YOUR HONOR; AND I WOULD ASK THAT HE

4    BE ALLOWED TO FURTHER THAT CONDITION AND BE GIVEN A

5    SURRENDER DATE, YOUR HONOR.

6           **THE COURT:**  ALL RIGHT.

7           MS. WILKINSON, DO YOU WISH TO BE HEARD ON ANY OF

8    THOSE?

9           **MS. WILKINSON:**  ON THE SELF-SURRENDER DATE, YES,

10   YOUR HONOR.  THE GOVERNMENT DOES MOVE FOR A REMAND IN THIS

11   CASE UNDER 3143, I THINK IT IS, (B).

12          THIS IS POST-SENTENCING, AND SO THE BURDEN HAS

13   SHIFTED, AND I THINK THAT IT WAS A CLOSE CALL.  THE

14   GOVERNMENT HAD MOVED FOR DETENTION BELOW, AND I THINK IT

15   WAS A CLOSE CALL THEN.  AND I THINK NOW THE BURDEN HAS

16   SHIFTED, AND THAT THERE ISN'T A SORT OF SECONDARY FINDING

17   THAT NEEDS TO BE MADE UNDER THAT SUBSECTION (B) THAT THERE

18   BE -- YOU KNOW, HE'S NOT GOING TO GET TIME IN CUSTODY,

19   THERE'S A GOOD ISSUE FOR APPEAL -- IN THIS CASE, I THINK

20   THAT REMAND IS APPROPRIATE.

21          **THE COURT:**  ALL RIGHT.

22          MR. KESSEL, DO YOU WANT TO BE HEARD FURTHER ON

23   THAT?

24          **MR. KESSEL:**  YOUR HONOR, HAVING HAD SELF-REMAND

25   IN MANY CASES, I KNOW IT'S DISCRETIONARY.  I KNOW THERE'S

```
 1   SOME STATUTORY GUIDANCE.

 2           BUT I WOULD NOTE TWO THINGS, YOUR HONOR, AND I

 3   DON'T KNOW IF THERE'S ISSUES ON APPEAL -- THERE'S ALWAYS

 4   ISSUES ON APPEAL.  THE QUESTION IS WHETHER THERE'S MERIT

 5   OR NOT.  THERE'S ISSUES THAT WE RAISED, I SHOULD SAY, IN

 6   OUR SENTENCING ON ADJUSTMENTS, AND WE RESPECT WHAT THE

 7   COURT FOUND AND GAVE FACTUAL BASIS.

 8           WHAT I'M CONCERNED WITH, YOUR HONOR, IS ALLOWING

 9   THE DEFENDANT, WHO HAS REMAINED OUT, TO SELF-SURRENDER

10   BECAUSE OF THE SITUATION WHERE THERE'S BEEN NO VIOLATIONS

11   OF HIS RELEASE.  A BENCH OFFICER DID ALLOW HIM TO BE

12   RELEASED PRETRIAL, YOUR HONOR, ON NOT ONLY HOME DETENTION,

13   HIS AUNT, WHO IS PRESENT, ALSO PROFFERED HER HOUSE AS

14   SECURITY, WHICH IS STILL IN PLACE, YOUR HONOR.  AND WE

15   WOULD BE ASKING FOR THOSE REASONS.

16           THERE IS NO CONCERN THAT I KNOW OF THAT HE'S

17   CONTACTED ANY OF THE VICTIMS, THAT HE HAS USED A COMPUTER

18   PER THE PRETRIAL RELEASE CONDITIONS, YOUR HONOR, AND WE

19   WOULD ASK FOR SELF-SURRENDER IN THIS CASE ON THOSE

20   REASONS, YOUR HONOR.

21           THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

22           WITH RESPECT TO YOUR REQUEST THAT THE BUREAU OF

23   PRISONS BE ASKED TO CONSIDER HIM FOR THE R.D.A.P. PROGRAM,

24   I WILL RECOMMEND TO THE BUREAU OF PRISONS THAT TO THE

25   EXTENT IT CONSIDERS IT APPROPRIATE, MR. KAZARYAN BE
```

```
1   CONSIDERED FOR ENROLLMENT IN THE R.D.A.P. PROGRAM.

2          WITH RESPECT TO THE RECOMMENDATION FOR LOCATION

3   OF CONFINEMENT --

4          YOU WANT ME TO RECOMMEND IN THE CALIFORNIA AREA

5   OR SOUTHERN CALIFORNIA AREA?

6       MR. KESSEL:  DOES YOUR HONOR EVER SUGGEST A

7   PARTICULAR INSTITUTION?

8       THE COURT:  I CAN, BUT IT'S UP TO THEM, BUT I

9   CERTAINLY CAN.

10      MR. KESSEL:  EITHER F.C.I. LOMPOC OR F.C.I.

11  TERMINAL ISLAND, OR IN THE ALTERNATIVE, A

12  SOUTHERN CALIFORNIA INSTITUTION.

13      THE COURT:  I WILL RECOMMEND TO THE BUREAU OF

14  PRISONS, TO THE EXTENT THEY FIND IT APPROPRIATE, THAT

15  MR. KAZARYAN BE CONSIDERED FOR DESIGNATION TO EITHER

16  LOMPOC OR TERMINAL ISLAND, OR FAILING WHICH, A FACILITY IN

17  THE SOUTHERN CALIFORNIA AREA IN ORDER TO FACILITATE FAMILY

18  VISITATION.

19      MR. KESSEL:  THANK YOU, YOUR HONOR.

20      THE COURT:  WITH RESPECT TO THE REQUEST FOR

21  SELF-SURRENDER, MR. KESSEL, AS YOU KNOW, UNDER 18 UNITED

22  STATES CODE, SECTION 3143(B), BECAUSE THIS IS NOW PENDING

23  APPEAL POST-SENTENCING, THE LAW REQUIRES ME TO REMAND

24  MR. KAZARYAN UNLESS CERTAIN THINGS ARE SHOWN.

25          AND THE FACTORS ARE THAT, ONE, YOU MUST SHOW ME
```

```
 1   BY CLEAR AND CONVINCING EVIDENCE THAT HE'S NOT LIKELY TO

 2   FLEE OR TO POSE A DANGER TO THE SAFETY OF ANOTHER PERSON

 3   OR TO THE COMMUNITY.

 4           I MIGHT BE ABLE TO FIND THAT IN THIS CASE BASED

 5   UPON SOME OF THE THINGS THAT YOU HAVE ARGUED THAT HE HAS

 6   COMPLIED WITH, PRETRIAL SUPERVISION AND SO FORTH, BUT

 7   THERE IS A CONJUNCTIVE REQUIREMENT, WHICH IS THAT IN

 8   ADDITION TO MAKING THAT SHOWING, YOU MUST ALSO MAKE THE

 9   SHOWING THAT THE APPEAL -- STRIKE THAT.

10           YOU MUST MAKE THAT SHOWING SO THAT I CAN MAKE

11   THAT FINDING, BUT YOU MUST MAKE A SHOWING SO THAT I CAN

12   MAKE A FINDING THAT THE APPEAL WOULD NOT BE FOR PURPOSES

13   OF DELAY AND WOULD RAISE A SUBSTANTIAL QUESTION OF LAW AND

14   FACT -- THAT'S NOT IT.  IT HAS TO GO FARTHER -- THAT IT

15   DOES NOT RAISE A SUBSTANTIAL QUESTION OF LAW AND FACT THAT

16   IS LIKELY TO RESULT IN REVERSAL.

17           THERE IS NO REVERSAL.  HE PLED GUILTY.

18           ORDER FOR NEW TRIAL.  HE PLED GUILTY.  THERE IS

19   NO ORDER FOR NEW TRIAL.

20           A SENTENCE DOES NOT INCLUDE A TERM OF

21   IMPRISONMENT.  THAT'S NOT GOING TO HAPPEN BECAUSE THERE'S

22   A MANDATORY MINIMUM SENTENCE OF AT LEAST 25 MONTHS, AND

23   YOU'VE EVEN SUGGESTED 30 MONTHS OR A REDUCED SENTENCE TO A

24   TERM OF IMPRISONMENT LESS THAN THE TOTAL TIME ALREADY

25   SERVED PLUS THE EXPECTED DURATION OF THE APPEAL PROCESS.
```

```
 1          HE HAS SERVED WHAT?

 2          MR. KESSEL:  TWO MONTHS, I BELIEVE, YOUR HONOR.

 3          THE COURT:  TWO MONTHS.  AND CERTAINLY THE

 4  APPEAL PROCESS I DO NOT THINK WILL TAKE 28 MONTHS OR EVEN

 5  22 MONTHS.

 6          SO BASED UPON MY READING OF 3143(B) AND THE

 7  REQUIREMENTS OF THE LAW IN THE MANDATORY LANGUAGE, BECAUSE

 8  THE LAW SAYS I SHALL DO THIS -- NOT THAT I HAVE DISCRETION

 9  OR I CAN CONSIDER IT, BUT I SHALL DO THIS, YOUR REQUEST

10  FOR SELF-SURRENDER IS DENIED.

11          MR. KAZARYAN IS NOW REMANDED TO THE CUSTODY OF

12  THE UNITED STATES MARSHAL.

13          MS. WILKINSON, ANYTHING FURTHER AT THIS TIME?

14          MS. WILKINSON:  NO, YOUR HONOR.  THANK YOU.

15          THE COURT:  MR. KESSEL, ANYTHING FURTHER AT THIS

16  TIME?

17          MR. KESSEL:  I'M SORRY, YOUR HONOR?

18          THE COURT:  ANYTHING FURTHER?

19          MR. KESSEL:  NO, YOUR HONOR.  THANK YOU FOR THE

20  COURT'S TIME.

21          THE COURT:  ALL RIGHT.

22          THE CLERK:  THIS COURT NOW STANDS IN RECESS.

23              (PROCEEDINGS CONCLUDED.)

24                  --OOO--

25
```

```
 1                          CERTIFICATE

 2

 3          I HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

 4   TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

 5   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

 6   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

 7   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

 8   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED

 9   STATES.

10

11   DATED THIS 7TH DAY OF FEBRUARY, 2014.

12

13                  /S/ MARY RIORDAN RICKEY
                    MARY RIORDAN RICKEY
14                  OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25
```