

**MEMO ENDORSED**

COLSON & HARRIS LLP

80 Broad Street
19th Floor
New York, NY 10004

T  212-257-6455
F  212-257-6453

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___4/10/2015___

SO ORDERED.

*[signature]* Valerie Caproni

HON. VALERIE CAPRONI
UNITED STATES DISTRICT JUDGE

Date: April 10, 2015

April 9, 2015

Via ECF

The Honorable Valerie E. Caproni
United States District Judge
United States District Court
Thurgood Marshall United States Courthouse
40 Foley Square
New York, N.Y. 10004

     Re:    *United States v. Marlen Rappa,* 14 Crim. 544

Dear Judge Caproni:

     I represent Marlen Rappa and write in anticipation of Mr. Rappa's sentencing, scheduled for April 13, 2015.

     As required by Your Honor's individual rules, I write to respectfully request permission to electronically file: (1) the enclosed, redacted letter in response to the government's letter dated April 6, 2015, and (2) the attached, redacted letter from Mr. Rappa's father, Leonard Rappa. The proposed redactions concern highly sensitive information relating to Mr. Rappa's mental health and the names of his minor children. An unredacted copy has been forwarded to chambers.

     I appreciate the Court's consideration.

                            Respectfully submitted,

                            /s/

                            Justine A. Harris

cc:   AUSA Daniel Noble

Enclosure

17115



80 Broad Street
19th Floor
New York, NY 10004

T  212-257-6455
F  212-257-6453

April 9, 2015

Via Electronic Mail and ECF

The Honorable Valerie Caproni
United States District Judge
United States District Court
40 Foley Square
New York, New York 10007

  Re: *United States v. Marlen Rappa,* 14 Crim. 544 (VEC)

Your Honor:

  I write respectfully to: (1) correct and respond to certain statements in the Government's April 6, 2015 submission, and (2) to provide the Court with the letter from Mr. Rappa's father, Leonard Rappa, received after the filing of my April 1, 2015 submission (attached).

  First, with respect to the government's arguments concerning application note 20(A)(ii) to U.S.S.G. § 2B1.1, certainly the Commission "expanded" the factors relevant to consideration of an upward departure for fraud offenses by making clear that an upward departure would be warranted in Section 1030 offenses when "death resulted." However, by simultaneously creating a separate enhancement for obtaining personal information and explicitly stating that the "more appropriate" way to punish the invasion of privacy involved in § 1030 offenses is by way of the enhancement, and not the discretionary departure provision, the Commission essentially narrowed how the departure provision would apply to § 1030 offenses. But whatever the Court ultimately concludes about its ability to depart upwards under this provision, it is our position that it *should not* do so, given the six point enhancement Mr. Rappa has already received despite the nonmonetary quality of the harm he inflicted.

  Second, the government's letter only highlights the fundamental similarities between Mr. Rappa's case and Mr. Sanchez's.

The Honorable Valerie Caproni
Page 2



There are also similarities between the two cases when considering the harm caused by the offense. While Mr. Rappa's and Mr. Sanchez's cases are not identical, Mr. Rappa obtained the same kind of information from the hacked computers as Mr. Sanchez did – personal photographs and webcam shots. While Mr. Rappa appears to have obtained more such data,[2] he did not obtain intimate or sexual images from all 90 computers infected. Still, in recognition of the greater quantity of material downloaded, Mr. Rappa is being treated more severely. Unlike Mr. Sanchez, he pled guilty to a felony, an enormous punishment in and of itself. A felony record is a lifelong stigma that prevents an individual from receiving certain Federal benefits, limits his or her ability to engage in civic duties such as voting, and significantly burdens the individual's ability to obtain employment. When applying to a job, applicants are not asked if they have served jail time, but whether they have been convicted of a felony; a survey of employers in five large U.S. cities found that 65% of prospective employers would not knowingly hire an ex-convict. *See A Stigma That Never Fades*, The Economist at 1-2 (2002), available at http://www.economist.com/node/1270755. Those who bear the label feel its weight, and even consider their status as felons "to be a scarlet letter, leaving them permanently marked or 'branded.'" Christopher Uggen, et al, *'Less Than The Average Citizen': Stigma, Role Transition and The Civic Reintegration of Convicted Felons* in Shadd Maruna and Russ Immarigeon, *After Crime and Punishment*: *Pathways to offender reintegration* at 280 (2004), available at http://www.socsci.umn.edu/~uggen/Uggen_Manza_Behrens_CH_04.pdf.

Importantly, it is worth emphasizing that the United States Attorney's Office itself believes that Mr. Rappa's case is different from Mr. Fedorek's. Unlike Mr. Fedorek, Mr. Rappa was permitted to plead to unauthorized access of a computer, 18 U.S.C. § 1030(a)(2)(c), as opposed to the felony "damage" provision, 18 U.S.C. § 1030(a)(5)(A), which carries a four point enhancement.  It is on this basis that the government obtained Mr. Rappa's plea, and it is neither right nor fair for the Government

---

[1] 

[2]Given the early disposition of Mr. Sanchez's case it is unclear how extensively that computer was searched.

The Honorable Valerie Caproni
Page 3

to now argue the "substantial similarity" between Mr. Fedorek's and Mr. Rappa's offenses, and suggest that the Court "could" upwardly depart.

       Contrary to the government's assertions, Mr. Rappa has repeatedly acknowledged that his crime is serious. As Mr. Rappa wrote in his letter to Your Honor:

> I am embarrassed, ashamed and feel terrible about it. I find it hard to put in words just how badly I feel.  Every day I regret my actions.  Every day is a struggle for me to deal with the pain that I feel inside for the people whose privacy I invaded and for putting my wife, children and family through all of this.

(Ex. A to the March 6, 2015 Sentencing Submission). He intends to echo these sentiments when he has the opportunity to speak to Your Honor in court. In fact, we acknowledged the "serious" nature of the offense no less than eight times in our sentencing submissions. (Opening Memo. at 2, 6, 14, 15; Supplemental at 5, 6, 7, 18).

       The reference to "otherwise serious offense" in the supplemental sentencing submission refers to a very specific legal argument based on the statutory language of 18 U.S.C. § 994(j). This statute makes clear that, in this context, Congress meant "otherwise serious" to relate to offenses involving bodily harm or cases that posed serious public safety threats. Indeed, the phrase that immediately follows "otherwise serious offense" reads "and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." *Id.* Indeed, along with the legislative history to the Sentencing Reform Act of 1984, this statute makes clear that Congress intended that "prison resources [would be], first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, §§ 217(a), 239, 98 Stat. 1987, 2039 (1984). Indeed, Congress intended that with the Guidelines, probation and intermediate sanctions would be used *more often* than they had been before the Guidelines, when about 38% of offenders were sentenced to probation. *See* S. Rep. No. 98-225, at 67, 172-76 & NN. 531-32 (1983).  *See also* U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing; An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 43 (2004).  Indeed, Congress believed that a term of imprisonment was *not* necessarily a more stringent sentence than a term of probation with restrictive conditions and a heavy fines. *See* S. Rep. No. 98-225, at 55.

       Unfortunately, the Commission "implemented that statutory directive by redefining 'serious offense' in a way that was entirely inconsistent with prior practice, and not at all based on any real data or analysis." *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007). Our country has paid a heavy price for the Commission's failure to heed the first offender directive. As Judge Gleeson and others have noted, federal prisons are 38% over capacity presenting safety problems for inmates and counselors alike, and the immense costs of incarceration are spiraling out of control. *See United States v. Leitch*, 11 Crim. 00609, 2013 WL 753445, *1 (E.D.N.Y. Feb. 28, 2013). Moreover, "[a]part from the fiscal cost of mass incarceration, but at least as important, is the human cost.  Lives are ruined, families are destroyed, and communities are weakened." *Id.* at *2.

The Honorable Valerie Caproni
Page 4

Here, the human and social cost of incarcerating Mr. Rappa would be high.  Not only does Mr. Rappa's condition risk deteriorating significantly in prison, but further isolation from his family and the community would only set him back, putting him in much the same circumstances, or worse, that he was in when he committed the offense. Now Mr. Rappa is rebuilding his life, ▮▮▮▮▮▮▮▮ and devoted to his children. He is attending job interviews and has gone regularly to church services.

Given this progress, we respectfully submit that the public would best be served were the Court to structure a punishment that would allow Mr. Rappa to continue his rehabilitation. Certainly such a sentence would avoid wreaking havoc on his wife and children, innocent third parties whose interests this Court should also take into account. As detailed in the pre-sentence report and in our prior submissions, Mr. Rappa's family is on the brink of insolvency. If he is incarcerated, childcare costs will increase substantially. Ms. Rappa will have to pay for "before care" to drop them off early at school and extend their aftercare hours. In addition, because she works through the summer, the family will have to pay approximately $3200 for summer day care. Given that the family's cashflow is already negative, *see*  PSR ¶98, these additional costs may force Ms. Rappa to declare bankruptcy and go into foreclosure.  Beyond the devastating economic impact however, is the emotional trauma that any prolonged period of incarceration would cause Mr. Rappa's children. But for the brief period of time that Mr. Rappa lived with his mother, he has essentially seen his children every day of their lives. He is a devoted and loving father, and, as the pictures attached to our first sentencing submission make clear, they depend on him and need him in their lives.

Finally, the government once again emphasizes the need for general deterrence. While we addressed this issue at length in our opening submission (pp. 16-17), it is important to emphasize that there is no empirical research to support the claim that the *length* of sentences, as opposed to arrest and prosecution, has any deterrent effect whatsoever. Gary Kleck at al, *The Missing Link in General Deterrence Research*, 43 Criminology 637, 644, 647, 650 (2005). Often "potential criminals . . . do not believe [that] they will be apprehended and convicted," and therefore they do not "consider sentence consequences in the manner one might expect of rational decision makers." Amy Baron-Evans, *Sentencing by the Statute,* 7-9 (Apr. 27, 2009, revised Dec. 21, 2010), available at http://www.fd.org/docs/select-topics---sentencing/Sentencing_by_the_Statute.pdf  (citing Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice; A Review of Research 28-29 (2006)). Although the "punishment-generating activities of the criminal justice system" may produce some "baseline deterrence effect," deterrence is not influenced by either an increase or a decrease in punishment levels. Gary Kleck at al, *The Missing Link in General Deterrence Research*, 43 Criminology 637, 644, 647, 650 (2005).

For all of these reasons, and the reasons stated in our previous sentencing submissions, we respectfully urge Your Honor impose a sentence at the bottom of the Guidelines range.

Respectfully submitted,

/s/

Justine A. Harris

The Honorable Valerie Caproni
Page 5


cc:   AUSA Daniel Noble

Enclosure

Case 1:14-cr-00544-VEC   Document 46   Filed 04/10/15   Page 6 of 9

**LAW OFFICES**
**LEONARD F. RAPPA**
**731 NORTH WOOD AVENUE**
**P.O. BOX 1430**
**LINDEN, NEW JERSEY 07036**

**PHONE:  (908) 925-6565**                    **FAX:  (908) 925-6591**

April 6, 2015

The Honorable Valerie Caproni
U.S. District Judge, Courtroom 443
Thurgood Marshall Courthouse
40 Foley Square
New York, NY

Re: Marlen Rappa

Dear Judge Caproni:

The duties of being an attorney often resulted in my neglecting my duties as a father to my son Marlen, during his formative years. When his mother and I separated and divorced, Marlen did not handle this well emotionally. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and is still suffering from the chronic effects of these emotionally traumatic events.

I do not say these things to excuse his computer hacking misconduct, but only to put this activity into the context of the traumatic events in Marlen's life that have resulted in ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ and likely contributed to the lack of proper judgment that resulted in his computer hacking misconduct.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ he has accomplished much of a positive nature in his life. He is married to a wonderful woman, and has two bright, active, loving children. These are my seven-year-old twin grandchildren, ▮▮▮▮▮▮▮▮▮▮. To experience Marlen with his children, and the love they share, has been one of my

greatest pleasures as a parent and a grandparent.

Marlen has been the principal caregiver for these children over the years, in order to allow his wife to pursue her career goals and obtain a Doctoral Degree in Education. He continues to be the principal caregiver for these wonderful children so that his wife can devote the time necessary to her professional duties as an Assistant Principal in the public school system.

The relationship Marlen has developed with his children is a joy to behold. They love him dearly and trust and rely on him for guidance and emotional support.

Moreover, these wonderful children are completely innocent. Their innocence is punctuated by the fact that they did not make, play any part in, or have anything to do with Marlen's computer hacking misconduct.

Marlen's misconduct certainly merits punishment, but the innocence of these children and of his wife cries out for avoiding damage to them by any punishment given to Marlen.

My grandchildren are seven years old, and at that age, children are emotionally vulnerable and ill-equipped to handle the emotional stigma and damage associated with the loss of a parent to incarceration.

Marlen is an integral part of the life of the family unit formed and created by him with his wife and children. His loss to this wonderful family through incarceration would be devastating to his innocent wife and children, emotionally and financially. The loss of Marlen to this family would result in the loss of their home, where these children have grown up since birth, and which is the only home they have ever known. Under these circumstances, the loss of their home would traumatize them and damage their emotional stability. They would be torn from their school, their teachers and friends, and from everything that has provided them with the sense of security so essential to them, and to children generally, during these early formative years. They would also be torn from their father, who they love and rely

on for guidance and ongoing emotional support.

Can there be any doubt that such events would unfairly traumatize these innocent children, and scar and damage them emotionally for the rest of their lives?

Yes, Marlen should have thought of all of these consequences before he engaged in the computer hacking which now places the emotional and financial well-being of his family at risk. But he didn't, and he is clearly culpable. But just as clearly, Marlen's wife and children are innocent of any wrong-doing, and do not deserve to suffer the permanent and irreparable emotional and financial damage that will result from any sentencing of Marlen that will remove him from their lives.

Under these circumstances, I ask that Your Honor consider and balance the need for punishment of Marlen with the permanent financial and emotional harm to Marlen's totally innocent wife and children. I ask for them, and for their future emotional and financial stability, that you sentence Marlen to any sentence that will not remove him from the wonderful family that he has helped create.

I respectfully submit that a sentence like that recommended in the Presentence Investigation Report, or any other sentence that will not remove him from his home and family, will serve the interests of justice, and, simultaneously, preserve the well-being of a totally innocent family that makes a positive social contribution to their community, to all of us who know and love them, and to society as a whole -- every single day.

Thank you for your understanding in this matter. I will be at the Sentencing Hearing, and would appreciate an opportunity to address the court personally at that time.

Respectfully submitted,


**Leonard F. Rappa, Esq**
